# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIPLA LTD. and CIPLA USA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-44 (LPS) |
| | ) | |
| AMGEN INC. and | ) | **JURY TRIAL DEMANDED** |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |
| AMGEN INC., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CIPLA LTD. and CIPLA USA, INC., | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

## AMGEN INC.'S PARTIAL ANSWER AND COUNTERCLAIMS TO
## CIPLA'S FIRST AMENDED COMPLAINT

Defendant Amgen Inc. ("Amgen"), hereby sets forth its partial answer, defenses to the First

Claim for Relief, and counterclaims to the First Amended Complaint ("FAC") filed herein by

Plaintiffs Cipla Ltd. and Cipla USA, Inc. (collectively, "Cipla") on February 25, 2019 (D.I. 73).

Each of the paragraphs below in Amgen's Partial Answer corresponds to the same-numbered

paragraphs in Cipla's FAC. In responding to the allegations below, Amgen (i) incorporates into

each such response a denial of each allegation in the FAC to the extent it asserts or suggests that

Plaintiffs are entitled to declaratory judgment with respect to the Amgen-Cipla Agreement; and

(ii) unless otherwise specifically admitted, denies any averments in the introductory paragraphs,

cover page, headings, subheadings, tables, and exhibits of the FAC generally, and the First Claim

for Relief specifically. To the extent that any part of the FAC incorporates by reference any other

parts of the FAC, Amgen incorporates herein its responses to those allegations. Unless otherwise specifically admitted, Amgen denies each and every allegation in the First Claim for Relief. Amgen expressly reserves the right to seek to amend and/or supplement its Partial Answer as may be necessary. Pursuant to the agreement of the parties and approval of the Court, Amgen's deadline to answer or otherwise respond to the Second through Fifth Claims for Relief in the FAC is deferred, and Amgen will move to dismiss the Second through Fifth Claims for Relief on the schedule ordered by the Court.[1]

## **NATURE OF THIS ACTION**

The "Nature of the Action" section of the FAC states legal conclusions to which no response is required. To the extent a response is required, Amgen admits that Amgen and Teva entered into an agreement dated January 2, 2019 (the "Amgen-Teva Agreement"). Amgen further admits that, on January 25, 2019, this Court ordered limited discovery on an expedited basis. Except as expressly admitted, Amgen denies the allegations of the "Nature of the Action" section of the FAC.

## **PARTIES AND JURISDICTION**

1. Amgen admits the allegations in Paragraph 1 of the FAC.

2. Amgen admits the allegations in Paragraph 2 of the FAC.

3. Amgen admits the allegations of Paragraph 3 of the FAC.

4. Amgen lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 4 of the FAC and on that basis denies the same.

5. Paragraph 5 states legal conclusions to which no response is required.

---

[1] *See Intel Corp. v. Future Link Sys. LLC*, No. 14-cv-377-LPS, 2016 WL 4162648, at *1 (D. Del. Aug. 2, 2016) (noting defendant's filing of partial answer and counterclaim). To the extent any allegation in the FAC is deemed to require a response at this time and is not responded to herein, it should be considered denied.

6.      Paragraph 6 states legal conclusions to which no response is required.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment with Respect to Amgen-Cipla Agreement)**

7.      Amgen incorporates by reference Paragraphs 1-6 of this Answer as if fully set forth herein in response to Plaintiffs' incorporation by reference of the same Paragraphs.

8.      Amgen admits the allegations of Paragraph 8 of the FAC.

9.      Amgen refers to the text of the Amgen-Cipla Agreement.  Amgen denies any remaining allegations of Paragraph 9 of the FAC.

10.     Amgen refers to the text of the Amgen-Cipla Agreement.  Amgen denies any remaining allegations of Paragraph 10 of the FAC.

11.     Amgen admits the allegations of Paragraph 11 of the FAC.

12.     Amgen denies the allegations of Paragraph 12 of the FAC.

13.     Amgen denies the allegations of Paragraph 13 of the FAC.

14.     Amgen admits that, by December 29, 2018, it was aware that Teva had launched a generic cinacalcet product.  Amgen further admits that it received the email attached as Exhibit 2 to the FAC on or about December 29, 2018.  Except as expressly admitted, Amgen denies the allegations of Paragraph 14 of the FAC.

15.     Amgen denies the allegations of Paragraph 15 of the FAC.

16.     Amgen admits that it did not file a motion for a temporary restraining order or preliminary injunction prohibiting Teva from continuing to sell its generic cinacalcet product. Amgen reached an agreement with Teva on January 2, 2019, pursuant to which Teva ceased sales of generic cinacalcet.  Except as expressly admitted, Amgen denies the allegations of Paragraph 16 of the FAC.

17.     Amgen admits the allegations of Paragraph 17 of the FAC.

18.     Amgen admits that Exhibit 4 appears on Amgen's website at https://www.amgen.com/media/featured-news/2019/01/amgen-announced-today-that-it-has-resolved-its-ongoing-dispute-with-teva/.   Amgen refers to the content of its website.  Except as expressly admitted, Amgen denies the allegations of Paragraph 18 of the FAC.

19.     Amgen refers to Exhibit 5 to the FAC for its contents.  Amgen lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 19 of the FAC, and on that basis denies the same.

20.     Amgen admits that the letter reproduced in Exhibit 6 is a letter from Joshua I. Rothman, Amgen's counsel, to Anil Patel, Cipla's counsel.  Amgen refers to the letter for its contents.  Except as expressly admitted, Amgen denies the allegations of Paragraph 20 of the FAC.

21.     Amgen denies the allegations of Paragraph 21 of the FAC.

22.     Amgen denies the allegations of Paragraph 22 of the FAC.

23.     Amgen denies the allegations of Paragraph 23 of the FAC.

24.     Amgen denies the allegations of Paragraph 24 of the FAC.

25.     Amgen refers to the Amgen-Cipla Agreement for its contents.  Amgen lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 25 of the FAC, and on that basis denies the same.

26.     Amgen refers to the Amgen-Teva Agreement for its contents.  Amgen denies any remaining allegations of Paragraph 26 of the FAC.

27.     Amgen denies the allegations of Paragraph 27 of the FAC.

28.     Amgen denies the allegations of Paragraph 28 of the FAC.

29.     Amgen denies the allegations of Paragraph 29 of the FAC.

30.     Amgen admits that, as of February 25, 2019, the court in the *Amneal* action had not issued the Consent Judgment agreed by Amgen and Teva.  Except as expressly admitted, Amgen denies the allegations of Paragraph 30 of the FAC.

31.     Amgen denies the allegations of Paragraph 31 of the FAC.

32.     Amgen denies the allegations of Paragraph 32 of the FAC.

33.     Amgen denies the allegations of Paragraph 33 of the FAC.

34.     Amgen denies the allegations of Paragraph 34 of the FAC.

35.     Amgen denies the allegations of Paragraph 35 of the FAC.

36.     Amgen refers to the Amgen-Cipla Agreement and the Amgen-Teva Agreement for their contents.  Amgen denies the remaining allegations of Paragraph 36 of the FAC.

37.     Amgen denies the allegations of Paragraph 37 of the FAC.

38.     Amgen denies the allegations of Paragraph 38 of the FAC.

39.     Amgen admits that the letter reproduced in Exhibit 6 is a letter from Joshua I. Rothman, Amgen's counsel, to Anil Patel, Cipla's counsel.  Amgen refers to the letter for its content.  Except as expressly admitted, Amgen denies the allegations of Paragraph 39 of the FAC.

40.     Paragraph 40 of the FAC states legal conclusions to which no response is required.

## SECOND CLAIM FOR RELIEF
### (Violation of 15 U.S.C. § 1)

41.     Amgen incorporates by reference Paragraphs 1–40 of this Answer as if fully set forth herein in response to Plaintiffs' incorporation by reference of the same Paragraphs**.**

42.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

43.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

44.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

45.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

46.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

47.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

48.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

49.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

50.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

51.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

52.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

53.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

54.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

55.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

56.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

57.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

58.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

59.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

60.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

61.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

62.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

63.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

64.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

65.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

66.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

67.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

68.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

69.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

70.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

71.     Count II of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

**THIRD CLAIM FOR RELIEF**
**(Violation of Cal. Bus. & Prof. Code § 16720)**

72.     Amgen incorporates by reference Paragraphs 1–71 of this Answer as if fully set forth herein in response to Plaintiffs' incorporation by reference of the same Paragraphs.

73.     Count III of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

74.     Count III of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

75.     Count III of the FAC is the subject of a forthcoming Motion to Dismiss. Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

## FOURTH CLAIM FOR RELIEF
### (Violation of Cal. Bus. & Prof. Code § 17200)

76.     Amgen incorporates by reference Paragraphs 1–75 of this Answer as if fully set forth herein in response to Plaintiffs' incorporation by reference of the same Paragraphs.

77.     Count IV of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

78.     Count IV of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

79.     Count IV of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

## FIFTH CLAIM FOR RELIEF
### (Fraud)

80.     Amgen incorporates by reference Paragraphs 1–79 of this Answer as if fully set forth herein in response to Plaintiffs' incorporation by reference of the same Paragraphs.

81.     Count V of the FAC is the subject of a forthcoming Motion to Dismiss.  Amgen will respond to this paragraph, if appropriate, after resolution of the Motion to Dismiss.

## CIPLA'S PRAYER FOR RELIEF

Amgen admits that Cipla seeks the relief described in the Prayer but denies that Cipla is entitled to that relief or any relief against Amgen.

## CIPLA'S JURY DEMAND

Cipla's statement in this Paragraph does not require admission or denial.

## AMGEN'S DEFENSES TO THE FIRST CAUSE OF ACTION

Amgen reserves the right to assert additional defenses or claims when and if they become appropriate and/or available in this action.  Amgen asserts the following defenses to the First Cause of Action, without assuming any burden of proof it would not otherwise bear:

1.      The First Cause of Action fails to state a claim upon which relief can be granted.

2.      The First Cause of Action is barred, in whole or in part, due to Cipla's failure to satisfy contractual requirements.

3.      Amgen lacked the requisite scienter required for liability.

4.      Cipla is not entitled to any recovery from Amgen because no act or omission of Amgen's was the cause in fact or the proximate causation of some or all of Cipla's alleged damages.

5.      Cipla's claims are barred by the equitable doctrines of equitable estoppel, judicial estoppel, waiver, and unclean hands.

6.      Cipla's claims fail because Amgen complied with all relevant statutory and contract obligations applicable during the time period at issue.

7.      To the extent Cipla suffered any legally cognizable injury, which Amgen denies, any damages or injury were caused by intervening or superseding events, factors, occurrences, conditions, acts or omissions of other entities and/or factors and not the alleged wrongful conduct on the part of Amgen.

## PRAYER FOR RELIEF

WHEREFORE, Amgen prays that this Court enter judgment in Amgen's favor as follows:

A.      Dismissing the First Amended Complaint in its entirety with prejudice and/or granting judgment in favor of Amgen on each of Cipla's causes of action with prejudice;

B.      Awarding Amgen its costs and expenses incurred in defense of Cipla's causes of action, including reasonable attorneys' fees as allowed by applicable law; and

C.      Granting such other and further relief as it deems just and proper.

## COUNTERCLAIM

Counterclaim-Plaintiff Amgen hereby sets forth its counterclaim against Plaintiffs and Counterclaim-Defendants Cipla Ltd. and Cipla USA, Inc. (collectively, "Cipla"), as follows:

## NATURE OF THE ACTION

1.  On March 5, 2018, Cipla settled patent infringement litigation with Amgen.  In that settlement agreement (the "Amgen-Cipla Agreement"), Cipla ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Cipla also ██████████████████████████████████████ The Entry Date has not yet occurred, yet Cipla has launched its generic cinacalcet product.  Cipla also has challenged the enforceability of the '405 patent.  Cipla therefore has breached the Amgen-Cipla Agreement.

2.  None of the provisions of the Amgen-Cipla Agreement ████████████████ ████████ have been implicated.  And while the Amgen-Cipla Agreement ████████████ ████████████████████████████████████████████████████████████ ████████████████ those circumstances are not present here.  No other entity has launched with an authorized generic cinacalet product, and no entity that has launched at risk ████████ ████████████████████████████████████████████████████████████ ████████████████

3.  Cipla's breach is of a voluntarily entered agreement that ██████████████ ████████████████████████████████████████████████ even though Cipla ████████████ ████████████████████████████████████████ Having agreed to the terms on which it ████████████████████████████████████████████████████, Cipla now ignores those terms in furtherance of its hope to beat other companies—including manufacturers that received a

favorable decision on the merits on their non-infringement defense in the district court and are now litigating that judgment on appeal—to the market.

4.        Cipla's cavalier defiance of its contractual obligations is unlawful.  Accordingly, Amgen brings this Counterclaim for damages and equitable relief to stop Cipla's ongoing breach.

## PARTIES AND JURISDICTION

5.        Counterclaim-Plaintiff Amgen, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320-1799.

6.        Counterclaim-Defendant Cipla Ltd. is a corporation organized and existing under the laws of India, having its principal place of business at Cipla House, Peninsula Business Park, Ganpatrao Kadam Marg, Lower Parel, Mumbai – 400013, Maharashtra, India.

7.        Counterclaim-Defendant Cipla USA, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 1560 Sawgrass Corporate Pkwy., Suite 130, Sunrise, FL 33323.

8.        This action arises under Delaware state law.

9.        This Court has subject matter jurisdiction to hear this action under 28 U.S.C. § 1331 and § 1367.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

10.        Amgen is the assignee of the '405 patent, which claims pharmaceutical compositions that include the active ingredient cinacalcet hydrochloride, along with inactive ingredients, for the treatment of various diseases, including hyperparathyroidism and hypercalcemia.  Cinacalcet hydrochloride is the active ingredient in SENSIPAR®, a medication marketed and sold by Amgen that is indicated for the treatment of secondary hyperparathyroidism

and hypercalcemia in certain patients. The FDA's official publication of approved drugs (the "Orange Book") lists the '405 patent in connection with SENSIPAR®.

11. Beginning in 2016, Cipla and other generic drug manufacturers (including Teva's subsidiary, Watson) filed Abbreviated New Drug Applications ("ANDAs") seeking approval to manufacture and sell generic cinacalcet hydrochloride products. Amgen sued each of those manufacturers for infringement of the '405 patent.

### A. Amgen Settles Its Infringement Claims With Cipla

12. Amgen sued Cipla on September 29, 2016, asserting that Cipla's proposed Generic Cinacalcet Product, if sold and marketed, would infringe the '405 patent.

13. On February 26, 2018, before any adjudication regarding infringement by Cipla's product, Cipla and Amgen entered into the Amgen-Cipla Agreement █████████████████████ █████████████████████████████████. Cipla e█████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████. As is typical in settlements of Hatch-Waxman litigation, the Amgen-Cipla Agreement ██████ █████████████████████████████████████████████████████ Notably, the Amgen-Cipla Agreement also ████████████████████████████████████████████ ██████████████████████████████████

14. Further, Cipla ████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ████████████████████████████ The parties also filed a Consent Judgment, signed and entered by the district court on March 5, 2018, in which Cipla ██████ admitted to the validity, enforceability, and infringement of the '405 patent, and further agreed to be enjoined from

importing, offering for sale, or selling its proposed Generic Cinacalcet Product "except to the extent specifically authorized in the Settlement Agreement."

15.     Over the course of 2018, Amgen continued settling infringement actions with other generic manufacturers.  Consistent with its obligations under the Amgen-Cipla Agreement, each time Amgen ███████████████████████████, it provided Cipla ███████████████ ███████

16.     On July 27, 2018, the District Court issued a ruling finding that the '405 patent was infringed by one defendant but was not infringed by three others—generic manufacturers Amneal Pharmaceuticals LLC, Piramal Healthcare UK Ltd., and Watson Laboratories, Inc. (a division of Teva, hereinafter referred to as "Teva").  *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 399 (D. Del. 2018) (finding Amgen's patent infringed by one defendant, Zydus Pharmaceuticals, but not infringed by Teva, among others).  Because Amgen appealed that judgment, the judgment ████████████████████████████████████████████████████████

**B.     Teva Launches At Risk, Settles With Amgen, And Ceases Selling**

17.     On December 27, 2018, the FDA granted final approval of Teva's Abbreviated New Drug Application ("ANDA") for a Generic Cinacalcet Product.  On December 28, 2018, with no notice to Amgen, Teva, ████████████████████████████, began selling its Generic Cinacalcet Product without Amgen's authorization.   Because Teva ███████ ████████████████████████████████████████████████████ Teva's launch ███████████████████ ████████████████████████████

18.     Five days later, on January 2, 2019, Amgen and Teva entered into a Litigation Settlement Agreement resolving Amgen's still-pending infringement claims against Teva (the "Amgen-Teva Agreement") and requiring Teva and its Affiliates to cease selling Teva's product

immediately.  Pursuant to that agreement, Teva ████████████████████ just as Cipla had

nearly one year prior, that ████████████████████████████████████████████████

██████████████████████████████████████████████.

19.    Teva also ████████████████████████████████████████████████

████████████████ Teva's ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████. Amgen and Teva each announced the

settlement publicly.

### C.    Cipla Launches Despite Its Contractual Obligations

20.    On January 2, 2019, the same day Teva agreed ████████████████████

██████████████████ Amgen sent a letter to Cipla notifying it of Teva's launch.  Amgen

further notified Cipla that, ██████████████████████████████████████, Teva

had agreed to cease selling its Generic Cinacalcet Product ████████████████████

██████████████████████████.

21.    On January 8, 2019, Cipla filed suit, seeking a declaratory judgment that it is now

licensed to sell its Generic Cinacalcet Product under the Amgen-Cipla Agreement, allegedly due

to Teva's December 28 launch, and asserting antitrust violations under federal and California law

based on Amgen's settlement with Teva.

22.    On March 2, 2019, Cipla sent a letter to Amgen to "give[] notice of its intent to

commence selling, immediately" its generic cinacalcet product.  Cipla March 2 Letter (D.I. 103-

1, Exhibit C).

23.    Public evidence indicates that Cipla began sales on March 6, 2019.

**COUNT I – BREACH OF CONTRACT**

**(Launch of Generic Cinacalcet Hydrochloride)**

24.     Amgen repeats and re-alleges each and every averment set forth in paragraphs 1 through 23 as if fully set forth herein.

25.     Cipla ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

26.     █████████████████████████████████████████████████████████
████████████

27.     █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ Amgen-Cipla Agreement █████ (emphasis added).

28.     The ████████████████████████████ has not yet occurred.

29.     The ██████████████████████████ also has not yet occurred. █████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████ of the Amgen-Cipla Agreement, has found any claims of the '405 patent invalid or unenforceable.

30.     The ██████████████████████████ also has not occurred.  By █████████
████████████████████████████████████████████████████████████
████████████ under the Amgen-Cipla Agreement.  As set forth above, Teva's launch ███████████
██████████████████████████

31. Specifically, ███████████████████████████████████████████

████████████ Teva's December 28, 2018, sale of its generic cinacalcet product ████████████

████████████████████████████████████████████████, and the product it sold ████

███████████████████████████████████████████████████████████████████████

Amgen did not ████████████████████████████████████████, and there has been no

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████, including the district court's

finding of infringement in *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373 (D. Del. 2018).

32. Because Teva's ████████████████████████ on December 28, 2018,

████████████████████████████████████████████████████████████, Teva's ████

███████████████████████████████████████

33. Moreover, Teva's Launch ████████████████████████████████████

████████████████████ that would ████████████████████████████████████████

█████████████████████████████████████████████████████████████████████ In

relevant part, ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

if several conditions are satisfied. Among other conditions not relevant here, ████████████

██████████████████████ that have not been satisfied.

34. ***First***, ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

35.     Cipla sent Amgen a notice letter of a generic launch on December 27, 2018.  Teva informed Amgen of its ████████████ on December 28, 2018.

36.     Amgen entered into the Amgen-Teva Agreement with Teva on January 2, 2019. That agreement required Teva to cease and desist from the sale of its Generic Cinacalcet Product immediately.

37.     In particular, █████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

38.     In fact, neither Teva nor any of its affiliates has sold or otherwise transferred any of its product since, at the latest, January 2, 2019—five days after Teva launched, and therefore █████████████████████████████████████████

39.     **Second**, ████████████████████████████████████████ ██████████████████████████████████████████████



40.     On January 2, 2019, Amgen notified Cipla that Teva ██████████████ ████████████████████ and that Teva actually had ceased selling its product or would do so immediately.  As a result, Cipla ████████████████████████████ ██████████████████████████████████████████████████████ ████████████ Accordingly, Cipla's at-risk sales are in breach of the Amgen-Cipla Agreement and remain subject to a temporary restraining order or preliminary injunction.

41.     *Third*, in the event Cipla ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████

42.     Teva ceased its sales no later than January 2, 2019.  Thus, in addition to the other contractual provisions barring Cipla's launch, Cipla ████████████████████████ because Teva's sales have ceased.  Accordingly, Cipla's at-risk sales are in breach of the Amgen-Cipla Agreement and remain subject to a temporary restraining order and preliminary injunction.

43.     Each unauthorized sale of Cipla's Generic Cinacalcet Product has proximately caused, and continues to cause, harm to Amgen by reducing both the number of units and the price per unit of SENSIPAR® that Amgen is able to sell.

44.     Absent prompt injunctive relief, Cipla's continued unauthorized sale of its Generic Cinacalcet Product inevitably will lead to irreparable harms including, but not limited to, price erosion, loss of goodwill, reputational harm, and loss of business opportunities.  Accordingly,

Amgen has no adequate remedy at law for Cipla's continued breach of the Amgen-Cipla Agreement.

45. Cipla's sustained launch will likely cause Amgen to incur irreversible price erosion and long-term loss of market share, both of which are irreparable injuries. Unless enjoined, Cipla undoubtedly will place a flood of products into the distribution channels. Manufacturers of other generic competitors will also be incentivized to enter the market if Cipla's at-risk launch is not enjoined. The impact to Amgen of this market competition is likely to be immediate and devastating. Typically, entry of a generic product results in immediate loss of 40% of a brand's market share, with additional losses of more than 90% upon entry of additional generics. Hausman Decl. ¶ 22. Amgen can expect a loss of approximately 40–70% market share in the first month of entry, and up to a 90–95% loss of market share within the first six months, particularly if other generics follow Cipla in entering at risk. *Id.*; Georghiou Decl. ¶ 14. Moreover, these losses are also likely to persist over the long term because market changes to insurance coverage, reimbursement, and formulary status, as well as price erosion, are deeply engrained and almost impossible to undo.

46. Amgen is likely to suffer significant irreparable harm in the event of a sustained Cipla launch that will only increase with the length of time that Cipla's products are on the market, particularly if other generics follow suit.

47. Cipla's sustained launch also will cause Amgen to suffer significant injury to its goodwill, relationships, and product development pipeline, which injury cannot be readily measured, let alone redressed by money damages. In particular, the entry of Cipla or another generic weakens the perceived connection between Amgen and SENSIPAR®, a breakthrough drug that has treated over one million patients in the United States and more than three million

patients worldwide.  A sustained generic launch also ██████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████.  Moreover, the significantly reduced revenue from SENSIPAR® sales

will harm Amgen's efforts to fuel innovation and develop new drug products, which it funds by

reinvesting approximately 16–22% of its revenue back into research and development.

48.      Amgen stands ready, willing, and able to perform the Amgen-Cipla Agreement and

has fulfilled all of its duties thereunder to date.

<center>**COUNT II – BREACH OF CONTRACT**
**(Agreement Not To Challenge Enforceability of the '405 Patent)**</center>

49.      Amgen repeats and re-alleges each and every averment set forth in paragraphs 1

through 48 as if fully set forth herein.

50.      Cipla ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████ Cipla also ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

51.      ██████████████████████████████ Cipla filed suit against Amgen on

January 8, 2019, and filed an amended complaint on February 25, 2019, alleging, *inter alia*, that it

is entitled to sell its Generic Cinacalcet Product in the United States, and seeking relief in

connection with such sales by both challenging the enforceability of the '405 patent affirmatively

and raising the issue of the '405 patent's enforceability defensively or as a bar to Amgen's enforcement of or recovery of damages under the Amgen-Cipla Agreement. Cipla has repeatedly challenged the enforceability of the '405 patent in its filings in this litigation, including in its Complaint (D.I. 2); its Motion for a Conference with the Court and Limited Expedited Discovery (D.I. 8); its First Amended Complaint (D.I. 73); and its Opening Brief in Support of Motion for Preliminary Declaratory Relief (D.I. 74).

52. By challenging the enforceability of the '405 patent, Cipla has breached and continues to breach ███████████████████ the Amgen-Cipla Agreement.

53. Cipla's breach of the Amgen-Cipla Agreement by challenging the enforceability of the '405 patent has proximately caused, and continues to cause, financial and other harm to Amgen.

54. Amgen has no adequate remedy at law for Cipla's continued breach of the Amgen-Cipla Agreement.

55. Amgen stands ready, willing, and able to perform the Amgen-Cipla Agreement and has fulfilled all of its duties thereunder to date.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Amgen respectfully requests that this Court enter an Order granting Amgen the following relief:

A. Declaring that Cipla has breached the Amgen-Cipla Agreement;

B. Entering judgment on Cipla's claims in favor of Amgen as a result of Cipla's breaches of the Amgen-Cipla Agreement;

C. Issuing preliminary and permanent injunctions against Cipla breaching the Amgen-Cipla Agreement;

D. Ordering Cipla to specifically perform its obligations under the Amgen-Cipla Agreement;

E.    Awarding Amgen compensatory damages that flow from Cipla's breaches of the Amgen-Cipla Agreement in an amount to be determined at trial;

F.    Awarding Amgen treble damages as provided by law;

G.    Awarding Amgen punitive damages as provided by law;

H.    Awarding Amgen its reasonable attorneys' fees incurred in prosecuting this action;

I.    Awarding Amgen pre-judgment interest and costs; and

J.    Awarding Amgen such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Amgen demands a trial by jury on all issues so triable in its Counterclaim.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201-6912
(214) 571-2900

Jeffrey T. Thomas
Eric J. Stock
Kate Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

March 11, 2019

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 11, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire          *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
Farnan LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire         *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004
*Attorneys for Plaintiffs*

*/s/ Brian P. Egan*
_____
Brian P. Egan (#6227)

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIPLA LTD. and CIPLA USA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-44 (LPS) |
| | ) | |
| AMGEN INC. and | ) | **FILED UNDER SEAL** |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| AMGEN INC., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CIPLA LTD. and CIPLA USA, INC., | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

**AMGEN INC.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
(214) 571-2900

Jeffrey T. Thomas
Eric J. Stock
Kate Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

March 11, 2019

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

ARGUMENT ...................................................................................................... 6

I.    Amgen Is Likely To Succeed on the Merits of Its Counterclaim for Breach
of Contract ...............................................................................................6

    A.   Cipla's sales are in breach of its settlement agreement .............................7

        1.   Cipla's sales are not currently licensed................................................7

        2.   Cipla is also not currently permitted to sell at risk ............................. 8

        3.   Cipla's arguments that it is free to sell its product are meritless ...................... 11

    B.   Cipla breached its agreement not to challenge enforceability.................................. 15

II.   Amgen Will Suffer Irreparable Injury Without an Injunction ...........................................15

    A.   Amgen will suffer irreversible price erosion and long-term loss of
market share ...................................................................................... 17

    B.   Amgen will suffer harm to its goodwill and other non-quantifiable
harm.................................................................................................. 20

III.  The Balance of Equities Clearly Favors Amgen.................................................................21

IV.  The Public Interest Will Be Served by Issuance of a Preliminary
Injunction .....................................................................................................23

CONCLUSION.................................................................................................... 25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)...............................................................................15, 17, 23

*Allergan Sales LLC v. Sandoz, Inc.*,
    2018 WL 3675235 (D.N.J. July 13, 2018).....................................................................16, 17

*Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*,
    963 A.2d 746 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009)...........................................14

*Amgen Inc. v. Amneal Pharm. LLC*,
    328 F. Supp. 3d 373 (D. Del. 2018)..........................................................................................5

*Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*,
    513 F. Supp. 2d 304 (E.D. Pa. 2007) .......................................................................................6

*Darius Int'l, Inc. v. Young*,
    2006 WL 1071655 (E.D. Pa. Apr. 20, 2006) ...........................................................................6

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013)..............................................................................................16

*Eli Lilly & Co. v. Teva Pharm. USA, Inc.*,
    609 F. Supp. 2d 786 (S.D. Ind. 2009) ....................................................................................17

*ESG Holdings, LLC v. Lear Corp.*,
    2017 WL 3485816 (D. Del. Aug. 14, 2017) ..........................................................................12

*Fresenius Kabi USA, LLC v. Fera Pharm., LLC*,
    2016 WL 5348866 (D.N.J. Sept. 23, 2016) ...........................................................................16

*GRT, Inc. v. Marathon GTF Tech., Ltd.*,
    2012 WL 2356489 (Del. Ch. June 21, 2012)........................................................................12

*Henkel Corp. v. Coral, Inc.*,
    754 F. Supp. 1280 (N.D. Ill. 1991), *aff'd*, 945 F.2d 416 (Fed. Cir. 1991)..............................17

*Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*,
    630 F. Supp. 2d 527 (E.D. Pa. 2009) .......................................................................................6

*Impax Labs. v. Aventis Pharm.*,
    235 F. Supp. 2d 390 (D. Del. 2002).......................................................................................24

*In re Wellbutrin XL Antitrust Litig.*,
133 F. Supp. 3d 734 (E.D. Pa. 2015) ........................................................................24

*Kos Pharm., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004).............................................................................6, 21

*Micro Focus (US), Inc. v. Ins. Servs. Office, Inc.*,
125 F. Supp. 3d 497 (D. Del. 2015)...........................................................................7

*Ortho McNeil Pharm., Inc. v. Barr Labs., Inc.*,
2009 WL 2182665 (D.N.J. July 22, 2009).............................................................23

*Payless Shoesource, Inc. v. Reebok Int'l Ltd.*,
998 F.2d 985 (Fed. Cir. 1993).................................................................................24

*Penn. Prof'l Liab. Joint Underwriting Ass'n v. Wolf*,
328 F. Supp. 3d 400 (M.D. Pa. 2018) ..................................................................6, 7

*Pfizer, Inc. v. Teva Pharm. USA, Inc*.,
429 F.3d 1364 (Fed. Cir. 2005)...................................................................21, 23, 24

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
117 F. Supp. 3d 613 (D. Del. 2015)...........................................................................7

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
98 F. Supp. 2d 362 (S.D.N.Y. 2000)........................................................................17

*Ranbaxy Labs. Ltd. v. Abbott Labs.*,
2005 WL 3050608 (N.D. Ill. Nov. 10, 2005) .........................................................21

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017).....................................................................................21

*Research Found. of State Univ. of N.Y. v. Mylan Pharm., Inc.*,
723 F. Supp. 2d 638 (D. Del. 2010)...........................................................20, 22, 23

*Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.*,
836 F. Supp. 1247 (W.D. Va. 1993) .......................................................................21

*Sanofi-Synthelabo v. Apotex*,
470 F.3d 1368 (Fed. Cir. 2006).........................................................................17, 23

*Smith Int'l, Inc. v. Hughes Tools Co.*,
718 F.2d 1573 (Fed. Cir. 1983)................................................................................23

**Other Authorities**

John LaMattina, *Pharma R&D Investments Moderating, But Still High*,
    Forbes.com (June 12, 2018, 7:58 AM),
    https://www.forbes.com/sites/johnlamattina/2018/06/12/pharma-rd-
    investments-moderating-but-still-high/.....................................................................21

## NATURE AND STAGE OF THE PROCEEDINGS

On March 2, 2019, Cipla announced its intention to commence unauthorized sales of Cipla's generic cinacalcet product, which Cipla has admitted infringes Amgen's valid and enforceable patent. Shortly thereafter, Cipla began those sales, in flagrant breach of its Litigation Settlement Agreement with Amgen (the "Amgen-Cipla Agreement"). Cipla's sales must be halted promptly to avoid continued irreparable harm to Amgen. Amgen is entitled to this relief because all of the factors the Court must consider in deciding whether to grant a preliminary injunction weigh in Amgen's favor: Amgen will likely succeed on the merits of its breach of contract counterclaim; Amgen will suffer irreparable harm in the absence of an injunction; the harm Amgen will suffer unless Cipla is enjoined outweighs any harm Cipla might suffer if it is enjoined only preliminarily; and the public interest favors protecting Amgen's patent rights. Thus, Amgen has moved for a preliminary injunction stopping Cipla's sales. The Court has set an April 2, 2019 hearing on this motion.

## SUMMARY OF ARGUMENT

Amgen is likely to succeed on the merits of its breach of contract counterclaim because the terms of the Amgen-Cipla Agreement unambiguously preclude Cipla from entering the market at this time. Cipla covenanted ███████████████████████████████ ████████████████████████████ ████████████████████ yet Cipla entered the market anyway. And although a provision of the agreement ████████████ ████████████████████████████████████████ ██████████████████████, those circumstances are not present here. Thus, Cipla is clearly in breach.

Absent a preliminary injunction, Cipla's unchecked sales will almost certainly set off a rapid domino effect of other generic entries, causing irreversible price erosion and decimating

Amgen's market share in a way that is unrecoverable, both of which have been recognized by the Federal Circuit (and this Court) to constitute irreparable harm. In addition, Cipla's entry robs Amgen of its status as the exclusive maker of cinacalcet hydrochloride products, and inflicts injuries to its goodwill, relationships, and product development pipeline—all of which are intangibles that cannot be compensated by money damages or rehabilitated by an injunction at the end of this case. This harm far outweighs any harm Cipla would experience from being enjoined from launching one of multiple competing generic products. Moreover, the public interest favors the protection of patent rights, particularly in the pharmaceutical industry where the innovation of patentees is necessary for the invention of lifesaving drugs.

This Court should hold Cipla to the terms of its agreement by granting a preliminary injunction precluding Cipla's illegal sales.[1]

## STATEMENT OF FACTS

Amgen is the assignee of the '405 patent, which claims pharmaceutical compositions that include the active ingredient cinacalcet hydrochloride (along with inactive ingredients), for the treatment of various diseases, including hyperparathyroidism and hypercalcemia. Cinacalcet hydrochloride is the active ingredient in SENSIPAR®, a medication marketed and sold by Amgen that is indicated for the treatment of secondary hyperparathyroidism and hypercalcemia in certain patients. The FDA's official publication of approved drugs (the "Orange Book") lists the '405 patent in connection with SENSIPAR®. Beginning in 2016, Cipla and other manufacturers (including Teva's subsidiary, Watson) filed Abbreviated New Drug Applications ("ANDAs") through which they sought approval to manufacture and sell generic cinacalcet

---

[1] Although Amgen indicated at the March 8 hearing that it intended to file a motion for temporary restraining order as well, in light of the prompt hearing date on the motion for preliminary injunction and Cipla's statements that its launch will be limited because it is at risk, Amgen has elected only to file a motion for preliminary injunction at this time.

hydrochloride products.  Amgen sued each of those manufacturers for infringement of the '405 patent.

Amgen sued Cipla on September 29, 2016, asserting that Cipla's proposed generic cinacalcet product would infringe the '405 patent.  On February 23, 2017, that lawsuit, captioned C.A. No. 16-880-MSG, was consolidated into C.A. No. 16-853-MSG with Amgen's other lawsuits concerning other generic filers.   On February 26, 2018—before any adjudication regarding infringement by Cipla's product——Amgen entered into the Amgen-Cipla Agreement disposing of all claims between the parties in the 16-880 and 16-853 cases.

As part of the agreement, Cipla conceded that, among other things, the ██████████ ████████████████████████████████████████████████████████████ ████████████████████     ████████████████████████████████   In addition, Cipla agreed ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████     ████████████   The parties filed a consent judgment, entered by the district court on March 5, 2018, in which Cipla ██████ admitted to the validity, enforceability, and infringement of the '405 patent, and further agreed to be enjoined from selling its generic cinacalcet product "[e]xcept to the extent specifically authorized in the Settlement Agreement."  *See* Consent Judgment (D.I. 320 in C.A. No. 16-853) at 3.

As is typical in settlements of Hatch-Waxman litigation, the Amgen-Cipla Agreement included ██████████████████████████████████████████████████ and Cipla covenanted ████████████████████████████████████     ████████████

Although ████████████████████████████

After Cipla entered into its settlement agreement, on July 27, 2018, the District Court issued a ruling with respect to infringement by the non-settling defendants in the 16-853 case. That decision found that Amgen's patent was infringed by one defendant, Zydus Pharmaceuticals, but was not infringed by Teva (for which only infringement under the doctrine of equivalents was at issue), among others. *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 387, 399 (D. Del. 2018). Because Amgen appealed the non-infringement judgment, ▮

On December 28, 2018, with no notice to Amgen, Teva began selling its generic cinacalcet hydrochloride product, without authorization. On January 2, 2019, Amgen and Teva entered into an agreement stopping Teva's sales and resolving Amgen's still-pending infringement claims against Teva. Pursuant to the agreement, Teva agreed to cease selling its generic product immediately ▮ Amgen and Teva each publicly announced that a settlement had been reached. Amgen Webpage (D.I. 73-1, Exhibit 4); Teva News Release (D.I. 73-1, Exhibit 5).

On January 8, 2019, Cipla filed this suit, seeking a declaratory judgment that it is now licensed to sell its generic cinacalcet product under the Amgen-Cipla Agreement, allegedly due to Teva's December 28 launch, and asserting patent misuse and antitrust violations under federal and California law based on Amgen's settlement with Teva. On February 25, 2019, Cipla filed an amended complaint (the "FAC"), adding a claim for fraud and impleading Teva as an

additional named defendant.  FAC (D.I. 73).  On March 2, 2019, Cipla asserted its intent to begin selling its generic cinacalcet product, in breach of its settlement agreement, and public evidence indicates that Cipla began sales on March 6, 2019.  Cipla's March 6 Letter (D.I. 111, Exhibit 1). Amgen now moves to enjoin Cipla's sales of its generic cinacalcet product.

## ARGUMENT

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  Preliminary injunctions may be awarded on claims for breach of contract.  *See, e.g.*, *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 313–14 (E.D. Pa. 2007); *Darius Int'l, Inc. v. Young*, 2006 WL 1071655, at *20–21 (E.D. Pa. Apr. 20, 2006).  When a preliminary injunction is sought on a breach of contract claim, irreparable injury may be found "(1) where the subject matter of the contract is of such a special nature [or] of peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable."  *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 540 (E.D. Pa. 2009) (citation omitted).

## I.  Amgen Is Likely To Succeed on the Merits of Its Counterclaim for Breach of Contract

"To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action."  *Penn. Prof'l Liab. Joint Underwriting Ass'n v. Wolf*, 328 F. Supp. 3d 400, 407 (M.D. Pa. 2018).  "A mere possibility that the claim might be defeated does not preclude a finding of probable success if

evidence clearly satisfies the essential prerequisites of the cause of action." *Id.* Under Delaware law, the elements of a breach of contract are "(1) the existence of a contract; (2) breach of an obligation imposed by the contract; and (3) resulting damage to the plaintiff." *Micro Focus (US), Inc. v. Ins. Servs. Office, Inc.*, 125 F. Supp. 3d 497, 500 (D. Del. 2015). "[S]tandard rules of contract interpretation" require a court to "determine the intent of the parties from the contract language." *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015). "Where the contract contains no ambiguity, 'the Court interprets the contract based on the plain meaning of the language on the face of the contract.'" *Id.* (citation omitted).

### A. Cipla's sales are in breach of its settlement agreement

#### 1. Cipla's sales are not currently licensed

Cipla's sales of its generic product are in breach of the unambiguous terms of the Amgen-Cipla Agreement. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ ████████

██████████████████████████████████

Cipla was thus required to █████████████████████████████████████

███████████████████████████████████████ There is no dispute that █████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Amgen-Cipla Agreement (D.I. 73-1 Exhibit 1) § 5.2 (emphasis added).[2]  Cipla contends that

Teva's December 28, 2018 launch █████████████████████████████████████████████

███  ██████████████████████████ Cipla's erroneous contention relies on a blatant

misreading of its own agreement.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████

Teva's December 28 launch ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ And although Teva secured a district court

judgment of non-infringement, ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████ Thus, Teva's launch ██████████████████████████████

████████████████████████████████████████████

### 2.  Cipla is also not currently permitted to sell at risk

As discussed above, █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████,

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

The narrow circumstances under which Cipla could escape the threat of preliminary injunction are not present here. ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ ████████████████████████████ On January 2, 2019 ████████████████████████████ Amgen entered into an agreement with Teva requiring Teva to cease its sales immediately, ██████████████████████ ██████████████ █████████████████████████████████ Ragan Decl. ¶¶ 6–7.[4]

Cipla's erroneous contention that the Amgen-Teva Agreement does not require Teva to ██████████████ its sales of its generic product is without merit and is directly contradicted by the express terms of the Amgen-Teva Agreement. ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ ████████████████████ ████████████

---

[3] Cipla has argued that it is *licensed* █████████████████████████████ ████████████████████████████████████ █ ████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████

[4] The Declaration of Colman B. Ragan is submitted herewith.

[redacted]

[redacted] [redacted]

[5] Although the Court indicated at the March 8 status conference that Judge Goldberg intends to deny Amgen's and Teva's motion for an indicative ruling—a prerequisite to the entry of the consent judgment [redacted] *see* Joint Motion for an Indicative Ruling (D.I. 412 in C.A. No. 16-853)—that does not change the analysis here. Regardless of when, if ever, the consent judgment is ultimately entered, [redacted]

███████Pursuant to its agreement with Amgen, Teva ceased its sales no later than January 2, 2019.  Ragan Decl. ¶ 7.  Thus, even if Cipla were correct that the Amgen-Teva Agreement were ████████████████████████████████████████████████████████████████ ██████████████████████

Cipla's sales are therefore in breach of the Amgen-Cipla Agreement and remain subject to Amgen's motion for a preliminary injunction.

### 3.  Cipla's arguments that it is free to sell its product are meritless

In its filings in this matter, Cipla has made a series of additional arguments to support its contention that Teva's launch somehow permits Cipla to launch without legal restraint.  Those arguments are all meritless and should be rejected.

*First*, Cipla has argued that███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████ ███████████████████████████████████████████████ █████████████████ ████████████ █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████ █████████████████████ █████████████████████ ████████████████████████████████████████████████████████████████ █████████

*Second*, Cipla argues that ████████████████████████████████████

████████████████████████████████████████████████████████ Cipla Br.

(D.I. 74) at 9. ████████████████████████████████ "courts will not rewrite

contracts to read in terms that a sophisticated party could have, but did not, obtain at the

bargaining table." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *6 (Del. Ch.

June 21, 2012); *see also ESG Holdings, LLC v. Lear Corp.*, 2017 WL 3485816, at *4 (D. Del.

Aug. 14, 2017) ("It is not the Court's role to relieve a sophisticated party of its voluntarily-

undertaken, unambiguous contractual obligation.").

Moreover, the drafting history of the Amgen-Cipla Agreement demonstrates that Cipla

████████████████████████████████████████████████████████

████████████████████████████████████████ ████████████████

████████████████████████████████████████████

████████████████████████████████████ In a draft version of the agreement,

████████████████████████████████████████████████████████

████████████████████████████████████████████ Declaration

of Joshua I. Rothman ("Rothman Decl."), Exhibit A at 17.[6] On February 22, 2018, Cipla sent

Amgen a revision to the draft agreement, ██████████████████████████

████████████████████████████████████████████████████████

████████████████████ *Id.* In light of this history, ██████████████████

████████████████████████████████████████████████████████

████████████████████████

---

[6] The draft version of the Amgen-Cipla Agreement is attached as Exhibit A to the Declaration of Joshua I. Rothman submitted herewith.

*Third*, Cipla has made the unsupported allegation that ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Cipla Br.

(D.I. 74) at 4.  In fact, however, the Amgen-Teva Agreement ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ ████████ █████ And, in fact, neither Teva nor its affiliates have put any generic cinacalcet products into the market since at least January 2, 2019.

Ragan Decl. ¶ 7.

*Fourth*, as an alternative to Cipla's faulty argument that it is licensed █████████████ ████████████████████████ Cipla has argued that it is licensed to launch now because of the provision ████████████████████████████████████████████ ████████████████████████████████ ████████████████████████ Amgen did not grant Teva an entry date of December 28, 2018—█████████████████████████

---

[7]  The Amgen-Teva Agreement ████████████████████████████████ ████████████████████████████████ ████████████ █████████████████████████ ████████ ██████████████████████████████████████████████ ██████ ██ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████ ███████████

███████████████████████████ ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  These provisions were vigorously negotiated by sophisticated parties

and their counsel, and "courts will not alter the terms of a bargain sophisticated parties entered

into willingly because a party now regrets the deal."  *Alliance Data Sys. Corp. v. Blackstone*

*Capital Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009).

*Fifth*, Cipla argues that Amgen is ████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ ██████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

Cipla relies on the next sentence of ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████  ██████████████████████

████████████████████████████  ██████████████████████

██████████████████████████████████████████████████

████████████████████████████  ██████████████████████

██████████████████████████████████████████████████

████████████████

In sum, Cipla breached the Amgen-Cipla Agreement by commencing sales of its generic cinacalcet product, and those sales remain subject to Amgen's preliminary injunctive relief.

**B.  Cipla breached its agreement not to challenge enforceability**

Cipla breached the Amgen-Cipla Agreement not only through its unauthorized sales, but also by challenging the enforceability of the '405 patent in this suit.  ████████████████████ ████████████████████████████████████████  ██████████████  Thus, Cipla has breached ██████████████ by alleging unenforceability due to alleged patent misuse. FAC (D.I. 73) ¶¶ 64, 65.

**II.  Amgen Will Suffer Irreparable Injury Without an Injunction**

Amgen will be irreparably harmed if Cipla's at-risk launch is not promptly enjoined.  It is well known that generic entry can lead to irreparable injuries like price erosion, loss of goodwill, reputational harm, and loss of business opportunities.  *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 544

F.3d 1341, 1361–62 (Fed. Cir. 2008). Such irreparable injuries are inevitable if Cipla's launch is not promptly enjoined, as confirmed by the accompanying declarations of Christos Georghiou ("Georghiou Decl."),[8] an Amgen senior executive with direct knowledge of Amgen's marketing and sales of SENSIPAR®, and Dr. Jerry A. Hausman ("Hausman Decl.").[9] Although Cipla would be liable for damages in the event of an ultimate decision on the merits of Amgen's counterclaim in Amgen's favor, that cannot fully compensate Amgen for the extent of its injury. And Amgen's market exclusivity—the fundamental right to which Amgen is entitled as patentee—is itself an intangible asset that money damages cannot replace. *See, e.g.*, *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, [Amgen's] exclusive right to make, use, and sell the patented inventions is under attack by [Cipla's] infringement.").

Moreover, a permanent injunction after trial or a determination at trial that Cipla had breached its agreement with Amgen could never fully restore the status quo. *See, e.g.*, *Allergan Sales LLC v. Sandoz, Inc.*, 2018 WL 3675235, at *8–9 (D.N.J. July 13, 2018) (finding irreparable harm where plaintiffs contended that "Defendants' entry would cause immediate reduction in market share and price erosion that could not be corrected even if Defendants were later forced to withdraw from the market."); *Fresenius Kabi USA, LLC v. Fera Pharm., LLC*, 2016 WL 5348866, at *13 (D.N.J. Sept. 23, 2016) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm. Loss of market share, for example, constitutes irreparable injury because market share is so difficult to

---

[8] The Declaration of Christos Georghiou in Support of Amgen Inc.'s Motion for a Preliminary Injunction is submitted herewith.

[9] The Declaration of Jerry A. Hausman in Support of Amgen Inc.'s Motion for a Preliminary Injunction is submitted herewith.

recover. Price erosion, because of the difficulty of reversal, may constitute irreparable harm. The right to exclude direct competition in a limited sphere, a right inherent in the grant of a patent, is irreparably harmed by the loss of sales and the competitive foothold that the infringer will gain.") (internal alterations, quotation marks, and citations omitted).

### A. Amgen will suffer irreversible price erosion and long-term loss of market share

Irreversible price erosion is expected here because third-party payers will likely be able to resist efforts by Amgen to raise prices later when Cipla's generic product is removed from the market after Amgen's ultimate success on the merits. *See Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368, 1381 (Fed. Cir. 2006); *Allergan Sales LLC*, 2018 WL 3675235, at *8–9; *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F. Supp. 2d 362, 398 (S.D.N.Y. 2000). Long-term loss of market share is similarly incapable of being redressed by damages. *See Abbott Labs.*, 544 F.3d at 1361–62 (finding that market share and revenue loss caused by entry into the market of an additional generic producer was sufficient to show irreparable harm); *Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, 609 F. Supp. 2d 786, 811 (S.D. Ind. 2009) ("[L]oss of market share and revenue . . . will be difficult, if not impossible for Lilly to recover, even if the Court were to later rule in favor of Lilly and Teva's generic raloxifene product was removed entirely from the market."); *Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1322 (N.D. Ill. 1991), *aff'd*, 945 F.2d 416 (Fed. Cir. 1991) ("[L]oss of market share constitutes irreparable injury because market share is so difficult to recover.") (quotation marks omitted).

Cipla's sustained launch of its generic competitor will cause Amgen to incur these irreparable harms. Hausman Decl. ¶¶ 19–33; Georghiou Decl. ¶¶ 13–27. Absent an injunction, Cipla will undoubtedly place a flood of products into the distribution channels. Manufacturers of other generic competitors will also be incentivized to enter the market if Cipla's at-risk launch is

not enjoined. The impact to Amgen of this market competition is likely to be immediate and devastating. Typically, entry of a generic product results in immediate loss of 40% of a brand's market share, with additional losses of more than 90% upon entry of additional generics. Hausman Decl. ¶ 22. Amgen can expect a loss of approximately 40–70% market share in the first month of entry, and up to a 90–95% loss of market share within the first six months, particularly if other generics follow Cipla in entering at risk. *Id.*; Georghiou Decl. ¶ 14.[10]

Moreover, these losses are also likely to persist over the long term because market changes to insurance coverage, reimbursement, and formulary status, as well as price erosion, are deeply engrained and almost impossible to undo. Georghiou Decl. ¶ 21. After a sustained launch, health insurance providers will be unlikely to cover prescriptions for SENSIPAR® without significant bargaining and permanent concessions from Amgen. Hausman Decl. ¶¶ 10–13, 24. These third-party payers have significant influence over the pricing and reimbursement of prescription drugs, *id.* ¶ 13, and SENSIPAR® is currently a preferred "Tier 1" drug for most insurers, Georghiou Decl. ¶ 20. A sustained launch by Cipla could result in branded SENSIPAR® dropping to "Tier 3" status, resulting in larger patient copays and leading prescribing physicians to try less expensive treatments first. *Id.* ¶¶ 20, 24. Moreover, many states *require* generic drug substitution absent explicit instructions from the physician—and those physicians are unlikely to provide it. *Id.* ¶ 18.

The Medicare reimbursement policy that presently governs the administration of

---

[10] Amgen also recently learned that Piramal Healthcare may have also entered the market. A limited generic entry by Piramal would not eliminate the irreparable harm to Amgen's business that is threatened by Cipla's sustained launch. Georghious Decl. ¶ 27. Even with a limited launch by Piramal, a sustained launch by Cipla would significantly—indeed, dramatically—enhance the irreparable harm being suffered by Amgen. *Id.*; Hausman Decl. ¶ 30. Moreover, given the timing of Piramal's entry, it is likely that Piramal only entered the market as a result of Cipla's threats to enter, thus further illustrating the irreparable harm to Amgen being caused by Cipla.

SENSIPAR®, the "Transitional Drug Add-on Payment Adjustment" policy (TDAPA), could further accelerate Amgen's market share losses. Under TDAPA, until at least January 2020, dialysis centers are reimbursed based on a four-quarter running average price for SENSIPAR® *or* any generic drugs sharing the same code. *Id.* ¶ 16. If Cipla is allowed to sustain its at-risk launch, its generic will be assigned to SENSIPAR®'s code. Because reimbursements are generally based on the price of all drugs within the same code, healthcare providers will be strongly incentivized to use the generic drug. Doing so will provide them with reimbursements at a rate much higher than they are paying for the generic drug, further driving market demand to the generic. *Id.* ¶¶ 16–17, 22; Hausman Decl. ¶¶ 23, 31–32. Because this is a transitional system, calculating future damages cannot be done with certainty. Additionally, if Cipla conducts a full-scale launch and fills distribution channels, its products (which presumably share SENSIPAR®'s five-year expiration date) will likely remain on pharmacy shelves and in warehouses for months or even years after new sales have been ordered to stop. Georghiou Decl. ¶ 25; Hausman Decl. ¶¶ 27–28.

Moreover, the fact that Teva has previously entered the market does not alter this analysis. Teva's entry lasted for only six days and was halted as a result of the Amgen-Teva Agreement. And Amgen was harmed as a result of Teva's entry. Georghiou Decl. ¶ 23. But for the reasons stated above, Amgen is likely to suffer significantly increased irreparable harm in the event of a sustained Cipla launch. Such harm will result from even an abbreviated launch by Cipla, but the harm will be especially severe in the event of a sustained launch and will only increase with the length of time that Cipla's products are on the market, potentially increasing dramatically depending on the number of generic competitors that follow suit, the degree of price erosion, and the ultimate market share loss suffered by Amgen. *Id.* ¶¶ 24–27.

**B.  Amgen will suffer harm to its goodwill and other non-quantifiable harm**

Amgen would suffer significant injury to its goodwill, relationships, and product development pipeline from a sustained generic launch, which cannot be readily measured, let alone redressed by money damages.   A breakthrough drug for the treatment of hyperparathyroidism, SENSIPAR® has treated over one million patients in the United States and more than three million patients worldwide, and positively affects the perception of Amgen. Georghiou Decl. ¶¶ 6–7, 31.   Amgen has worked hard to cultivate a strong work force, reputation, and goodwill in the nephrology community, including through loyalty to the SENSIPAR® brand.  Hausman Decl. ¶¶ 34–35; Georghiou Decl. ¶¶ 7, 30–33.  The entry of Cipla or another generic onto the market weakens the perceived connection between the innovator and the drug's benefits and may lead to consumer confusion, causing unquantifiable harm.

Further, a sustained generic launch would likely force Amgen ███████████████████████

███████████████████████████████████████████████████████████████████

██████████████  Georghiou Decl. ¶ 30; Hausman Decl. ¶¶ 34–36.  ███████████████

████████████████████████████████████████████████████████████████████■

████████████████will impact goodwill and reputation in ways that cannot be quantified. Georghiou Decl. ¶¶ 31–33.  *See, e.g.*, *Research Found. of State Univ. of N.Y. v. Mylan Pharm., Inc.*, 723 F. Supp. 2d 638, 658 (D. Del. 2010) (noting that evidence of "loss of research opportunities[] and possible layoffs may constitute irreparable harm" as well).

Beyond those losses, the lost revenue from SENSIPAR® sales will also have a significant impact on Amgen's ongoing research and development efforts.   Consistent with industry

norms,[11] Amgen reinvests approximately 16–22% of its revenue back into research and development. Georghiou Decl. ¶ 28. Accordingly, the significantly reduced revenue from SENSIPAR® sales will harm Amgen's efforts to develop new drug products. *Id.*

## III. The Balance of Equities Clearly Favors Amgen

Once the two "gateway factors" are met, the Court then considers the balance of the hardships and public interest to determine "in its sound discretion if all four factors, taken together, balance in favor of" granting relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Here, consideration of these additional two factors confirms that a preliminary injunction is proper.

It is clear that entry of an injunction here "would not harm the infringer more than a denial would harm" Amgen. *Kos*, 369 F.3d at 727. As described above, Amgen will suffer severe and irreversible harm if Cipla is not enjoined from marketing and selling its generic version of SENSIPAR® until the Court reaches a final decision on the merits. Any harm Cipla allegedly suffers would be much less significant by comparison. "Simply put, an alleged infringer's loss of market share and customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct." *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). Moreover, Cipla's knowing breach of its agreement tips the balance of hardships still further in Amgen's favor. *See Ranbaxy Labs. Ltd. v. Abbott Labs.*, 2005 WL 3050608, at *30 (N.D. Ill. Nov. 10, 2005) (finding that the hardship associated with drug manufacturer's loss of market share outweighs potential hardship to generic manufacturers); *Rubbermaid Commercial*

---

[11] *See, e.g.*, John LaMattina, *Pharma R&D Investments Moderating, But Still High*, FORBES.COM (June 12, 2018, 7:58 AM), https://www.forbes.com/sites/johnlamattina/2018/06/12/pharma-rd-investments-moderating-but-still-high/.

*Prods., Inc. v. Contico Int'l, Inc.*, 836 F. Supp. 1247, 1258 (W.D. Va. 1993) (noting that a defendant's "knowing entrance into a risky venture lays much of the harm at its own doorstep").

Further, Cipla's theory of irreparable harm depends on the assertion that it has a potential right to be the exclusive generic cinacalcet product, and that if it is delayed in entering the market, it will lose that right. Prior cases have cast doubt on whether that theory could describe irreparable harm. *See Research Found.*, 723 F. Supp. 2d at 661 ("the 'loss' of [generic market] exclusivity is not a legally cognizable harm for purposes of a preliminary injunction motion"). Moreover, even if loss of an opportunity to be the first generic could theoretically be an irreparable harm, Cipla has no opportunity to be the first generic here—Teva has already entered, and many other generics are likely to follow Cipla immediately if it is able to maintain a sustained launch.

Moreover, Cipla's insincere portrayal of itself as having some entitlement to enter into the market due to the decisions made by Judge Goldberg in the patent litigation is baseless. The '405 patent has never been declared invalid; there is no free-for-all against SENSIPAR®. Though it is true that, in the patent litigation, three generic products were found not to infringe the '405 patent, Judge Goldberg found the '405 patent infringed by one generic, Zydus. In any event, Cipla's agreement with Amgen was an arm's-length agreement among sophisticated entities. It avoided the need to specifically litigate whether Cipla's formulation was infringing and granted Cipla a right to enter the market earlier. Cipla voluntarily bargained away its right to seek *immediate*, potentially exclusive entry, accepting instead that while it would be able to enter the market before patent expiration, its entry would follow, or at best be contemporaneous with, other generic companies. In other words, Cipla bargained away any *chance* at exclusivity.

In contrast, Teva and Piramal took the risk and incurred the costs to fully litigate their challenges to Amgen's patents. The fear that Cipla asserts as the basis for a finding that it would suffer irreparable harm—its fear that Piramal might enter the market first—ignores that Piramal, not Cipla, took the risk and incurred the expense to position itself to be the first generic to enter the market at risk. Cipla is not irreparably harmed merely because it wants this Court to help it to leapfrog Piramal, when it was Piramal, not Cipla, that took the risk to pursue a favorable decision on the merits in the district court.

## IV.     The Public Interest Will Be Served by Issuance of a Preliminary Injunction

The final factor in evaluating a motion for a preliminary injunction—whether granting the motion would serve the public interest—also favors granting Amgen's motion. It is well-settled law that "public policy favors the protection of the rights secured by . . . valid patents." *Smith Int'l, Inc. v. Hughes Tools Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983). Indeed, the patentee's right to exclude competitors is "[t]he very nature of the patent right." *Id.* The public interest thus strongly favors enforcing that right over the accused infringer's right to compete before a final decision. *Abbott Labs.*, 544 F.3d at 1362; *Research Found.*, 723 F. Supp. 2d at 663; *see also Ortho McNeil Pharm., Inc. v. Barr Labs., Inc.*, 2009 WL 2182665, at *11 (D.N.J. July 22, 2009) ("[T]he public interest favors encouraging investment in drug development by protecting and enforcing . . . valid pharmaceutical patent[s]."). That is especially true in the pharmaceutical industry, where patent rights provide the backbone incentives to invest huge sums of money and time into research and development. *See Sanofi-Synthelabo*, 470 F.3d at 1383–84 ("We have long acknowledged the importance of the patent system in encouraging innovation."); *Pfizer*, 429 F.3d at 1382. Indeed, if Amgen prevails on the merits without preliminary injunctive relief, the spillover effects could harm consumers: Cipla's product supply

would be discontinued after several months on the market, causing unnecessary disruption and confusion in the marketplace. An injunction avoids all of those problems.

Furthermore, because protecting pharmaceutical patent rights spurs the innovation of life-saving drugs, the public interest in protecting those rights outweighs the competing public interest in the availability of low-cost generic drugs. *See Pfizer*, 429 F.3d at 1382; *Impax Labs. v. Aventis Pharm.*, 235 F. Supp. 2d 390, 397 (D. Del. 2002) ("[T]here is a strong public interest in protecting valid patents by preventing the premature entry of generic drugs into the marketplace."). Cipla's ability to reap the bounty of Amgen's substantial labors in the development and marketing of SENSIPAR®, and thereby sell a lower priced generic product, does not justify Cipla's breach of its settlement agreement with Amgen. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993). Therefore, the Federal Circuit has noted that "[w]ere [selling a lower priced product] to be a justification for patent infringement, most injunctions would be denied because copiers universally price their products lower than innovators." *Id*.

Cipla has argued that the Amgen-Teva Agreement harms the public interest based on meritless allegations that the agreement is supposedly anticompetitive. But the Amgen-Teva Agreement is actually the precise type of settlement agreement sanctioned by the FTC, and prohibiting such settlements is contrary to public policy. Under the Supreme Court's seminal decision in *FTC v. Actavis, Inc.*, a patent settlement "allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point," only risks becoming unlawful if the branded pharmaceutical company provides a "large and unjustified" payment to the generic manufacturer (known as a "reverse payment" settlement). 570 U.S. 136, 158 (2013); *In re Wellbutrin XL Antitrust Litig.*,

133 F. Supp. 3d 734, 752–53 (E.D. Pa. 2015) ("Such settlements . . . are not subject to antitrust scrutiny because they allow the *strength* of the patent claims, not extra-litigation considerations, to control the outcome.").  Cipla does not allege that any such payment was made here—███

████████████████████████████████████████████████████████

Prohibiting this type of ordinary patent infringement settlement is contrary to public policy and would harm consumers.  If parties may not settle patent litigation after an at-risk launch—or if courts refuse to enforce patent infringement settlements entered during litigation, such as Amgen's settlement with Cipla—there will be many fewer patent infringement suit settlements.  That means *both* that patentees will not agree to earlier entry dates, and that parties contemplating an at-risk launch, knowing that they cannot settle with the patentee after launching, will be less likely to launch.  Moreover, the risk of anticompetitive harm is particularly low here because other parties to Judge Goldberg's ruling are continuing with the appeal—████████████████████████████████████████████████████

████████  ██████████████████████████████████  Because upholding, and enforcing, the settlement of patent infringement suits serves the public interest, granting an injunction against Cipla's improper launch likewise serves the public interest.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Cipla from making, having made, using, selling, offering to sell, or distributing its generic cinacalcet product in the United States, or importing the its product into the United States, in breach of the Amgen-Cipla Agreement, until Amgen's claims have been finally resolved.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201-6912
(214) 571-2900

Jeffrey T. Thomas
Eric J. Stock
Kate Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

March 11, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 11, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire                                    *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire                                    *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
*Attorneys for Plaintiffs*

/s/ *Brian P. Egan*
_____
Brian P. Egan (#6227)

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CIPLA LTD. and CIPLA USA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AMGEN INC. and TEVA PHARMACEUTICALS USA, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| AMGEN INC.,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>CIPLA LTD. and CIPLA USA, INC.,<br><br>Counterclaim-Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 19-cv-44-LPS

<u>**CONFIDENTIAL – FILED UNDER SEAL**</u>

**DECLARATION OF CHRISTOS GEORGHIOU IN SUPPORT OF**
**<u>AMGEN INC.'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

I, Christos Georghiou, declare as follows:

## I.   **INTRODUCTION**

1.     While I recently moved to a new position within Amgen (Executive Director of Global and U.S. Enbrel Marketing), I was the Executive Director of U.S. Nephrology Marketing at Amgen from September of 2013 through July of 2018.  Prior to assuming my Nephrology role, I held various positions within Amgen beginning in October of 2004.  I first had direct involvement with the marketing for SENSIPAR® cinacalcet hydrochloride tablets ("SENSIPAR®") in January of 2008.

2.     I obtained both a Bachelor of Science in Management and a Master of Business Administration with a focus in Marketing/Healthcare from the University of Tennessee.

3.     As part of my former role, I was responsible for all aspects of marketing for Amgen's Nephrology portfolio in the United States and based on my experience I am personally familiar with Amgen's sales and marketing of SENSIPAR®.

4.     I make this declaration in support of Amgen's Motion for a Preliminary Injunction.  Absent injunctive relief in this matter, I expect Amgen to suffer immediate irreparable harm upon the continued launch of a generic version of SENSIPAR® by Plaintiffs Cipla Ltd. and Cipla USA, Inc. (together, "Cipla").  Unless Cipla's generic launch is quickly halted, that harm will likely include a loss of up to about 40–70% market share, or more, in the first month, immediate and long-lived (if not permanent) price erosion, loss of formulary status, and lost profits in the hundreds of millions of dollars in the first two months alone.

5.     I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

## II.   **AMGEN AND SENSIPAR®**

6.     Amgen is one of the world's leading independent biotechnology companies and

has long been committed to unlocking the potential of biology for patients suffering from serious illnesses by discovering, developing, manufacturing and delivering innovative human therapeutics. Amgen focuses on areas of high unmet medical need. The development of SENSIPAR® embodies this focus. SENSIPAR® is approved for two "orphan indications": (1) the treatment of hypercalcemia in patients with parathyroid carcinoma; and (2) hypercalcemia in adult patients with primary hyperparathyroidism for whom parathyroidectomy would be indicated on the basis of serum calcium levels, but who are unable to undergo parathyroidectomy. These are rare diseases that affect fewer than 200,000 people in the United States. SENSIPAR® is also approved for the treatment of secondary hyperparathyroidism in patients with Chronic Kidney Disease on dialysis.

7.      Before launching SENSIPAR®, Amgen engaged in years of research, development, and testing related to potential calcimimetic compounds and effective formulations. Even after development, Amgen remained committed to not only seeing the drug to market but providing ongoing and substantial support to the nephrology community. In addition to both manufacturing and marketing SENSIPAR®, Amgen also maintains active and ongoing relationships with the health care providers administering SENSIPAR®, and Amgen devotes substantial efforts to related education. As a result of Amgen's extensive commitment, SENSIPAR® has treated over 1 million patients in the United States and more than 3 million patients worldwide, and it has grown to be one of Amgen's key drug products.

8.      At present, SENSIPAR® is primarily administered to patients covered by Medicare, and Medicare (including Medicare Advantage) provides reimbursement for nearly ███ ███ of all SENSIPAR® sales by volume. The remaining patients are typically covered by third party payors (private insurers, public health programs, and healthcare maintenance

3

organizations).

## III.    GENERIC PRODUCTS

9.    At least 20 different generic drug manufacturers have filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking to market generic versions of SENSIPAR®, and several of these proposed generic versions have been either tentatively or finally approved by the FDA.

10.    Generic drug manufacturers prepare thoroughly for the launch of their generic products, ramping up production and taking pre-orders from drug wholesalers well in advance of the launch date. As a result, they are typically prepared to enter the market within days of final FDA approval.

11.    Indeed, final approval has now been granted by the FDA for seven (7) of the filed ANDAs, including the ANDA of Cipla and of Watson Laboratories, Inc., a division of Teva Pharmaceuticals ("Teva").

12.    On December 28, 2018, Teva launched its generic versions of SENSIPAR® without authorization or license from Amgen (an "at-risk launch"). I understand that almost immediately thereafter, on January 2, 2019, Amgen and Teva entered into a settlement agreement under which Teva agreed to immediately cease selling its generic products. I understand that Cipla informed Amgen on March 2, 2019 that it had begun its own at risk launch of its generic cinacalcet product, although my understanding is that Cipla has not yet engaged in a full-scale launch. I understand that Piramal Pharma may have commenced selling its generic cinacalcet product at risk as well, although I do not know the extent of Piramal's potential entry.

## IV.    LOSS OF SALES AND MARKET SHARE

### a.    Immediate Effect

13.    Amgen currently projects that the price of generic cinacalcet could be 25% to

50% of the current branded SENSIPAR® Wholesaler Acquisition Cost, depending on the number of generic versions available. Although Cipla and, potentially, Piramal, are the only entities currently selling generic alternatives in the market, other generic manufacturers may attempt their own at-risk launches if Cipla is not promptly enjoined. Additionally, it is also common for the generic price to decrease further over time. As a result of head-to-head competition from one or more of the generics, Amgen would have little choice but to compete on price if it wants to attempt to reduce its loss of market share. In the case of the generic launch by Teva, Amgen has not yet been forced to lower its price because a settlement agreement ceasing generic sales was entered into almost immediately after Teva's at-risk launch. In addition, Cipla has not yet begun a full-scale launch (and nor, to my understanding, has Piramal). However, as is explained further below, Amgen does expect that Teva's and Cipla's at-risk launches will ultimately force Amgen to lower the price of SENSIPAR® or lose substantial market share in the future, due to the nature of the current and future Medicare reimbursement systems, particularly if Cipla's launch is not immediately halted.

14.     Amgen will unquestionably lose significant market share in the event of a sustained generic launch, whether or not it attempts to compete on price. If Amgen wants to mitigate these market share losses and retain any significant market share, it will need to respond to sustained generic competition by dropping the price of SENSIPAR® dramatically. Market research has shown that generic oral drugs typically capture approximately 40-70% or more of the market within the first month following launch, and the numbers are even greater at three months (80-90%) and six months (90-95%). Based on this research and for the reasons described below, if a generic version of SENSIPAR® were to enter the market through a full-scale launch in the near future, and remain on the market for a significant period of time, Amgen

5

risks losing up to about 70% of market share within the first month, and 95% of market share within the first six months, if it does not reduce SENSIPAR® prices substantially, especially in the event that there are multiple generic launches.

15.     As prices decline and market share is lost, Amgen's costs per unit to maintain its current manufacturing, distribution and sales infrastructure for SENSIPAR® would increase. Both Amgen's revenue and profitability would be significantly harmed by sustained generic entry, and it would be difficult to predict precisely how deeply and how long that injury would be suffered under any particular set of circumstances.

16.     Of note here, the Medicare reimbursement policy that presently governs the administration of SENSIPAR® (the "Transitional Drug Add-on Payment Adjustment" policy or "TDAPA") could even further exacerbate and accelerate Amgen's loss of market share. Under TDAPA, until at least January of 2020, the amount that dialysis centers and other healthcare providers are reimbursed by Medicare for the administration of SENSIPAR® is based on a four-quarter running average selling price for SENSIPAR® and any generic drugs sharing the same Healthcare Common Procedure Coding System ("HCPCS") code as SENSIPAR®. At the time TDAPA ends, the Medicare reimbursement for SENSIPAR® will transition to a permanent, capitated system.

17.     As a result of TDAPA, dialysis centers and other healthcare providers will be both strongly incentivized to switch to the generic after a full-scale launch by Cipla and strongly disincentivized from administering SENSIPAR® because the reimbursement they receive for their acquisition cost of these products will be based on the combined retrospective running average selling price for these products. For example, at least at the outset, a dialysis center that immediately switches to the generic product after launch will see substantially increased profits,

as the reimbursement rate will continue to reflect the past average price of branded SENSIPAR®, while it will incur only the substantially reduced cost to purchase the generic product. For the same reason, unless Amgen drops its price dramatically to compete with the generics, a dialysis center would at best break even if it continued administering branded SENSIPAR®, and would quickly incur increasing losses as the Medicare reimbursement trended downward over time as the growing volume of lower priced sales are averaged into the calculation of the reimbursement rate.

18.     In addition to pricing differentials, there are also several other reasons that Amgen faces the risk that generic versions of SENSIPAR® might capture such a large portion of the market so quickly after a sustained generic launch. First, a number of states have "automatic substitution" laws that mandate the substitution of generic drugs for branded drugs, regardless of whether the physician specifically prescribes the branded drug. In those states, immediately upon launch of a generic version of SENSIPAR®, the generic product will be automatically substituted for SENSIPAR® by pharmacists when presented with a prescription for SENSIPAR®, to the extent that the generic product is available to the pharmacist.

19.     Further, other states permit (but do not require) pharmacists to substitute generic drugs for branded drugs without consulting the physician, either because it is in the pharmacist's financial interest to do so, or because the patient requests it. Because pharmacists negotiate discounted prices for generic drugs, they are typically incentivized to substitute the generic drug for the brand name drug even if it is not mandated by state law.

20.     Third party payors also actively drive demand for the generic drug. These third-party payors, often acting through a pharmacy benefit manager (PBM), create "formularies," or lists of covered medicines that may be prescribed by physicians, typically ranked by tier. By

7

assigning generic drugs more favorable placement on formularies (and often, removing brand name products from the formularies entirely once a generic drug is available), PBMs encourage the substitution of generic drugs for branded drugs. At present, SENSIPAR® is ranked as "Tier 1" by most third-party payors, and therefore enjoys preferred coverage. While Teva's entry caused a few commercial plans to move SENSIPAR® to Tier 3, it still remains on Tier 1 for most plans. After a sustained generic launch, Amgen expects that SENSIPAR® would fall to at least Tier 3 status on most formularies, which would result in larger patient copays and increasing step therapy requirements that would direct patients and prescribing physicians to try less expensive treatment options prior to branded SENSIPAR®, further reducing Amgen's market share and profitability.

### b. Ongoing Detriment

21.     In the event of a sustained generic launch, the market changes to insurance coverage, reimbursement and formulary status as well as the price erosion caused by generic entry are deeply engrained and can be almost impossible to undo even if the generic products themselves are removed from the market. Indeed, even after a launched generic product is removed from the market, I expect that a number of factors will result in Amgen's continuing to experience losses. Those losses will be significant, but they are especially difficult to quantify here.

22.     As one example, a sustained generic at-risk launch of a drug administered under the TDAPA reimbursement policy, to my knowledge, has never occurred before. Even after a generic exit, the TDAPA reimbursement policy would leave Amgen in an unprecedented and unpredictable position—wherein the Medicare reimbursement rate for SENSIPAR® would remain well below the pre-generic launch level as a result of the four-quarter average selling price, which will continue to reflect prior cut-rate generic sales. With the reimbursement level

8

depressed, dialysis centers will be unwilling, and likely unable, to pay for SENSIPAR® at the pre-launch cost, as doing so would require them to take a loss each time the drug is administered. Furthermore, Amgen is not aware of any mechanism within the TDAPA framework that would allow an adjustment in the reimbursement rate to address such an issue. Patients and doctors could face difficulties accessing the product, and Amgen would unquestionably lose substantial goodwill within the nephrology community under any resolution that did not involve steeply discounting SENSIPAR®. In effect, Amgen could not attempt to rehabilitate price without injuring its relationship with its customers.

23. Amgen even expects the limited generic at-risk launches by Teva and Cipla (thus far) to cause the Medicare reimbursement rate for the administration of SENSIPAR® to fall within the next year due to the structure of TDAPA and the fact that Teva and Cipla almost certainly have sold their generic products at a price below Amgen's selling price for SENSIPAR®. Due to uncertainties about the price and volume of generic products sold by Teva and Cipla, the precise magnitude of this effect will not be known to Amgen until the Medicare reimbursement rate actually changes in the future. However, regardless of the magnitude of the change, Amgen will likely be forced to reduce the price of SENSIPAR® to match any reduction in the reimbursement rate if it wishes to attempt to mitigate the substantial market share losses likely to occur with generic entry. Furthermore, Amgen also expects that Teva's and Cipla's generic at-risk launches could affect the price of SENSIPAR® even after the end of TDAPA; in the post-TDAPA environment, the capitated reimbursement rate may ultimately reflect the reduced, post-generic launch average selling price, rather than Amgen's own selling price for SENSIPAR®.

24. Additionally, after a sustained generic launch, even if those generic products were

later recalled from the market, SENSIPAR® is unlikely to regain its preferred Tier 1 status on most formularies, unless Amgen were to provide substantial discounts to PBMs. If SENSIPAR® were to remain at Tier 2 or 3, it would continue to suffer from the related market-share-suppressing effects discussed previously, and patients' ability to continue with or resume SENSIPAR® may be impeded. For example, patients who were already taking SENSIPAR® might be required to disrupt their treatment and try alternative (less expensive) treatments without the proven efficacy of SENSIPAR®.

25. Lastly, even during a relatively short period of generic availability, Amgen expects that generic manufacturers would continue to be motivated to flood the market with enough lower priced generic products to supply the markets for months or even years (and presumably such products will have a five-year expiration date, like SENSIPAR®).

26. Between the expected price erosion, market share loss, and effect from changes to product reimbursement and coverage by public and private insurers as a result of a sustained generic entry, the potential damage to Amgen if generics like those offered by Cipla are not prohibited from launching at risk is difficult to quantify, but Amgen would undoubtedly be at risk of suffering a substantial and continuing injury to its business.

27. The fact that Piramal also may have recently commenced an at-risk launch does not eliminate the great risk to Amgen's business posed by the threatened sustained market entry by Cipla. To begin with, if Amgen obtains an injunction against Piramal, Piramal's product would remain on the market only for a very short time. In that scenario, the threat of a sustained launch by Cipla would not be materially affected by a fleeting launch by Piramal. Moreover, even if Piramal does enter the market to some degree for some period of time, a sustained launch by Cipla will still likely have the effect of significantly—probably dramatically—enhancing the

irreparable harm suffered by Amgen as a result of the market entry of these generics.

## V.   EFFECT ON AMGEN OPERATIONS

28.    Amgen's loss of market share and revenue related to a sustained generic launch would, in turn, also have a significant negative impact on Amgen's Research and Development ("R&D") efforts and internal operations.  Amgen reinvests approximately 16-22% of its revenue into R&D, and the projected loss of the SENSIPAR® component of this revenue would cause a significant reduction in Amgen's ability to self-fund R&D.

29.    Additionally, Amgen anticipates that the significant reduction in sales associated with a generic launch would ███████████████████████████████ ████████ including to its manufacturing, regulatory, and clinical, as well as sales and marketing efforts.

30.    For example, with particular regard to Amgen's nephrology sales and marketing team, Amgen projects that ███████████████████████████████ ████ following a sustained generic launch.

31.    ███████████████████████████████████████ ███████████████████████████████████████████. Physician loyalty is also central to the success of SENSIPAR®, and Amgen devotes substantial efforts to educating physicians about the unique benefits of SENSIPAR®, and toward developing, promoting, and retaining their loyalty.  Amgen would expect to ██████████ ████████████████████████████████████████ As discussed above, Amgen is a trusted resource in the nephrology community.  An at-risk generic launch, ███████████████████████████████████ ████████ would cause unquantifiable damage to Amgen's reputation in this field.

32.    ███████████████████████████████████

██



█████████████████████████████████████████████████████████, even if generics were later withdrawn from the market. That would result in damage to Amgen that cannot be calculated. After a sustained generic launch, Amgen would likely ████████ ████████████████ for SENSIPAR®, who would also be nearly impossible to regain, even if the generic products were later withdrawn. Amgen would, importantly, ███████████ █████████████████████████████████████████████████████████ ████████████████ suffering further unquantifiable harm.

33.　　Finally, Amgen's loss of market share and reduced profitability could damage Amgen's reputation and significantly impact Amgen's stock price.

<p style="text-align:center">*　　*　　*</p>

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2019.

Christos Georghiou

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 11, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire                                    *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire                                   *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
*Attorneys for Plaintiffs*

/s/ *Brian P. Egan*

_____

Brian P. Egan (#6227)

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CIPLA LTD. and CIPLA USA, INC.,

    Plaintiffs,

    v.

AMGEN INC. and TEVA
PHARMACEUTICALS USA, INC.,

    Defendants.

 

AMGEN INC.,

    Counterclaim-Plaintiff,

    v.

CIPLA LTD. and CIPLA USA, INC.,

    Counterclaim-Defendants.

C.A. No. 19-cv-44-LPS

**CONFIDENTIAL – FILED UNDER
SEAL**

**DECLARATION OF JERRY A. HAUSMAN IN SUPPORT OF
AMGEN INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Jerry A. Hausman, do hereby declare:

# I.     INTRODUCTION

1.  My name is Jerry A. Hausman.  I am the MacDonald Professor of Economics at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts.

2.  I have been retained as an expert witness by counsel for Amgen in order to provide testimony on behalf of Amgen.  I have been asked by Amgen to provide an economic analysis of the effect of the launch of a generic competitor to Amgen's Sensipar (cinacalcet) tablets in the U.S.

3.  My qualifications are set forth below and in my curriculum vitae, attached as Exhibit A.

# II.    EXPERIENCE AND QUALIFICATIONS

4.  I graduated from Brown University in 1968.  I received a D.Phil. (Ph.D.) in economics from Oxford University in 1973 where I was a Marshall Scholar.  I have been at MIT since completing my D.Phil.  My academic specialties are econometrics, the application of statistical methods to economic data, and applied microeconomics, the study of behavior by firms and by consumers.

5.  In December 1985, I received the John Bates Clark Award of the American Economic Association, awarded every other year for the most "significant contributions to economics" by an economist under the age of 40.  In 1980, I was awarded the Frisch Medal of the Econometric Society.  In 2013, I was named a Distinguished Fellow by the American Economics Association.  I have been a member of numerous government advisory committees for both the U.S. government and the Commonwealth of Massachusetts.  I have published over 200 academic research papers in leading economic

journals including the *American Economic Review*, *Econometrica*, and the *Rand (Bell) Journal of Economics*. I have been an associate editor of *Econometrica*, the leading economics journal, and the *Rand (Bell) Journal of Economics*, the leading journal of applied microeconomics.

6. I have done academic research and consulted in the pharmaceutical industry for over 20 years. I conducted extensive studies of pricing and marketing by pharmaceutical companies in the mid-1990s. I have continued to consult over the years on pricing strategy by pharmaceutical companies, including the effects of the regulation of prices by numerous foreign governments. I have also consulted for a number of pharmaceutical benefit managers. I have written academic papers that study competition in the pharmaceutical industry, including "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," with S. Fisher Ellison, I. Cockburn, and Z. Griliches, Rand Journal of Economics vol. 28, 1997.

## III. BACKGROUND

### A. Sensipar and Its Market

7. Sensipar (cinacalcet) is a calcium-sensing receptor agonist indicated for secondary hyperparathyroidism in adult patients with chronic kidney disease on dialysis, hypercalcemia in adult patients with parathyroid carcinoma, and hypercalcemia in adult patients with primary hyperparathyroidism for whom parathyroidectomy would be indicated on the basis of serum calcium levels, but who are unable to undergo

parathryroidectomy.[1]  Sensipar was initially approved in the U.S. in 2004.[2]  U.S. sales of Sensipar in 2018 totaled approximately $1.436 billion.[3]

8.  Sensipar faces competition from other treatments such as active vitamin D analogs.[4]  To remain competitive, Amgen promotes Sensipar using a sales and marketing team of over ███ people.[5]

9.  Currently approximately ███████ of Sensipar volume is reimbursed through Medicare.[6]  For this portion of the business Amgen contracts directly with dialysis organizations, and those dialysis organizations are reimbursed for the purchases of Sensipar through the Transitional Drug Add-on Payment Adjustment (TDAPA) system, under which the reimbursement is based on the four-quarter moving average selling price of Sensipar (and any Sensipar generics).[7]  The remainder of Sensipar volume is primarily reimbursed through third-party payers such as pharmacy benefits manages.[8]

### B.  Pricing and Access in the Prescription Drug Market

10. For drugs reimbursed through third-party payers, the effective cost of drugs to drug consumers is largely determined by the placement of the drugs on formularies (lists of drugs divided into categories), which determine the co-pay patients have to pay for prescription drugs.

11. Formularies are typically divided into three or more tiers so as to encourage patients to select those pharmaceutical products favored by the third-party payer.  Thus,

---

[1] Sensipar prescribing information, p. 1.
[2] Id.
[3] Amgen Form 10-K for the year ended 12/31/18, p. 48.
[4] Id., p. 8.
[5] Georghiou Decl., ¶ 30.
[6] Georghiou Decl., ¶ 8.
[7] Georghiou Decl., ¶ 16.
[8] Georghiou Decl., ¶ 20.

3

because generic products are priced at a discount to branded drugs, the first tier—which offers patient the lowest co-pays of $5 to $10—typically contains only generic drugs. The second tier typically consists of branded products in a "preferred position" with copays of approximately $30. Higher tiers include disfavored branded products where co-pays of $50 or more are imposed. As a result of these significantly higher co-pays, there is substantially less demand for products in the higher tiers than for drugs in the first and second tiers.

12. To further influence patients into selecting cheaper generic medicines, third-party payers generally move branded products into a disfavored formulary tier once a generic product becomes available unless the drug manufacturer offers substantial discounts, rebates, or other incentives that lower the effective price of the drug to the third party. Alternatively, if the branded product is already in a disfavored formulary tier when a generic competitor launches, third-party payers will sometimes refuse to reimburse for the branded product at all.

13. Third-party payers are very aggressive in trying to force down drug prices, and they have considerable leverage in negotiating prescription drug prices and formulary tier positions with prescription drug companies. The prescription drug company generally must offer substantial rebates or discounts to the third-party payer after generic entry occurs to have the branded product placed in a favorable formulary tier. These third-party payers also are very competitive with each other, creating a need for third-party payers to demand the highest discounts or rebates possible from the manufacturer.

### C. Impacts of Generic Entry on the Market for a Drug

14. When a generic version of a prescription drug product enters the market, it can have severe economic impacts on the branded product. First, the entry of a generic

4

competitor can cause immediate and significant erosion of the market share of the senior branded product. Second, the economic effect of market share erosion is likely to be exacerbated by the steep price erosion that typically follows the launch of a generic competitor. Both these effects lead to substantial economic losses to the manufacturer of the branded product that are both irreversible and difficult to quantify.

15. For example, the market share erosion that any branded drug will experience due to generic competition is difficult to estimate because of the specific factors that apply to each particular drug, including the amount of non-generic and generic competition, and drug substitution patterns among patients who are using the drug before generic competition begins. In my experience, market share erosion due to introduction of a generic product varies, and can range from an immediate 40% erosion to over 90% erosion over the long run. My experience is consistent with studies of generic market share erosion.[9] This wide variability is further exacerbated by the complex interplay between the patchwork of restrictions in coverage and high copays introduced by various third-party payers; the loss of promotional spending by the brand that is caused by generic entry; and the long-term disrupting impact of the common generic practice of immediately releasing large quantities of the generic drug, which can be sold by wholesalers even months after that generic drug is "removed" from the market.

16. Adding to the uncertainty is the fact that the severity of generic market share erosion appears to be increasing over time. One study finds that drugs experiencing

---

[9] See, e.g., E. Berndt et al., "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs* 26, 2007, p. 796; D. Lakdawalla and T. Philipson, "Does Intellectual Property Restrict Output? An Analysis of Pharmaceutical Markets," *Journal of Law and Economics* 55, 2012, p. 168.

generic entry in 1999-2000 lost an average of 56% of their share after one year, while drugs experiencing generic entry in 2011-2012 lost an average of 84% of their share after one year.[10]

17. The effects of price erosion are similarly both difficult to predict and difficult to assess after they have occurred. While generic substitutes for branded drugs are typically initially priced 10% to 40% below the branded drug price, the amount of the generic price discount will often depend on a variety of factors, including the number of generic manufacturers. Thus, a single generic can launch with a price discount typically in the range of 10-20%, with the discount increasing to up to 75% when there are more than five generic manufacturers.[11]

18. Furthermore, as with market erosion, generic price discounts have also been increasing over time, with one recent study finding that "[t]he price of generic medicines that entered the market between 2011 and 2013 fell 79% within 12 months compared to 44% for generics that entered the market between 2002 and 2004."[12] As explained above, if a generic launch occurs, a branded company will generally have to give substantial discounts or rebates on its product in order to compete with the generic product for competitive formulary placement.

---

[10] H. Grabowski, G. Long, and R. Mortimer, "Recent trends in brand-name and generic drug competition," *Journal of Medical Economics*, 2013, pp. 6-7.

[11] See, e.g., FDA, "Generic Competition and Drug Prices," (available at http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm); E. Berndt et al., "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs* 26, 2007, pp. 792-793.

[12] IMS Institute for Healthcare Informatics, "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," January 2016, p. 4.

## IV.   ECONOMIC ANALYSIS OF THE EFFECT OF GENERIC ENTRY ON SENSIPAR

19. I understand that Cipla Ltd. and Cipla USA, Inc. (together, "Cipla") have informed Amgen that Cipla has begun a limited launch of its generic cinacalcet product and that, if not enjoined by this Court, it intends to commence a larger, more sustained launch of its product.  I have been asked to consider the likely economic outcomes if Cipla launches a generic version of Sensipar into the U.S. marketplace, and then is subsequently required to withdraw its generic product from the market.

20. While Amgen has likely suffered some harm already as a result of a limited prior launch by Teva, and the limited launch by Cipla that has taken place thus far, a large and sustained launch by Cipla would greatly increase that harm.  For the reasons described below, it is my opinion that if Cipla were permitted to engage in a fuller, sustained launch of its product, that would cause Amgen to suffer immediate, substantial, and long-lasting harm that could not be reversed or adequately compensated through money damages should the launch be found unlawful.

### A.  Lost Market Share

21. If Cipla enters the market with a sustained launch, it is my opinion that Amgen will suffer an immediate and substantial loss of market share that will be irreversible and extremely difficult to quantify even if Cipla is subsequently required to exit the market.

22. Specifically, if Cipla enters the market with a sustained launch, Amgen will lose considerable Sensipar market share to Cipla's generic product as well as other competitive products due to the effects of TDAPA reimbursement, third-party payer

restrictions, reduction in promotion, and wholesaler inventory stocking practices. The amount of the market share that is lost is likely to be substantial and typically ranges anywhere from 40% to over 90%.[13] The existence of a sizable impact is consistent with Amgen's own projections, which forecast that if Amgen does not reduce the price of Sensipar substantially, Sensipar will lose up to 40-70% share after one month and over 90% share by six months, particularly in the event that Cipla's sustained entry leads to further entry by multiple generics.[14]

23. First, Amgen is likely to lose substantial market share due to the incentives created by the TDAPA reimbursement system that covers the majority of Sensipar sales. As explained above, dialysis organizations are reimbursed for their purchases of Sensipar (or generic equivalents) based on the average price over the past four quarters. Because a generic product is likely to price at a discount to the historic branded price, when a generic product first enters the market, dialysis organizations will have a strong financial incentive to choose the generic over Sensipar.

24. Second, for the portion of the business covered by third-party payers, Amgen is likely to lose substantial market share due to the loss of preferred coverage. Upon the market entry of one or more generic products, third-party payers will move Sensipar to less preferred formulary tiers, place extensive restrictions on coverage, and/or withhold coverage altogether for Amgen's product. In many states, pharmacists will be permitted

---

[13] See, e.g., E. Berndt et al., "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs* 26, 2007, p. 796; D. Lakdawalla and T. Philipson, "Does Intellectual Property Restrict Output? An Analysis of Pharmaceutical Markets," *Journal of Law and Economics* 55, 2012, p. 168; H. Grabowski, G. Long, and R. Mortimer, "Recent trends in brand-name and generic drug competition," *Journal of Medical Economics*, 2013, pp. 6-7.
[14] Georghiou Decl., ¶ 14.

by law, and encouraged by third-party payers, to substitute cheaper generic products for Sensipar, regardless of the prescribing physician's request for Sensipar. These formulary practices will drive a large percentage of Sensipar patients to Cipla's generic product. It is my understanding that these formulary changes have not yet occurred broadly as a result of the limited nature of the launches by Teva and Cipla thus far.[15]

25. Third, Amgen will also suffer loss of market share due to necessary reductions in its promotional efforts after a generic launch. It will not make economic sense for Amgen to promote Sensipar at the same levels it did before a sustained generic launch took place, because the generic will "free ride" on any such promotional efforts.[16] This reduction or elimination of promotion of a branded drug after generic entry is a commonly observed economic outcome.[17]

26. Continued marketing and physician outreach is an essential part of Amgen's efforts to maintain Sensipar's market share. It is therefore highly likely that the reduction in the promotion of Sensipar will cause a reduction in the sales not only of Sensipar itself, but also of the combined sales of both branded and generic Sensipar, as physicians and patients instead use alternative treatments such as active vitamin D analogs.[18]

---

[15] Georghiou Decl., ¶ 20.

[16] Amgen anticipates that the launch of a generic will lead to substantial reductions in its marketing efforts (Georghiou Decl., ¶ 31).

[17] See, e.g., D. Lakdawalla and T. Philipson, "Does Intellectual Property Restrict Output? An Analysis of Pharmaceutical Markets," *Journal of Law and Economics* 55, 2012, pp. 169-171.

[18] See, e.g., D. Lakdawalla and T. Philipson, "Does Intellectual Property Restrict Output? An Analysis of Pharmaceutical Markets," *Journal of Law and Economics* 55, 2012, p. 176 ("[F]or the average molecule, total quantity falls by about 5 percent on net after 5 months of patent expiration.").

27. Fourth, Amgen is also unlikely to regain its market share after the generic product is withdrawn from the market because of the "inventory overhang" effect of generic product inventory. Sophisticated generic companies are able to ramp up production, contact wholesalers, and be ready to ship immediately upon being able to enter the market. Sensipar has a shelf life of five years.[19] Accordingly, a strategy of immediately placing significant product inventory in the distribution channels is expected for generic entrants such as Cipla because bulk purchasers will buy a large stockpile of the lower-priced generic product. Those bulk purchasers, knowing of the risk that the generic product may soon be unavailable, will also have an economic incentive to stock up on generic inventory to the greatest extent possible. As a result, initial sales of the generic product will have an "inventory overhang" effect in the market, which will affect the sales of Sensipar for a long time, even if generic distribution is subsequently enjoined. Apotex's at-risk launch of a generic version of Plavix in 2006 provides an example of this effect. Within one day of Apotex's launch pharmaceutical wholesalers had purchased a six-month's supply of the product.[20]

28. Finally, even after the effect of an "inventory overhang" of a generic product has dissipated, Amgen is still not likely to be able to overcome the loss of market share caused by a generic at-risk launch and subsequent withdrawal. As described above, the launch of a generic product is likely to cause many patients and physicians to use different treatments. Once a patient begins treatment on an alternative drug during the period of reduced promotion for Sensipar, it may be difficult to convince the physician to

---

[19] Georghiou Decl., ¶ 25.
[20] J. Rubin, "Bristol-Myers Squibb: Further Scenario Analysis," Morgan Stanley Research, August 8, 2006.

subsequently switch the patient to, or return the patient back to, Sensipar as long as the alternative treatment is effective.

29. While some of the above harms have occurred, to a more limited extent, as a result of the limited launches to date by Teva and Cipla, a continued sustained launch by Cipla would greatly increase and exacerbate these harms. I also understand that if a generic product is launched by Cipla now it may be several months or more before a final resolution of Cipla's contractual dispute with Amgen, and before a decision in the appeal of the District Court's decisions concerning the '405 patent. As a result, even if Amgen prevails in this lawsuit and in the patent appeal, there could be a delay of several months before Cipla's products would be removed from the market. In that scenario, Sensipar would be unable to fully regain the market share it enjoyed before a period of several months of competing with Cipla's generic product. Pharmaceutical promotion affects not only current sales but also future sales, because the information that pharmaceutical promotion provides is not quickly forgotten or destroyed.[21] As a result, even if Amgen is able to restore Sensipar promotion to its previous levels after the generic product is withdrawn, the reduced promotion during the time generic product is on the market will cause a long-term reduction in future Sensipar sales compared to the situation in which Amgen's marketing efforts were not interrupted.

30. From an economic perspective, the long-term effects of a generic launch on market share are very difficult to predict with precision. I understand that, aside from the possible launch by Cipla (and, as I understand, another generic manufacturer named

---

[21] E. Berndt et al., "The Roles of Marketing, Product Quality, and Price Competition in the Growth and Composition of the U.S. Antiulcer Drug Industry," in *The Economics of New Goods*, T. Bresnahan and R. Gordon eds., 1997, p. 296.

Piramal Healthcare), Amgen will not lose Sensipar exclusivity until 2021. In order to compensate Amgen for its lost profits, it would be necessary to calculate the future profits of Sensipar both in the actual world in which generic product entered and was then withdrawn, and in the but-for world in which generic product never entered. The calculation of future profits in both the actual and but-for worlds would have to extend until at least 2021. Such a calculation would be difficult to estimate given the dynamic nature of the market. It would be very difficult to forecast with precision the future path of Sensipar profits in both the actual and but-for worlds given the dynamic competition and the lagged effects of promotion. Thus, these future lost profits represent irreparable harm to Amgen.

**B. Price Erosion**

31. If Amgen wishes to attempt to reduce the substantial market losses that will occur with the sustained launch of a generic product by Cipla, long-lasting price erosion for Sensipar is likely to result, even after Cipla's product is subsequently withdrawn from the market. The TDAPA reimbursement system that covers the majority of Sensipar sales is a significant factor contributing to this long-lasting price erosion. Because the reimbursement received by dialysis organizations depends on the four-quarter moving average price, the presence of low-priced generic product on the market for a period of time will depress the reimbursement rate even after generic product is withdrawn from the market. Thus, if Amgen attempted to charge the same price to dialysis organizations for Sensipar after generic product is withdrawn as it charged prior to generic entry, dialysis organizations would lose money. The exact price Amgen would be able to charge cannot be predicted with any reliability given that it would depend on the actions

of Amgen, dialysis organizations, and the government, but the mechanics of the reimbursement system produce a clear downward pressure. The resulting prices would be incorporated into the four-quarter moving average and thus propagate into the future. Again, while the initial limited launches by Teva and Cipla (and possibly Piramal) may have already begun a longer trend of price erosion for Sensipar, a larger, sustained launch by Cipla would exacerbate and increase these trends, likely by a significant amount.

32. Adding to the downward pressure on Sensipar's price is the fact that after the removal of the generic product dialysis organizations and third-party payers would be in stronger bargaining position (due to the inventories of generic product and the long-run shift away from Sensipar caused by generic entry) and would resist attempts to return to pre-entry price levels.

33. The harm suffered by Amgen of such price erosion is not likely to be calculable with sufficient accuracy to fully compensate Amgen for its losses. Any damage calculation would have to predict the future price and sales of Sensipar through the loss of exclusivity in 2021 if there is generic entry and compare that to a prediction about what would have occurred if Cipla had not launched its generic product. Since, as noted above, the potential effects of generic entry on the price of Sensipar will be long-lasting and difficult to predict, it is my opinion that an economist could not estimate future damages with sufficient precision to adequately compensate Amgen for its losses. In the present situation the uncertainty regarding future prices is even greater than is normal for pharmaceuticals due to the fact that the majority of Sensipar business is reimbursed through the TDAPA system. As the name indicates, the TDAPA system is only a transitional system, and sometime after January 2020 Medicare reimbursement for

Sensipar will transition to a permanent system.[22] Calculating future damages would require estimation of post-2020 Sensipar reimbursement both in the actual world in which generic product enters and is then removed, and in the but-for world in which generic product never entered in the first place. Neither of these can be estimated with sufficient certainty to adequately compensate Amgen for any losses. Further, additional generic products may launch as a result of Cipla's sustained entry. If additional entry occurs, that would add the significant additional complication of trying to estimate the portion of price erosion attributable to Cipla as opposed to other entrants. Thus, this factor is another reason why Amgen would not be adequately compensated for its losses. Moreover, a sustained entry by multiple generics will further increase the harm suffered by Amgen in terms of reduced market share, price erosion, and other effects I describe herein.

## C. Loss of Qualified Employees and Resulting Future Lost Sales

34. As noted above, Amgen currently promotes and supports the sales of Sensipar with a sales and marketing team of over ▮ people. If Cipla enters the market with a sustained launch, due to the effects described above ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and some sales representatives may leave for other opportunities.[23] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ As described above, a reduction in promotion and marketing

---

[22] Georghiou Decl., ¶ 16.
[23] Georghiou Decl., ¶ 30.

efforts related to Sensipar will, in my opinion, further the loss of Sensipar market share to other treatments.

35. Even if the generic product is later withdrawn from the market, it is unlikely that Amgen could sufficiently remedy any economic harms associated with a reduction in its sales force. As the brand innovator, Amgen's staff has over a decade of experience in promoting Sensipar. Once lost, that expertise and experience could not be rebuilt quickly.

36. Notwithstanding the direct harms caused by the ████████████████ any associated economic harms caused by the loss of market share and sales to a competing generic product would be extremely difficult to predict. Additionally, for the reasons already discussed above, it is unlikely that such losses could ever be regained.

\*       \*       \*

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2019.

Jerry A. Hausman, Ph.D.

15

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 11, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire                              *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire                            *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004
*Attorneys for Plaintiffs*

/s/ *Brian P. Egan*
_____
Brian P. Egan (#6227)

EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIPLA LTD. and CIPLA USA, INC.,      ) <br><br> Plaintiffs,      ) <br><br> v.      ) <br><br> AMGEN INC. and TEVA <br> PHARMACEUTICALS USA, INC.,      ) <br><br> Defendants.      ) <br><br><br> AMGEN INC.,      ) <br><br> Counterclaim-Plaintiff,      ) <br><br> v.      ) <br><br> CIPLA LTD. and CIPLA USA, INC.,      ) <br><br> Counterclaim-Defendants.      ) | C.A. No. 19-cv-44-LPS <br><br> **CONFIDENTIAL – FILED UNDER SEAL** |

**DECLARATION OF COLMAN B. RAGAN, ESQ. IN SUPPORT OF
AMGEN INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Colman B. Ragan, declare as follows:

1.    I am Vice President & General Counsel, North America Intellectual Property Litigation, at Teva. I have served in that role since February 2018. Prior to assuming that role, I was Associate General Counsel, U.S. Intellectual Property Litigation, at Teva from August 2016 until January 2018. Prior to joining Teva, I held the position of Counsel, Intellectual Property, at Allergan plc (f/k/a Actavis plc.) from February 2013 until August 2016.

2.    I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

3.    As part of my current role, I oversee the team that handles all intellectual property litigation in the United States and Canada.

4.    In the course of carrying out those responsibilities, I was personally involved, on behalf of Teva Pharmaceuticals USA, Watson Laboratories, Inc., Actavis Pharma, Inc., and Barr Laboratories, Inc. (collectively, "Teva"), in the negotiation of the Litigation Settlement Agreement, signed on January 2, 2019, between Amgen Inc. ("Amgen") and Teva (the "Agreement").

5.    I understand that, in connection with a litigation filed by Cipla Ltd. and Cipla USA, Inc. (together, "Cipla"), Cipla has asserted that the Agreement between Teva and Amgen did not require Teva to cease and desist from sales of Teva's cinacalcet hydrochloride products (the "Teva Products"). This is incorrect.

6.    Under the Agreement, Teva agreed that it would cease selling the Teva Products ████████████████████████████████████████████████████

████████████████████████████████████

7.    In fact, Teva had ceased its sales of the Teva Products by January 2, 2019, and

2

neither Teva nor its affiliates have sold any Teva Products since that date.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 11, 2019.

_____
Colman B. Ragan
Vice President & General Counsel
North America Intellectual Property Litigation

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 11, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire                                      *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire                                      *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004
*Attorneys for Plaintiffs*

/s/ Brian P. Egan
_____
Brian P. Egan (#6227)

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIPLA LTD. and CIPLA USA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-cv-44-LPS |
| | ) | |
| AMGEN INC. and TEVA | ) | **SEALED** |
| PHARMACEUTICALS USA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| AMGEN INC., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CIPLA LTD. and CIPLA USA, INC., | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF JOSHUA I. ROTHMAN IN SUPPORT OF AMGEN INC.'S
## MOTION FOR A PRELIMINARY INJUNCTION

I, JOSHUA I. ROTHMAN, declare and state:

1.      I am an attorney duly admitted to practice before this Court and a partner at the law firm of Venable LLP.

2.      I have knowledge of the facts set forth herein, and if called upon as a witness, I could testify to them competently under oath.

3.     I represented Defendant Amgen Inc. ("Amgen") in connection with the Litigation Settlement Agreement, effective February 26, 2018, between Cipla Ltd. and Cipla USA, Inc. (collectively, "Cipla") and Amgen (the "Cipla Agreement").

4.     Attached hereto as **Exhibit A** is a true and correct copy of an e-mail I received, and subsequently forwarded, on February 22, 2018, from Anil H. Patel, who represented Cipla in connection with the Cipla Agreement, and the redline attachment to that email.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on March 11, 2019 in New York, New York.

_____
Joshua I. Rothman

# EXHIBIT A

| From: | Rothman,Joshua |
| --- | --- |
| To: | Kwasigroch, Lois - LAW; Agovino, Eric - LAW |
| Cc: | Murnane, John D.; Russo, Alicia |
| Subject: | FW: Amgen v. Cipla |
| Date: | Thursday, February 22, 2018 3:35:25 PM |
| Attachments: | image004.jpg |
| | REDLINE - Amgen 2 15 and Cipla 2 22.pdf |
| | Cipla 2 22 18 Amgen v Cipla - CLEAN.docx |

New draft

**Joshua I. Rothman**
**FITZPATRICK, CELLA, HARPER & SCINTO**
1290 Avenue of the Americas
New York, NY 10104-3800
T 212-218-2275
F 212-218-2200
JRothman@fchs.com
http://www.fitzpatrickcella.com
Bio

**From:** Patel, Anil H. [mailto:Anil.Patel@klgates.com]
**Sent:** Thursday, February 22, 2018 3:31 PM
**To:** Rothman,Joshua
**Cc:** Russo, Alicia; anil.patel@klgates.com
**Subject:** RE: Amgen v. Cipla

My apologies but please use this draft. A minor change.



**Anil Patel**
Partner
K&L Gates LLP
1000 Main St., Suite 2550
Houston, TX 77002 USA
Phone: 713.815.7304
Cell:  352.219.5071
Fax: 713.583.9417
anil.patel@klgates.com
www.klgates.com

**From:** Rothman,Joshua [mailto:JRothman@fchs.com]
**Sent:** Thursday, February 22, 2018 3:14 PM
**To:** Patel, Anil H.
**Cc:** Russo, Alicia; Patel, Anil H.
**Subject:** RE: Amgen v. Cipla

Of course.

**Joshua I. Rothman**
**FITZPATRICK, CELLA, HARPER & SCINTO**
1290 Avenue of the Americas

New York, NY 10104-3800
T 212-218-2275
F 212-218-2200
JRothman@fchs.com
http://www.fitzpatrickcella.com
Bio

---

**From:** Patel, Anil H. [mailto:Anil.Patel@klgates.com]
**Sent:** Thursday, February 22, 2018 3:14 PM
**To:** Rothman,Joshua
**Cc:** Russo, Alicia; anil.patel@klgates.com
**Subject:** RE: Amgen v. Cipla

Subject to FRE 408, of course ☺.



**Anil Patel**
Partner
K&L Gates LLP
1000 Main St., Suite 2550
Houston, TX 77002 USA
Phone: 713.815.7304
Cell:  352.219.5071
Fax: 713.583.9417
anil.patel@klgates.com
www.klgates.com

---

**From:** Patel, Anil H.
**Sent:** Thursday, February 22, 2018 3:13 PM
**To:** Rothman,Joshua
**Cc:** Russo, Alicia; Patel, Anil H.
**Subject:** RE: Amgen v. Cipla

**Subject to FRE 508**

Josh,

Please see attached. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

Cipla has also preliminarily obtained upper management approval, pending clarity on the couple of final points.

I am in a meeting all day, but am happy to step out to discuss once you have reviewed and discussed with your client.

Thanks,
Anil



**Anil Patel**
Partner
K&L Gates LLP
1000 Main St., Suite 2550
Houston, TX 77002 USA
Phone: 713.815.7304
Cell: 352.219.5071
Fax: 713.583.9417
anil.patel@klgates.com
www.klgates.com

---

**From:** Rothman,Joshua [mailto:JRothman@fchs.com]
**Sent:** Thursday, February 22, 2018 12:42 PM
**To:** Patel, Anil H.
**Cc:** Russo, Alicia
**Subject:** Amgen v. Cipla

Anil,

Let me know if you have a minute to talk.

Josh

**Joshua I. Rothman**
<span style="color:teal">**FITZPATRICK, CELLA, HARPER & SCINTO**</span>
1290 Avenue of the Americas
New York, NY 10104-3800
T 212-218-2275
F 212-218-2200
JRothman@fchs.com
http://www.fitzpatrickcella.com
Bio

---

This email message and any attachments are intended for the use of the addressee(s) indicated above. Information that is privileged or otherwise confidential may be contained therein. If you are not the intended recipient(s), you are hereby notified that any dissemination, review or use of this message, documents or information contained therein is strictly prohibited. If you have received this message in error, please immediately delete it and notify us by telephone at (212) 218-2100. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Anil.Patel@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Anil.Patel@klgates.com.

# REMAINDER OF THIS EXHIBIT REDACTED IN ITS ENTIRETY