IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION | ) ) ) ) ) |
| | MDL No. 19-2895-LPS |
| CIPLA LTD. and CIPLA USA, INC., | ) ) ) |
| | Filed October 21, 2019 |
| Plaintiffs, | ) ) ) |
| | Redacted: Public Version |
| v. | ) ) ) |
| | C.A. No. 19-044-LPS |
| AMGEN INC. and TEVA PHARMACEUTICALS USA, INC., | ) ) ) ) |
| Defendants. | ) ) |

**DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S MOTION TO REDACT OPENING BRIEF (NO. 19-44 D.I. 239, MDL NO. 2895 D.I. 26) UNDER SEAL**

OF COUNSEL:
Henninger S. Bullock
Richard A. Spehr
Karen W. Lin
MAYER BROWN
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Dated: October 16, 2019

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Defendant Teva Pharmaceuticals USA, Inc.*

Pursuant to this Court's February 19, 2019 Order (No. 19-44, D.I. 55), Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), by and through its undersigned counsel, respectfully submits this motion in support of its redaction to Teva's Opening Brief in Support of its Motion to Dismiss ("Brief") (No. 19-44, D.I. 239, MDL No. 2895, D.I. 26).[1]

The grounds for this motion are set forth below. A highlighted version of the proposed redactions is attached hereto as Exhibit A; a redacted version is attached as Exhibit B.

Although courts "recognize a common law right to inspect and to copy judicial records and documents, the right is not absolute." *Littlejohn v. Bic Corp.*, 851 F.2d 673, 677-78 (3d Cir. 1988). For example, courts may deny access where judicial records contain business records that may harm the party's competitive standing in the marketplace. *Id.* at 678; *see also Mars, Inc. v. JCM Am. Corp.*, 2007 WL 496816, at *2 (D.N.J. Feb. 13, 2007). Courts may also deny access where, as here, a case involves the confidential information of private litigants. *LEAP Systems, Inc. v. MoneyTrax, Inc.*, 638 F .3d 216, 222 (3d Cir. 2011). In particular, parties have a "legitimate private interest in keeping confidential the terms of a confidential business agreement not otherwise available to the public. *Mars*, 2007 WL 496816, at *2. Public disclosure of confidential terms may "dampen [the party's] ability to negotiate effectively favorable terms" in the future and cause it to "suffer a competitive injury by having its [c]onfidential [i]nformation disclosed to the public."

Pursuant to these principles and precedents, Teva respectfully requests that the redactions proposed on pages 5 and 18 be permitted. The proposed redactions are limited and consistent with the Court's Order dated February 19, 2019 (D.I. 55 at 4-5). The proposed redactions relate to terms of the confidential Amgen-Teva Agreement that have not been publicly disclosed. None of these terms were necessary to the Court's unsealed May 2, 2019 Memorandum Opinion.

---

[1] Pursuant to D. Del. L.R. 7.1.1, the parties met and conferred on the redactions proposed herein. Neither Cipla nor Amgen oppose this Motion to Redact Teva's sealed Opening Brief.

Accordingly, Teva respectfully requests approval of its proposed redactions.

/s/ Karen E. Keller
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Defendant Teva
Pharmaceuticals USA, Inc.*

OF COUNSEL:
Henninger S. Bullock
Richard A. Spehr
Karen W. Lin
MAYER BROWN
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Dated: October 16, 2019

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Defendant Teva*
*Pharmaceuticals USA, Inc.*

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION | ) ) ) ) | |
| | ) | MDL 2895 |
| *THIS DOCUMENT RELATES TO:* | ) ) | |
| *CIPLA LTD. and CIPLA USA, INC.,* | ) ) | |
| *Plaintiffs,* | ) ) | C.A. No.: 19-44-LPS |
| *v.* | ) ) | |
| *AMGEN INC. and TEVA PHARMACEUTICALS USA, INC.,* | ) ) ) | **FILED UNDER SEAL** |
| *Defendants.* | ) ) ) | |

**DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

Karen E. Keller (No. 4489)
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th floor
Wilmington, DE 19801
Telephone: (302) 298-0702
kkeller@shawkeller.com

Henninger S. Bullock (*pro hac vice*)
Richard A. Spehr (*pro hac vice*)
Karen W. Lin (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
hbullock@mayerbrown.com

*Counsel for Defendant Teva*
*Pharmaceuticals USA, Inc.*

# TABLE OF CONTENTS

**Page**

NATURE AND STATE OF THE PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

I.     THE ONGOING PATENT INFRINGEMENT LITIGATION. ............................... 3

    A.    The Settlement Agreement Between Amgen And Cipla. ...................... 3

    B.    The Settlement Agreement Between Amgen And Teva........................ 4

    C.    Amgen's January 4, 2019 Letter To Cipla........................................... 5

II.    THIS ACTION............................................................................................... 6

III.    CIPLA'S LAUNCH AND AMGEN'S COUNTERCLAIM. ............................ 7

ARGUMENT ................................................................................................................ 8

I.     CIPLA'S SHERMAN ACT CLAIMS AGAINST TEVA MUST BE DISMISSED. ................................................................................................... 8

    A.    Cipla Lacks Constitutional And Antitrust Standing. ............................. 8

        1.    Cipla Has Failed To Allege Constitutional Or Antitrust Injury................ 9

        2.    The Other Relevant Factors Weigh Against Finding Antitrust Standing. ............................................................................. 12

    B.    Cipla Failed To Plausibly Allege A Violation Of 15 U.S.C. § 1. ......................... 13

        1.    Cipla Failed To Plausibly Allege That The Teva Agreement Violated Section 1 Of The Sherman Act. ................................................. 14

        2.    Teva's Public Statement About The Settlement Agreement Is Not An Antitrust Violation. .......................................................... 17

        3.    Amgen's January 4, 2019 Letter. ........................................... 19

    C.    This Court Should Remand Or Dismiss Cipla's State Law Claims.................... 19

        1.    Cipla Failed To Plausibly Plead A Violation Of The Cartwright Act Or UCL................................................................ 19

        2.    Cipla Fails To State A Fraud Claim....................................... 20

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987)...................................................................................8

*Amgen Inc. v. Amneal Pharm. LLC*,
    328 F. Supp. 3d 373 (D. Del. 2018)........................................................................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................8

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994).....................................................................................11

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) ....................................................................9, 10, 13

*Barton & Pittinos, Inc. v. SmithKlineBeecham Corp.*,
    118 F.3d 178 (3d Cir. 1997) (Alito, J.) .................................................................12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................8, 17, 19

*Brunswick v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...........................................................................................9, 11

*Burtch v. Milberg Factors, Inc.*,
    2009 WL 840589 (D. Del. March 30, 2009)..........................................................17

*Cipla Ltd. v. Amgen, Inc.*,
    2019 WL 3202824 (3d Cir. July 16, 2019)..........................................................4, 7

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998)....................................................................................8

*City of San Jose v. Office of the Comm'r of Baseball*,
    776 F.3d 686 (9th Cir. 2015) .................................................................................20

*In re Dex Media*,
    595 B.R. 19 (D. Del. 2018)......................................................................................9

*Ethypharm S.A. France v. Abbott Labs.*,
    707 F.3d 223 (3d Cir. 2013)....................................................................................9

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ............................................................................................2, 14, 15, 17

*Gaffin v. Teledyne, Inc.*,
    611 A.2d 467 (Del. 1992) ...................................................................................................20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ................................................................................................16

*Goldman v. Gen. Accident Ins. Co. of Am.*,
    2007 WL 2781935 (D.N.J. May 24, 2007) ........................................................................16

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2005) ..............................................................................................16

*Hospira, Inc. v. Sandoz Inc.*,
    2014 WL 794589 (D.N.J. Feb. 27, 2014) ..........................................................................16

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010) ..............................................................................................14

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ..............................................................................................17

*Intervest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003) ..............................................................................................19

*Kappe Assocs. v. Chesapeake Evntl. Equip., LLC*,
    2016 WL 1257665 (E.D. Pa. Mar. 31, 2016) ....................................................................20

*Kim v. United States*,
    903 F. Supp. 1546 (S.D.N.Y. 1995) ..................................................................................16

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
    791 F.3d 388 (3d Cir. 2015) ..............................................................................................15

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
    729 F. App'x 528 (9th Cir. 2018) ......................................................................................20

*In re Lipitor Antitrust Litig.*,
    868 F.3d 231 (3d Cir. 2017) ..............................................................................................14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1974) ...........................................................................................................10

### TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Merican, Inc. v. Caterpillar Tractor Co.*,
    713 F.2d 958 (3d Cir. 1983)..................................................................................13

*Nat'l Distillers & Chem. Corp. v. Dep't of Energy*,
    1980 WL 1057 (D. Del. Oct. 23, 1980) ................................................................18

*NNN 400 Capital Ctr. 16, LLC v. FGG, Inc.*,
    2018 WL 3614794 (D. Del. July 27, 2018) ..........................................................20

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*,
    187 F. Supp. 3d 483 (D.N.J. 2016) ......................................................................11

*Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*,
    61 F. Supp. 2d 102 (D. Del. 1996)..................................................................16, 17

*QSGI, Inc. v. IBM Global Fin.*,
    2012 WL 1150402 (S.D. Fla. Mar. 14, 2012).......................................................12

*Schuylkill Energy Resources, Inc. v. Penn. Power & Light Co.*,
    113 F.3d 405 (3d Cir. 1997)..................................................................................11

*SigmaPharm, Inc. v. Mutual Pharm. Co.*,
    454 F. App'x 64 (3d Cir. 2011) ............................................................................11

*Southmark Prime Plus, L.P. v. Falzone*,
    776 F. Supp. 888 (D. Del. 1991)............................................................................7

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999)..................................................................................12

*United States v. Gibbs*,
    383 U.S. 715 (1966)..............................................................................................19

*United States v. Singer Mfg. Co.*,
    374 U.S. 174 (1963)..............................................................................................15

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948)..............................................................................................15

**Statutes**

Cal. Bus. & Prof Code § 16720 .....................................................................6, 19, 20

Cal. Bus. & Prof. Code § 17200 .................................................................................6

15 U.S.C. § 1 .........................................................................................................6, 13

### TABLE OF AUTHORITIES
(continued)

Page(s)

**Other Authorities**

Fed. R. Civ. P. 9 .................................................................................................................8, 20

Fed. R. Civ. P. 12 .................................................................................................................1, 8

## NATURE AND STATE OF THE PROCEEDINGS

Cipla Ltd. and Cipla USA, Inc. ("Cipla") filed their amended complaint on February 25, 2019.  D.I. 73.  Teva Pharmaceuticals USA, Inc. ("Teva") moves to dismiss the second, third, fourth, and fifth causes of action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and the fifth cause of action under Rule 9(b) for failure to plead fraud with particularity.

## SUMMARY OF ARGUMENT

Cipla brings this action against Teva and Amgen, Inc. ("Amgen") to recover profits that Cipla claims to have lost from the sale of cinacalcet hydrochloride products, which Cipla chose to forego.  In 2016 and 2017, Amgen sued Cipla, Teva, and other pharmaceutical manufacturers for patent infringement stemming from those manufacturers' filing of Abbreviated New Drug Applications seeking FDA approval to market generic cinacalcet products.  Rather than bearing the risk and costs of defending its generic product against Amgen's claims, Cipla entered into a settlement agreement with Amgen in which Cipla agreed to refrain from selling its product until a later specified date.  Teva, by contrast, chose to litigate the claim against it, and after prevailing in the district court, launched its product "at risk."  But faced with the possibility that the Federal Circuit could reverse the district court's judgment—and retroactively attach liability to Teva's at-risk sales—Teva ultimately entered into a settlement with Amgen (the "Teva Agreement").  Like Cipla, Teva agreed to cease selling its generic product until a future license date.

Upon learning of Teva's settlement, Cipla brought this action in an attempt to extract from Amgen and Teva the profits Cipla forewent.  Cipla alleges that Teva and Amgen violated federal antitrust law and California state antitrust and unfair competition statutes because Teva's agreement to cease selling its product reduces competition; Cipla then alleges that Teva violated those same statutes and committed fraud because Teva did *not* agree to cease selling its product

but publicly stated that it had.  Even aside from the inherent contradiction in Cipla's allegations, none of Cipla's claims have any merit, for two fundamental (and equally dispositive) reasons.

*First*, and most basically, Cipla lacks any standing to assert antitrust claims against Teva because Cipla has not suffered any injury, much less the type of injury that the antitrust laws were designed to redress.  Cipla argues that the Teva Agreement violated the Sherman Act by reducing the supply, and increasing the price, of cinacalcet products.  But Cipla does not claim to have been injured by any such reduction in supply and increase in price; rather, it seeks to *benefit* from those alleged effects.  Cipla has told this Court that its injuries here were from not having launched and sold its own generic product—and, thus, not realizing the profits from those sales—in a market without generic competition and at the higher prices that the Teva Agreement allegedly sought to preserve.  And at Cipla's behest, both this Court and the Third Circuit held that Teva's at-risk launch actually benefitted Cipla because that launch triggered Cipla's right to launch and sell its generic product, and Teva's later settlement with Amgen did nothing to extinguish that right.  Cipla thus benefitted from the very conduct about which it now complains; it suffered *no* injury as a result of the Teva Agreement, much less an injury that the antitrust laws were designed to redress.

*Second*, the Supreme Court's decision in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ("*Actavis*"), forecloses any argument that the Teva Agreement violated the antitrust laws. *Actavis* recognized that settlement agreements like Teva's—and like Cipla's—are commonplace and lawful.  Cipla's theory of liability would upend the longstanding, accepted practice of settling cases by *requiring* Teva to incur the costs and risks of reversal on appeal in the Federal Circuit.  But the law does not require such an absurd result—especially when there are no facts alleged that Teva even knew that entering into a settlement agreement with Amgen would impact

Cipla's (or anyone else's) contractual right to launch, much less that Teva worked with Amgen to frustrate those rights.

Because Cipla's sole federal law claim fails on its face, this Court should decline to exercise supplemental jurisdiction over Cipla's state law claims. But if this Court does exercise supplemental jurisdiction, it should dismiss the state law claims as well because Cipla has failed to adequately allege their required elements. This Court should accordingly dismiss the claims against Teva.

**STATEMENT OF FACTS**

## I.    THE ONGOING PATENT INFRINGEMENT LITIGATION

Amgen holds United States Patent No. 9,375,405 (the "'405 patent"), which describes and claims pharmaceutical compositions comprising cinacalcet hydrochloride and various other pharmaceutically acceptable excipients. Amgen also markets and sells Sensipar, the active ingredient in which is cinacalcet hydrochloride.

Beginning in 2016, Cipla, Watson Laboratories, Inc. (Teva's subsidiary), and other generic drug manufacturers filed Abbreviated New Drug Applications ("ANDAs") seeking approval to manufacture and sell generic cinacalcet hydrochloride products. Amgen sued those manufacturers, alleging infringement of the '405 patent.

### A.    The Settlement Agreement Between Amgen And Cipla

In February 2018, before trial, Cipla entered into an agreement with Amgen to settle Amgen's claims against Cipla ("Cipla Agreement"). D.I. 73, Am. Compl. ("AC") ¶ 8. Cipla agreed not to sell generic cinacalcet products in the United States. In return, Amgen released its claims against Cipla and agreed to grant Cipla a license to the '405 patent, beginning 97 days before the expiration of the agreement, subject to certain accelerators. AC Ex. 1, ¶ 5.2.

-3-

The Cipla Agreement contemplated certain circumstances in which a third party launch would trigger and accelerate Cipla's own ability to launch, including if a third party were to engage in an unauthorized launch of a generic cinacalcet product, and Amgen did not either (a) move for a temporary restraining order or preliminary injunction prohibiting any further sale of that generic product, or (b) enter into an agreement requiring the third party to stop selling the generic cinacalcet product within 30 calendar days of the agreement.  *Id.* § 5.5(a).

Section 5.6 of the Cipla Agreement then provided that Amgen is entitled to seek relief if Cipla launches its product following a third party's at-risk launch, and the third party (a) admits to or is later found to infringe Amgen's patent, and (b) agrees or is required to pay damages relating to its at risk launch.  *Id.* § 5.6.  But

> [n]otwithstanding anything to the contrary in this Settlement Agreement, if any Third Party that has made an At Risk Launch of a Generic Cinacalcet Product (where such At Risk Launch is before or after an at risk launch by Defendant) is not found to have infringed one or more valid and enforceable claims of the '405 patent or has not ceased or agreed to cease selling such Generic Cincalcet Product following an At Risk Launch, then Amgen shall not be entitled to seek or recover any relief from Defendants for Defendants' at risk sales, offers for sale, distribution, or importation of Defendants' Product.

*Id.*  In other words, Section 5.6 "identifies two circumstances that would allow Cipla to launch without Amgen's interference":  when "a third party 'is not found to have infringed' the '405 patent or has not stopped or agreed to stop selling a generic cinacalcet product."  2019 WL 3202824, at *4 (3d Cir. July 16, 2019).

### B.   The Settlement Agreement Between Amgen And Teva

In July 2018, the court (Goldberg, J.) ruled, among other things, that Watson's ANDA did not infringe the '405 patent.  *See Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 391 (D. Del. 2018).  Amgen subsequently appealed that judgment.

On or around December 28, 2018, while Amgen's appeal was pending, Teva launched its generic cinacalcet product "at risk." AC ¶ 12. Five days later, on January 2, 2019, Amgen and Teva entered into the Teva Agreement, which resolved Amgen's infringement claims against Teva. *Id.* ¶ 17. Under the Teva Agreement, Amgen agreed to release its claims against Teva in the patent infringement action and to grant Teva a license to sell cinacalcet products starting on ████████, or earlier under certain circumstances. AC Ex. 3, ¶¶ 3.3, 5.1-5.2. Solely for purposes of settlement, Teva was willing to stipulate that sale of its generic product would infringe Amgen's patent, agreed to cease sales of generic cinacalcet, and agreed to pay Amgen up to $40 million in exchange for Amgen's release.[1] *Id.* ¶¶ 3.1, 4.1, 7.17, 7.3.

Amgen and Teva then issued separate public statements announcing the settlement agreement. Teva's stated that it "ha[d] agreed to stop selling its generic product until its license date in mid-year 2021 or sooner depending on certain occurrences." AC Ex. 5.

### C.    Amgen's January 4, 2019 Letter To Cipla

In a letter dated January 4, 2019, Amgen responded to a letter it had received from Cipla concerning the Cipla Agreement. Amgen stated that Teva's at-risk launch did not trigger a right on Cipla's behalf to launch under the Cipla Agreement. AC Ex. 6, pp.1-2. Amgen then (1) sought confirmation that Cipla had not and would not launch at risk, and (2) preserved its ability to seek all remedies available under the Cipla Agreement in the event of such launch. AC ¶ 39.

---

[1] Because the amounts that Teva would earn from its at-risk sales—and the corresponding damages that Teva's at-risk launch would allegedly cause Amgen—would decrease if and as other generic manufacturers entered the cinacalcet market after the Teva Agreement, the exact amount that Teva would owe to Amgen was made dependent on how many such manufacturers entered the market, and when. *Id.* ¶ 3.1

## II.    THIS ACTION

Apparently not confident in the rights it had negotiated under its settlement agreement with Amgen, Cipla stood down in response to Amgen's January 4 letter and, notwithstanding Teva's launch, did not launch its own product.  Instead, Cipla commenced this action against Amgen and Teva, seeking damages that would substitute for the money it could have earned (but did not) had it launched its own product.[2]  In other words, Cipla sought to put itself in Teva's shoes without having undertaken the costs and risks that Teva did.

Cipla asserts five claims—only one of which arises under federal law:  a claim that Amgen and Teva violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  Cipla alleges that Amgen and Teva agreed to "restrict supplies of, and to maintain artificially high prices for, Cinacalcet Products sold in United States commerce, and to share in monopoly profits" by entering into the Teva Agreement.  AC ¶¶ 53-54.  Cipla further alleges that Amgen and Teva falsely stated to the public that "Teva has agreed to stop selling its generic product until its license date in mid-year 2021 or sooner depending on certain occurrences."  AC ¶¶ 18-21.

Cipla invokes supplemental jurisdiction over its remaining four state law claims based on the same allegations as its Sherman Act claim: (1) a request for a declaratory judgment concerning its contractual rights[3]; (2) a claim under California's Cartwright Act (Cal. Bus. & Prof Code § 16720); (3) a claim under California's Unfair Competition Law ("UCL," Cal. Bus. & Prof. Code § 17200); and (4) a common law fraud claim.  AC ¶¶ 72-81.

---

[2] Cipla originally named only Amgen as a defendant.  D.I. 2.  After Amgen filed a motion to dismiss, Cipla amended its complaint to include Teva as a defendant.  D.I. 73.

[3] The declaratory judgment claim is asserted against Amgen only.

### III.   CIPLA'S LAUNCH AND AMGEN'S COUNTERCLAIM

On March 2, 2019, almost two months after filing this lawsuit, Cipla launched its own generic cinacalcet product.  Cipla argued that it was entitled to do so under its settlement agreement with Amgen as a result of Teva's at-risk launch, notwithstanding the Teva Agreement.  D.I. 148.[4]  Amgen subsequently asserted a counterclaim against Cipla, alleging that Cipla's sales breached the Cipla Agreement, and moved for a preliminary injunction seeking to restrain further sales by Cipla.   D.I. 154-1, 121.   Cipla opposed the preliminary injunction, arguing that Teva's launch gave Cipla the right to launch and that Cipla's right was left "undisturbed" by the Teva Agreement.  D.I. 168-1 at 13-14.

This Court agreed with Cipla, holding that, under Section 5.6 of the Cipla Agreement, Amgen was barred from obtaining relief in connection with Cipla's sale of generic cinacalcet product because Teva was "not found to have infringed" the '405 patent.  D.I. 186 at 16-20.

Amgen appealed the denial of the preliminary injunction.  Cipla argued to the Third Circuit that it was entitled to launch under the Cipla Agreement without consequence "irrespective of whether Teva has 'ceased or agreed to cease selling' the Teva products."  Br. of Pls.-Appellees ("Cipla 3d Cir. Br.") at 32, *Cipla Ltd. v. Amgen, Inc.*, No. 19-2017 (3d Cir. June 20, 2019).  The Third Circuit agreed and affirmed, holding that "Amgen was not authorized to seek relief against Cipla for its launch" because Teva "made an at risk launch of its generic cinacalcet."  2019 WL 3202824, at *5.  Cipla's product has been on the market for six months.

---

[4] This court can take judicial notice of the contents of court records.  *See, e.g., Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991).

**ARGUMENT**

This Court should dismiss the claims against Teva under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, Rule 12(b)(6) for failure to state a plausible claim upon which relief can be granted and Rule 9(b) for failure to plead fraud with particularity.  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  And when a plaintiff alleges fraud, it must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Cipla's allegations fall far short of its burden.

**I.    CIPLA'S SHERMAN ACT CLAIM AGAINST TEVA MUST BE DISMISSED**.

    **A.    Cipla Lacks Constitutional And Antitrust Standing.**

As a threshold matter, Cipla's Sherman Act claim fails because Cipla lacks constitutional and antitrust standing.  Even where there has been a violation of the antitrust laws (which is not the case here), an antitrust plaintiff must satisfy the constitutional standing requirements, as well as the special "antitrust standing" requirements: "antitrust injury," *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264-65 (3d Cir. 1998), and a showing that the plaintiff is "the most effective plaintiff from among those who have suffered loss."  *Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987).  Cipla has not established constitutional or antitrust injury, nor would it be a proper plaintiff even if it had.

1.      **Cipla Has Failed To Allege Constitutional Or Antitrust Injury.**

An indispensable component of constitutional and antitrust standing is that the plaintiff suffered injury in fact traceable to the defendant's action; antitrust standing further requires that the injury be "the type the antitrust laws were intended to prevent that flows from that which makes defendants' acts unlawful"—*i.e.*, antitrust injury. *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232-33 (3d Cir. 2013). In other words, antitrust injury "means injury from higher prices or lower output." *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986).

Cipla is estopped from arguing that it has suffered *any* injury, much less an antitrust injury, flowing from *any* aspect of or statements about the Teva Agreement. Cipla argued—successfully—to both this Court and the Third Circuit that under Section 5.6 of its agreement with Amgen, (a) its right to launch its generic cinacalcet product arose the moment Teva did because a district court had previously found that Teva's product did not infringe on Amgen's patent, and (b) this right was in no way affected by Teva's subsequent settlement with Amgen because its right to launch was not dependent on Teva staying in the market. D.I. 168-1 at 12-14; Cipla 3d Cir. Br at 24-27, 32. Thus, according to Cipla itself, Teva's conduct was pro-competitive and, in any event, entirely *beneficial* to Cipla: It triggered Cipla's right to enter the market, and Teva's subsequent settlement with Amgen had no impact whatsoever on that right. Cipla's prior decision to stay out of the market was just that—Cipla's decision—and Cipla is estopped from arguing otherwise. *See, e.g., In re Dex Media*, 595 B.R. 19, 36-41 (D. Del. 2018).

Even if Cipla could plausibly claim that the Teva Agreement negatively affected its right to launch, that would not be an injury flowing from the Teva Agreement because that situation would be entirely the result of the bargain that Cipla itself negotiated with Amgen. Cipla and Amgen expressly contemplated that another company might engage in an at-risk launch, and

their agreement provided different rights to Cipla depending on the circumstances surrounding that launch:  Under the Cipla Agreement, if Amgen either sought a preliminary injunction or *entered into an agreement requiring the at-risk launcher to stop selling its generic product*, Cipla *agreed* that it would not launch.  AC Ex. 1 ¶ 5.5(a)(ii).  Meanwhile, as this Court and the Third Circuit have found, Section 5.6 of the Cipla Agreement *allowed* Cipla to launch under certain other circumstances—*e.g.,* Teva's at-risk launch.  Once again, therefore, Teva's conduct was directly to Cipla's benefit, but even were it not, Cipla's position would be the direct result of Cipla's own agreement with Amgen.  Accordingly, Cipla cannot now claim that it was injured by Teva's conduct (including the Teva Agreement).

In any event, Cipla's asserted injury is not an *antitrust* injury.  Cipla alleges that the Teva Agreement "restrict[s] supplies of, and . . . maintain[s] artificially high prices for, Cinacalcet Products sold in United States commerce."  AC ¶ 53.  But Cipla does not allege that *it* was injured by any restriction in the supply of cinacalcet products; and it does not allege that *it* was injured by high prices for those products.  Nor could it.  As the Supreme Court has explained, plaintiffs cannot recover damages for acts by their competitors "to charge higher than competitive prices" or that "limit[] output" because "[s]uch restrictions, though harmful to competition, actually *benefit* competitors."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1974); *accord Ball Mem. Hosp.*, 784 F.2d at 1334.

Apparently recognizing this fundamental problem, Cipla tries to plead around it, alleging that it was deprived of the opportunity to *take advantage of* the higher prices in the market because it was not sure whether it had the right to launch its own product under its agreement with Amgen and, thus, did not immediately launch in the wake of Teva's at-risk launch.  AC ¶¶ 24, 67.  But neither common sense, nor longstanding antitrust jurisprudence, supports this

allegation:  Teva cannot credibly be faulted for Cipla's uncertainty about its own contractual

rights, and that uncertainty is simply not "the type of injury that the antitrust statute was intended

to forestall."  *SigmaPharm, Inc. v. Mutual Pharm. Co.*, 454 F. App'x 64, 70 (3d Cir. 2011) (loss

of a "contractually agreed upon" benefit is not an antitrust injury).   Ultimately, Cipla is

complaining about its own failure, based on its own uncertainty as to its contractual rights, to

profit from the *lack* of competition in the marketplace.[5]  That alleged injury revolves around a

disputed "interpretation of the [agreement]" between Cipla and Amgen, which "should be

resolved pursuant to common-law contract principles," and not antitrust law.  *Schuylkill Energy*

*Resources, Inc. v. Penn. Power & Light Co.*, 113 F.3d 405, 418 (3d Cir. 1997); *see also*

*Balaklaw v. Lovell*, 14 F.3d 793, 797-98 (2d Cir. 1994).

    Indeed, because Cipla's alleged injury stems from Cipla's agreement with Amgen, it is an

injury that is unique to *Cipla*, and not shared by the overall market.  But the antitrust laws "were

enacted for the protection of competition not competitors," *Brunswick Corp.*, 429 U.S. at 488

(internal quotation marks omitted); accordingly the "hallmark for evaluating the plausibility of

an allegation of antitrust injury hinges upon whether the allegedly anticompetitive conduct bears

consequences for the overall market, rather than only for the individual competitor," *Otsuka*

*Pharm. Co. v. Torrent Pharm. Ltd.*, 187 F. Supp. 3d 483, 486 (D.N.J. 2016) (internal quotation

marks and brackets omitted).  The only consequence Cipla alleges is that *Cipla* was did not enter

the market for a period of several weeks.  AC ¶ 67.  Cipla does not allege that anyone else

suffered this purported harm, much less that Cipla seeks similar vindication for those

---

[5] Cipla has acknowledged in its filings in this litigation that it wants to take advantage of the fact that there were no other generics in the market and to sell its product at correspondingly elevated prices.  D.I. 143 at 12-13; D.I. 148 at 2.

manufacturers.  *See, e.g.*, *QSGI, Inc. v. IBM Global Fin.*, 2012 WL 1150402, at *2 (S.D. Fla.

Mar. 14, 2012) (dismissing complaint for failure to allege antitrust standing where plaintiff "has

not identified a single competitor (other than itself) that supposedly has been harmed by

[defendant's act]").").  Cipla's claim fails for this reason as well.

2.     **The Other Relevant Factors Weigh Against Finding Antitrust
Standing.**

Cipla is also not a "proper plaintiff" to bring the antitrust claims.  To determine whether a

plaintiff is a "proper plaintiff," courts consider factors such as "the causal connection between

the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that

harm, . . . the directness of the injury . . . [,] the existence of more direct victims of the alleged

antitrust violations[,] and . . . the potential for duplicative recovery or complex apportionment of

damages."  *Barton & Pittinos, Inc. v. SmithKlineBeecham Corp.*, 118 F.3d 178, 181 (3d Cir.

1997) (Alito, J.).  All of these factors weigh against permitting Cipla to sue.

*No Causal Connection.*   As set forth above, there is no causal connection between

Teva's conduct and Cipla's alleged "injury."   At most, any causal connection is indirect and

attenuated: Teva did not directly force Cipla to refrain from entering the generic cinacalcet

market.  Instead, Cipla alleges that Teva's entrance into the Teva Agreement caused Cipla to

question whether its own contractual right to launch a generic cinacalcet product under its

separate agreement with Amgen (and not Teva) might otherwise have been triggered by Teva's

earlier at-risk launch.  Such a convoluted and remote connection is insufficient to satisfy the

requisite causal connection to establish antitrust standing.  *See, e.g., Steamfitters Local Union*

*No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926-27 (3d Cir. 1999).

*More Direct Victims.*   In contrast to the tenuous connection between Teva's actions and

Cipla's asserted harm, there exist more direct victims of the alleged antitrust violations—such as

-12-

purchasers of cinacalcet products, who have in fact brought antitrust actions against Amgen and Cipla. And those consumers' interests are aligned with the "proper functions of antitrust." *Ball Mem. Hosp.*, 784 F.2d at 1334. By contrast, as noted above (*supra* at 10-11), Cipla's interest is "gain from high prices," which is "just the opposite of the consumers' interest." *Id.*

**Risk of Duplicative Recovery.** Additionally, the existence of actions by purchasers creates the risk of duplicative recovery should Cipla be permitted to sue here: The purchaser plaintiffs are seeking, at a minimum, the difference between the price charged by Amgen and the price that would have been charged in a market with generic products; Cipla meanwhile seeks lost profits, including the amount it believes it could have charged in a market without other generic products.[6] Accordingly, Cipla is not a proper plaintiff to bring these claims. *See, e.g.*, *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 968-69 (3d Cir. 1983) (finding that plaintiffs lacked antitrust standing because of "[t]he possibility of duplicative recovery if the direct purchaser brings suit and the potential for complex apportionment of damages").

**B.     Cipla Failed To Plausibly Allege a Violation Of 15 U.S.C. § 1.**

Cipla's claim fails for a second and independent reason: Cipla has failed to plausibly allege a violation of Section 1 of the Sherman Act. Reading its complaint liberally, Cipla alleges three possible sources of its asserted antitrust injury: (1) the Teva Agreement; (2) Amgen's and Teva's public statements about the Teva Agreement; and (3) Amgen's January 4, 2019 letter to Cipla. But Cipla has failed to plausibly allege that any of these actions violated Section 1 of the Sherman Act—which requires "(1) concerted action by the defendants; [2] that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted

---

[6] Cipla's actual damages, if any, would depend on complicated determinations of whether other generic manufacturers also would have entered the market, at what time, and at what price.

actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).

> 1. **Cipla Failed To Plausibly Allege That The Teva Agreement Violated Section 1 Of The Sherman Act.**

The heart of Cipla's Sherman Act claim is that Amgen and Teva allegedly entered into an unlawful agreement that restrained and eliminated competition, restricting the supply of, and maintaining artificially high prices for, cinacalcet products sold in United States commerce. AC ¶¶ 55-61. Cipla misunderstands the law and misreads the Teva Agreement.

*The Agreement Is Not Unlawful.* Cipla's claim that the Teva Agreement is illegal is foreclosed by the Supreme Court's decision in *Actavis*, which blessed agreements like the Teva Agreement, and excused them from antitrust scrutiny. In *Actavis*, the Supreme Court approvingly stated that parties to patent litigation "may, as in other industries, settle," including "by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration." 570 U.S. at 158. The patentee may not pair that license with a reverse payment—a payment from the patentee to the patent challenger to stay out prior to the license date. *Id.* But the Supreme Court recognized the "commonplace" scenario where "Company A sues Company B for patent infringement," and "B (the defendant) . . . pay[s] A (the plaintiff) some amount less than the full demand as part of the settlement." *Id.* at 151. The Supreme Court "agree[d]" that such "common place forms have not been thought for that reason alone subject to antitrust liability" and "d[id] not intend to alter that understanding." *Id.* at 152; *accord In re Lipitor Antitrust Litig.*, 868 F.3d 231, 250-52 (3d Cir. 2017).

This is precisely the type of agreement entered into by Amgen and Teva. There was no "reverse payment" from Amgen to Teva. In fact, Amgen did not agree to pay Teva anything, nor did it agree to provide any other "unexplained large transfer of value from the patent holder to

-14-

the alleged infringer."[7]  *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403-06 (3d Cir. 2015).  Instead, as expressly permitted by *Actavis*, Amgen merely agreed to "allow[] the generic manufacturer [Teva] to enter the patentee's [Amgen's] market prior to the patent's expiration."  570 U.S. at 158; *see* AC Ex. 3, §§ 5.1-5.2.  And Teva agreed to pay Amgen "some amount less than [Amgen's] full demand"—at most $40 million.  570 U.S. at 151; *see* AC Ex. 3, § 3.1.

Cipla attempts to obfuscate the commonplace and accepted form of the Teva settlement by mischaracterizing the Teva Agreement as one in which Amgen and Teva agreed to "share in monopoly profits."  AC ¶ 53.  Cipla appears to premise this allegation on the fact that under the Teva Agreement, Teva is not required to pay Amgen *all* of the profits Teva earned from its at-risk launch, but rather an amount not exceeding $40 million—*i.e.*, a portion of the damages Amgen is alleged to have incurred.  AC at 1.  But Teva's profits are not monopoly profits: Teva's profits came about from *Teva*'s at-risk sales, which were undeniably *pro*-competitive and *undermined* any monopoly or market power that Amgen may have otherwise enjoyed.

In any event, Teva's payment of money to Amgen under the Agreement is, once again, precisely the type of payment condoned by the Supreme Court in *Actavis*.  Had Amgen continued to pursue its patent infringement claim against Teva on appeal, its damages would have included the amount Teva made during its at-risk launch.  Accordingly, Teva's payment to Amgen of a portion of that amount is simply a "traditional" settlement that is not "subject to antitrust liability."  *Actavis*, 570 U.S. at 152.

---

[7] Nor did the Teva Agreement provide for any cross-licensing and patent pooling that could only be for the purpose of destroying competitors (*see United States v. Singer Mfg. Co.*, 374 U.S. 174, 189-194-95 (1963)), or fix the minimum price at which products embodying Amgen's patent could be sold (*see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 368-69, 400 (1948)).

That the amount Teva must pay Amgen could decrease depending on whether and when other generic cinacalcet products entered the market does not alter this conclusion. This feature of the Teva Settlement makes perfect sense: If other generics enter the market, the amount of Amgen's alleged damages that are attributable to *Teva* would decrease. The proportional amount of those damages that Teva would be willing to pay would, logically, be reduced as well.

That Teva prevailed in the district court and settled only after its launch and during the pendency of the appeal does not change the analysis either. Cipla would apparently require parties to incur the costs, risks, and delays associated with litigating an appeal. The law does not force parties—or the courts—to undertake such burdens. To the contrary, the "law favors settlement." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995); *see also Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*, 61 F. Supp. 2d 102, 108 (D. Del. 1996). And as numerous courts have held, a trial court's non-infringement ruling does not preclude victorious parties from nevertheless settling while the case is on appeal.[8] *See, e.g.*, *Hospira, Inc. v. Sandoz Inc.*, 2014 WL 794589, at *5 (D.N.J. Feb. 27, 2014); *Goldman v. Gen. Accident Ins. Co. of Am.*, 2007 WL 2781935, at *1 (D.N.J. May 24, 2007); *Kim v. United States*, 903 F. Supp. 1546 (S.D.N.Y. 1995).

**There Was No Concerted Action.** Cipla also failed to plausibly allege concerted action—that is, that "the alleged conspirators . . . had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 208 (3d Cir. 2005). To do this, it is not enough for Cipla to simply allege that Teva entered into

---

[8] Indeed, this Court recognized that "with all due respect to any District Judge who sits through a trial and makes a finding, it's not the last word. The Federal Circuit could disagree on claim construction and we could have a different outcome. It can't be that [litigants] can't bargain over that risk and uncertainty and reach a settlement." D.I. 181 at 54-55.

the Teva Agreement for anticompetitive purposes, nor is it enough for Cipla to allege facts that are "merely consistent with" an agreement to engage in anticompetitive conduct, *Twombly*, 550 U.S. at 556, where the facts alleged are "equally consistent with independently motivated behavior." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.42 (3d Cir. 2010); *see also Burch v. Milberg Factors, Inc.*, 2009 WL 840589, at *14 (D. Del. March 30, 2009) ("[A]llegations that point equally both to lawful and unlawful behavior are inadequate to state a violation of Section 1 of the Sherman Act."). Instead, Cipla must allege "further factual enhancement" to take the claim from "possibility" to "plausibility." 550 U.S. at 570.

There are no such allegations here. In fact, Cipla alleges nothing that is inconsistent with Teva independently deciding to enter into the settlement agreement. There is no allegation that Teva acted against its economic interests. *See Paragon Trade Brands, Inc.*, 61 F. Supp. 2d at 109. Indeed, this Court recognized that it is "plausible that Amgen and Teva may have reasonably assessed the risks each faced on appeal (and otherwise) and reached a rational compromise of their patent disputes." D.I. 186 at 35; *Paragon Trade Brands, Inc.*, 61 F. Supp. 2d at 105.

At a minimum, to survive beyond the pleading stage, Cipla must allege that Teva knew its settlement with Amgen would somehow affect Cipla's contractual right to launch. Cipla did not. As a result, it is simply not plausible, based on Cipla's own allegations, that Teva engaged in a scheme with Amgen designed to preclude Cipla from entering the market.

## 2. Teva's Public Statement About The Settlement Agreement Is Not An Antitrust Violation.

Cipla attempts to get around the unquestionably lawful nature of the Teva Agreement by collaterally attacking Amgen's and Teva's press releases describing the settlement agreement. Cipla claims that Amgen and Teva falsely represented that Teva had agreed to stop selling its

product as of the agreement's signing date, and that the statements were an attempt to deter other cinacalcet manufacturers from entering the market.  AC ¶¶ 19, 21.  But Cipla failed to plausibly allege that the press releases were false or the result of concerted action.

**The Press Releases Are Not Unlawful.**  First, Cipla fails to plausibly allege that Teva's (or Amgen's) press releases were unlawful.  Cipla claims that Teva's statement that Teva agreed to stop selling cinacalcet products was false, and that the Teva Agreement instead licenses Teva to sell and distribute cinacalcet products.  AC. ¶ 22.  But Cipla identifies no provision of the agreement that supports this allegation, and for good reason:  The allegation is flatly contradicted by the agreement itself.  As this Court recognized, the Teva Agreement obligates Teva not to "[sell] or otherwise transfer[]" its generic product "between the signing date and the Effective Date."  D.I. 186 at 21-22.  Teva further agreed not to sell cinacalcet products between the "Effective Date" (defined as the date ████████████████████████████████████ ████) and the "Entry Date" (defined as ████████████, or earlier under certain conditions not relevant here).  AC Ex. 3, §§ 5.1-5.2, 7.1.  Teva's public statement that it agreed to stop selling its generic cinacalcet product upon signing the Teva Agreement was thus entirely accurate, and this Court should reject Cipla's groundless allegations and theory to the contrary.  *See, e.g., Nat'l Distillers & Chem. Corp. v. Dep't of Energy*, 1980 WL 1057, at *1 (D. Del. Oct. 23, 1980) (Court is not obligated to accept "unwarranted factual inferences contradicted by written documents incorporated and referred to in the complaint").

**The Press Releases Are Not The Product of Concerted Action.**  Second, Teva's press release cannot serve as the basis for antitrust liability because Cipla has once again failed to plead concerted action.  Cipla alleges only that Amgen and Teva each issued press releases.  Cipla alleges no facts supporting the inference that these press releases were the result of a

common scheme by Amgen and Teva—much less a scheme designed to deceive and deter Cipla, and/or other manufacturers, from entering the market.  Again, Cipla did not even plead that Teva knew the terms of Cipla's agreement with Amgen.  At most, Cipla has alleged parallel conduct by Amgen and Teva, in that they both issued press releases, announcing the settlement, around the same time.  But parallel conduct of this sort (two companies issuing press releases announcing the settlement of litigation between them) is commonplace, and as the Supreme Court has explained, in any event, an allegation of parallel conduct "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

### 3.  **Amgen's January 4, 2019 Letter.**

Finally, Cipla's attempt to cast Amgen's January 4, 2019 letter as a Sherman Act violation is similarly deficient.  Cipla pleads no facts to suggest that Teva had any involvement in Amgen drafting or sending that letter.  "Unilateral activity by a defendant . . . cannot give rise to a section 1 violation." *Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003). Furthermore, for the reasons stated in Amgen's motion to dismiss, the letter is not illegal.

For any or all of the above reasons, this Court should dismiss Cipla's Sherman Act claim.

### C.  **This Court Should Remand Or Dismiss Cipla's State Law Claims.**

Because Cipla's sole federal law claim fails, this Court should decline to exercise supplemental jurisdiction over its state law claims.  *See United States v. Gibbs*, 383 U.S. 715, 726 (1966).  In any event, Cipla also failed to adequately plead the state law claims.

### 1.  **Cipla Failed To Plausibly Plead A Violation Of The Cartwright Act Or UCL.**

Cipla's Cartwright Act and UCL claims are based on the same barebones allegations as its Sherman Act claim.  Accordingly, "the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not

unlawful under the Cartwright Act or the 'unlawful' prong of the UCL," *Lenhoff Enters., Inc. v. United Talent Agency, Inc.,* 729 F. App'x 528, 531 (9th Cir. 2018), or an "'unfair' business act or practice" under the UCL. *City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015); *Lenhoff Enters.*, 729 F. App'x at 531.

### 2. **Cipla Fails To State A Fraud Claim.**

Cipla fails to state its fraud claim with particularity, as required by Rule 9(b). A plaintiff fails to satisfy Rule 9(b) where he simply reasserts the rest of its complaint in his fraud claim, without "explain[ing] how [the] conduct alleged in other paragraphs constitutes . . . fraud." *NNN 400 Capital Ctr. 16, LLC v. FGG, Inc.*, 2018 WL 3614794, at *3 (D. Del. July 27, 2018); *see also Kappe Assocs. v. Chesapeake Evntl. Equip., LLC*, 2016 WL 1257665, at *12 (E.D. Pa. Mar. 31, 2016). That is precisely what Cipla did here: The entirety of Cipla's fraud claim is an incorporation by reference of the previous 79 paragraphs, and a sentence stating "The conduct of Amgen and Cipla constitutes fraud." AC ¶¶ 81.

In any event, nothing in the complaint supports a claim of fraud. The only statement Cipla identifies as having been made by Teva is the statement that "[o]n or about January 2, 2019," Teva "agreed to stop selling its generic product until its license date in mid-year 2021, or earlier under certain circumstances." AC ¶ 19. As explained above, nothing about that statement is false or misleading. *See Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).[9]

### **CONCLUSION**

The Court should dismiss the claims against Teva with prejudice.

---

[9] Cipla does not specify what state's law applies to its fraud claim. As Teva's statement pertains to the interpretation of the Teva Agreement, and the Agreement specifies that Delaware law governs its interpretation, Delaware law should govern Cipla's fraud claim. AC Ex. 3 at 12.

Date: October 15, 2019

By:  /s/ Karen E. Keller

Karen E. Keller (No. 4489)
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th floor
Wilmington, DE 19801
Telephone: (302) 298-0702
kkeller@shawkeller.com

Henninger S. Bullock (*pro hac vice*)
Richard A. Spehr (*pro hac vice*)
Karen W. Lin (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
hbullock@mayerbrown.com

*Counsel for Defendant Teva*
*Pharmaceuticals USA, Inc.*

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LIGATION | ) ) ) ) |
| *THIS DOCUMENT RELATES TO:* | ) ) |
| *CIPLA LTD. and CIPLA USA, INC.,* | ) ) |
| *Plaintiffs,* | ) ) ) |
| *v.* | ) ) |
| *AMGEN INC. and TEVA PHARMACEUTICALS USA, INC.,* | ) ) ) |
| *Defendants.* | ) ) ) |

MDL 2895

C.A. No.: 19-44-LPS

<u>**FILED UNDER SEAL**</u>

<u>**DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**</u>

Karen E. Keller (No. 4489)
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th floor
Wilmington, DE 19801
Telephone: (302) 298-0702
kkeller@shawkeller.com

Henninger S. Bullock (*pro hac vice*)
Richard A. Spehr (*pro hac vice*)
Karen W. Lin (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
hbullock@mayerbrown.com

*Counsel for Defendant Teva
Pharmaceuticals USA, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

NATURE AND STATE OF THE PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

I. THE ONGOING PATENT INFRINGEMENT LITIGATION. ........................ 3

    A. The Settlement Agreement Between Amgen And Cipla. ..................... 3

    B. The Settlement Agreement Between Amgen And Teva. ...................... 4

    C. Amgen's January 4, 2019 Letter To Cipla. ...................................... 5

II. THIS ACTION ............................................................................................... 6

III. CIPLA'S LAUNCH AND AMGEN'S COUNTERCLAIM. ........................... 7

ARGUMENT ........................................................................................................... 8

I. CIPLA'S SHERMAN ACT CLAIMS AGAINST TEVA MUST BE DISMISSED. ................................................................................................. 8

    A. Cipla Lacks Constitutional And Antitrust Standing. .......................... 8

        1. Cipla Has Failed To Allege Constitutional Or Antitrust Injury................ 9

        2. The Other Relevant Factors Weigh Against Finding Antitrust Standing. ........................................................................ 12

    B. Cipla Failed To Plausibly Allege A Violation Of 15 U.S.C. § 1. ....... 13

        1. Cipla Failed To Plausibly Allege That The Teva Agreement Violated Section 1 Of The Sherman Act. ................ 14

        2. Teva's Public Statement About The Settlement Agreement Is Not An Antitrust Violation. .......................................... 17

        3. Amgen's January 4, 2019 Letter. ........................................... 19

    C. This Court Should Remand Or Dismiss Cipla's State Law Claims.................... 19

        1. Cipla Failed To Plausibly Plead A Violation Of The Cartwright Act Or UCL.................................................... 19

        2. Cipla Fails To State A Fraud Claim......................................... 20

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours & Co.*,
   826 F.2d 1235 (3d Cir. 1987)...................................................................................8

*Amgen Inc. v. Amneal Pharm. LLC*,
   328 F. Supp. 3d 373 (D. Del. 2018).........................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................8

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)....................................................................................11

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ......................................................................9, 10, 13

*Barton & Pittinos, Inc. v. SmithKlineBeecham Corp.*,
   118 F.3d 178 (3d Cir. 1997) (Alito, J.) ..................................................................12

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................8, 17, 19

*Brunswick v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..........................................................................................9, 11

*Burtch v. Milberg Factors, Inc.*,
   2009 WL 840589 (D. Del. March 30, 2009).........................................................17

*Cipla Ltd. v. Amgen, Inc.*,
   2019 WL 3202824 (3d Cir. July 16, 2019)..........................................................4, 7

*City of Pittsburgh v. W. Penn Power Co.*,
   147 F.3d 256 (3d Cir. 1998)....................................................................................8

*City of San Jose v. Office of the Comm'r of Baseball*,
   776 F.3d 686 (9th Cir. 2015) ................................................................................20

*In re Dex Media*,
   595 B.R. 19 (D. Del. 2018)......................................................................................9

*Ethypharm S.A. France v. Abbott Labs.*,
   707 F.3d 223 (3d Cir. 2013).....................................................................................9

## TABLE OF AUTHORITIES
(continued)

Page(s)

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) ............................................................................2, 14, 15, 17

*Gaffin v. Teledyne, Inc.*,
  611 A.2d 467 (Del. 1992) ................................................................................20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ..............................................................................16

*Goldman v. Gen. Accident Ins. Co. of Am.*,
  2007 WL 2781935 (D.N.J. May 24, 2007) ......................................................16

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005) ............................................................................16

*Hospira, Inc. v. Sandoz Inc.*,
  2014 WL 794589 (D.N.J. Feb. 27, 2014) ........................................................16

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) ............................................................................14

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ............................................................................17

*Intervest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003) ............................................................................19

*Kappe Assocs. v. Chesapeake Evntl. Equip., LLC*,
  2016 WL 1257665 (E.D. Pa. Mar. 31, 2016) ..................................................20

*Kim v. United States*,
  903 F. Supp. 1546 (S.D.N.Y. 1995) ................................................................16

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
  791 F.3d 388 (3d Cir. 2015) ............................................................................15

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
  729 F. App'x 528 (9th Cir. 2018) ....................................................................20

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017) ............................................................................14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1974) ........................................................................................10

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Merican, Inc. v. Caterpillar Tractor Co.*,
   713 F.2d 958 (3d Cir. 1983) ...................................................................13

*Nat'l Distillers & Chem. Corp. v. Dep't of Energy*,
   1980 WL 1057 (D. Del. Oct. 23, 1980) ...................................................18

*NNN 400 Capital Ctr. 16, LLC v. FGG, Inc.*,
   2018 WL 3614794 (D. Del. July 27, 2018) .............................................20

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*,
   187 F. Supp. 3d 483 (D.N.J. 2016) ........................................................11

*Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*,
   61 F. Supp. 2d 102 (D. Del. 1996) ....................................................16, 17

*QSGI, Inc. v. IBM Global Fin.*,
   2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) .........................................12

*Schuylkill Energy Resources, Inc. v. Penn. Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997) ...................................................................11

*SigmaPharm, Inc. v. Mutual Pharm. Co.*,
   454 F. App'x 64 (3d Cir. 2011) ..............................................................11

*Southmark Prime Plus, L.P. v. Falzone*,
   776 F. Supp. 888 (D. Del. 1991) ...............................................................7

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999) ...................................................................12

*United States v. Gibbs*,
   383 U.S. 715 (1966) ...............................................................................19

*United States v. Singer Mfg. Co.*,
   374 U.S. 174 (1963) ...............................................................................15

*United States v. U.S. Gypsum Co.*,
   333 U.S. 364 (1948) ...............................................................................15

**Statutes**

Cal. Bus. & Prof Code § 16720 .......................................................6, 19, 20

Cal. Bus. & Prof. Code § 17200 ................................................................6

15 U.S.C. § 1 ........................................................................................6, 13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 9 ........................................................................................................................8, 20

Fed. R. Civ. P. 12 ........................................................................................................................1, 8

## NATURE AND STATE OF THE PROCEEDINGS

Cipla Ltd. and Cipla USA, Inc. ("Cipla") filed their amended complaint on February 25, 2019.  D.I. 73.  Teva Pharmaceuticals USA, Inc. ("Teva") moves to dismiss the second, third, fourth, and fifth causes of action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and the fifth cause of action under Rule 9(b) for failure to plead fraud with particularity.

## SUMMARY OF ARGUMENT

Cipla brings this action against Teva and Amgen, Inc. ("Amgen") to recover profits that Cipla claims to have lost from the sale of cinacalcet hydrochloride products, which Cipla chose to forego.  In 2016 and 2017, Amgen sued Cipla, Teva, and other pharmaceutical manufacturers for patent infringement stemming from those manufacturers' filing of Abbreviated New Drug Applications seeking FDA approval to market generic cinacalcet products.  Rather than bearing the risk and costs of defending its generic product against Amgen's claims, Cipla entered into a settlement agreement with Amgen in which Cipla agreed to refrain from selling its product until a later specified date.  Teva, by contrast, chose to litigate the claim against it, and after prevailing in the district court, launched its product "at risk."  But faced with the possibility that the Federal Circuit could reverse the district court's judgment—and retroactively attach liability to Teva's at-risk sales—Teva ultimately entered into a settlement with Amgen (the "Teva Agreement").  Like Cipla, Teva agreed to cease selling its generic product until a future license date.

Upon learning of Teva's settlement, Cipla brought this action in an attempt to extract from Amgen and Teva the profits Cipla forewent.  Cipla alleges that Teva and Amgen violated federal antitrust law and California state antitrust and unfair competition statutes because Teva's agreement to cease selling its product reduces competition; Cipla then alleges that Teva violated those same statutes and committed fraud because Teva did *not* agree to cease selling its product

-1-

but publicly stated that it had.  Even aside from the inherent contradiction in Cipla's allegations, none of Cipla's claims have any merit, for two fundamental (and equally dispositive) reasons.

*First*, and most basically, Cipla lacks any standing to assert antitrust claims against Teva because Cipla has not suffered any injury, much less the type of injury that the antitrust laws were designed to redress.  Cipla argues that the Teva Agreement violated the Sherman Act by reducing the supply, and increasing the price, of cinacalcet products.  But Cipla does not claim to have been injured by any such reduction in supply and increase in price; rather, it seeks to *benefit* from those alleged effects.  Cipla has told this Court that its injuries here were from not having launched and sold its own generic product—and, thus, not realizing the profits from those sales—in a market without generic competition and at the higher prices that the Teva Agreement allegedly sought to preserve.  And at Cipla's behest, both this Court and the Third Circuit held that Teva's at-risk launch actually benefitted Cipla because that launch triggered Cipla's right to launch and sell its generic product, and Teva's later settlement with Amgen did nothing to extinguish that right.  Cipla thus benefitted from the very conduct about which it now complains; it suffered *no* injury as a result of the Teva Agreement, much less an injury that the antitrust laws were designed to redress.

*Second*, the Supreme Court's decision in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ("*Actavis*"), forecloses any argument that the Teva Agreement violated the antitrust laws. *Actavis* recognized that settlement agreements like Teva's—and like Cipla's—are commonplace and lawful.  Cipla's theory of liability would upend the longstanding, accepted practice of settling cases by *requiring* Teva to incur the costs and risks of reversal on appeal in the Federal Circuit.  But the law does not require such an absurd result—especially when there are no facts alleged that Teva even knew that entering into a settlement agreement with Amgen would impact

Cipla's (or anyone else's) contractual right to launch, much less that Teva worked with Amgen to frustrate those rights.

Because Cipla's sole federal law claim fails on its face, this Court should decline to exercise supplemental jurisdiction over Cipla's state law claims.  But if this Court does exercise supplemental jurisdiction, it should dismiss the state law claims as well because Cipla has failed to adequately allege their required elements.  This Court should accordingly dismiss the claims against Teva.

## STATEMENT OF FACTS

## I.     THE ONGOING PATENT INFRINGEMENT LITIGATION

Amgen holds United States Patent No. 9,375,405 (the "'405 patent"), which describes and claims pharmaceutical compositions comprising cinacalcet hydrochloride and various other pharmaceutically acceptable excipients.  Amgen also markets and sells Sensipar, the active ingredient in which is cinacalcet hydrochloride.

Beginning in 2016, Cipla, Watson Laboratories, Inc. (Teva's subsidiary), and other generic drug manufacturers filed Abbreviated New Drug Applications ("ANDAs") seeking approval to manufacture and sell generic cinacalcet hydrochloride products.  Amgen sued those manufacturers, alleging infringement of the '405 patent.

### A.     The Settlement Agreement Between Amgen And Cipla

In February 2018, before trial, Cipla entered into an agreement with Amgen to settle Amgen's claims against Cipla ("Cipla Agreement").  D.I. 73, Am. Compl. ("AC") ¶ 8.  Cipla agreed not to sell generic cinacalcet products in the United States.  In return, Amgen released its claims against Cipla and agreed to grant Cipla a license to the '405 patent, beginning 97 days before the expiration of the agreement, subject to certain accelerators.  AC Ex. 1, ¶ 5.2.

The Cipla Agreement contemplated certain circumstances in which a third party launch would trigger and accelerate Cipla's own ability to launch, including if a third party were to engage in an unauthorized launch of a generic cinacalcet product, and Amgen did not either (a) move for a temporary restraining order or preliminary injunction prohibiting any further sale of that generic product, or (b) enter into an agreement requiring the third party to stop selling the generic cinacalcet product within 30 calendar days of the agreement. *Id.* § 5.5(a).

Section 5.6 of the Cipla Agreement then provided that Amgen is entitled to seek relief if Cipla launches its product following a third party's at-risk launch, and the third party (a) admits to or is later found to infringe Amgen's patent, and (b) agrees or is required to pay damages relating to its at risk launch. *Id.* § 5.6. But

> [n]otwithstanding anything to the contrary in this Settlement Agreement, if any Third Party that has made an At Risk Launch of a Generic Cinacalcet Product (where such At Risk Launch is before or after an at risk launch by Defendant) is not found to have infringed one or more valid and enforceable claims of the '405 patent or has not ceased or agreed to cease selling such Generic Cincalcet Product following an At Risk Launch, then Amgen shall not be entitled to seek or recover any relief from Defendants for Defendants' at risk sales, offers for sale, distribution, or importation of Defendants' Product.

*Id.* In other words, Section 5.6 "identifies two circumstances that would allow Cipla to launch without Amgen's interference": when "a third party 'is not found to have infringed' the '405 patent or has not stopped or agreed to stop selling a generic cinacalcet product." 2019 WL 3202824, at *4 (3d Cir. July 16, 2019).

## B.   The Settlement Agreement Between Amgen And Teva

In July 2018, the court (Goldberg, J.) ruled, among other things, that Watson's ANDA did not infringe the '405 patent. *See Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 391 (D. Del. 2018). Amgen subsequently appealed that judgment.

On or around December 28, 2018, while Amgen's appeal was pending, Teva launched its generic cinacalcet product "at risk." AC ¶ 12. Five days later, on January 2, 2019, Amgen and Teva entered into the Teva Agreement, which resolved Amgen's infringement claims against Teva. *Id.* ¶ 17. Under the Teva Agreement, Amgen agreed to release its claims against Teva in the patent infringement action and to grant Teva a license to sell cinacalcet products starting on ████████, or earlier under certain circumstances. AC Ex. 3, ¶¶ 3.3, 5.1-5.2. Solely for purposes of settlement, Teva was willing to stipulate that sale of its generic product would infringe Amgen's patent, agreed to cease sales of generic cinacalcet, and agreed to pay Amgen up to $40 million in exchange for Amgen's release.[1] *Id.* ¶¶ 3.1, 4.1, 7.17, 7.3.

Amgen and Teva then issued separate public statements announcing the settlement agreement. Teva's stated that it "ha[d] agreed to stop selling its generic product until its license date in mid-year 2021 or sooner depending on certain occurrences." AC Ex. 5.

### C.    Amgen's January 4, 2019 Letter To Cipla

In a letter dated January 4, 2019, Amgen responded to a letter it had received from Cipla concerning the Cipla Agreement. Amgen stated that Teva's at-risk launch did not trigger a right on Cipla's behalf to launch under the Cipla Agreement. AC Ex. 6, pp.1-2. Amgen then (1) sought confirmation that Cipla had not and would not launch at risk, and (2) preserved its ability to seek all remedies available under the Cipla Agreement in the event of such launch. AC ¶ 39.

---

[1] Because the amounts that Teva would earn from its at-risk sales—and the corresponding damages that Teva's at-risk launch would allegedly cause Amgen—would decrease if and as other generic manufacturers entered the cinacalcet market after the Teva Agreement, the exact amount that Teva would owe to Amgen was made dependent on how many such manufacturers entered the market, and when. *Id.* ¶ 3.1

## II.     THIS ACTION

Apparently not confident in the rights it had negotiated under its settlement agreement with Amgen, Cipla stood down in response to Amgen's January 4 letter and, notwithstanding Teva's launch, did not launch its own product.  Instead, Cipla commenced this action against Amgen and Teva, seeking damages that would substitute for the money it could have earned (but did not) had it launched its own product.[2]  In other words, Cipla sought to put itself in Teva's shoes without having undertaken the costs and risks that Teva did.

Cipla asserts five claims—only one of which arises under federal law:  a claim that Amgen and Teva violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  Cipla alleges that Amgen and Teva agreed to "restrict supplies of, and to maintain artificially high prices for, Cinacalcet Products sold in United States commerce, and to share in monopoly profits" by entering into the Teva Agreement.  AC ¶¶ 53-54.  Cipla further alleges that Amgen and Teva falsely stated to the public that "Teva has agreed to stop selling its generic product until its license date in mid-year 2021 or sooner depending on certain occurrences."  AC ¶¶ 18-21.

Cipla invokes supplemental jurisdiction over its remaining four state law claims based on the same allegations as its Sherman Act claim: (1) a request for a declaratory judgment concerning its contractual rights[3]; (2) a claim under California's Cartwright Act (Cal. Bus. & Prof Code § 16720); (3) a claim under California's Unfair Competition Law ("UCL," Cal. Bus. & Prof. Code § 17200); and (4) a common law fraud claim.  AC ¶¶ 72-81.

---

[2] Cipla originally named only Amgen as a defendant.  D.I. 2.  After Amgen filed a motion to dismiss, Cipla amended its complaint to include Teva as a defendant.  D.I. 73.

[3] The declaratory judgment claim is asserted against Amgen only.

### III.    CIPLA'S LAUNCH AND AMGEN'S COUNTERCLAIM

On March 2, 2019, almost two months after filing this lawsuit, Cipla launched its own generic cinacalcet product.  Cipla argued that it was entitled to do so under its settlement agreement with Amgen as a result of Teva's at-risk launch, notwithstanding the Teva Agreement.  D.I. 148.[4]  Amgen subsequently asserted a counterclaim against Cipla, alleging that Cipla's sales breached the Cipla Agreement, and moved for a preliminary injunction seeking to restrain further sales by Cipla.  D.I. 154-1, 121.  Cipla opposed the preliminary injunction, arguing that Teva's launch gave Cipla the right to launch and that Cipla's right was left "undisturbed" by the Teva Agreement.  D.I. 168-1 at 13-14.

This Court agreed with Cipla, holding that, under Section 5.6 of the Cipla Agreement, Amgen was barred from obtaining relief in connection with Cipla's sale of generic cinacalcet product because Teva was "not found to have infringed" the '405 patent.  D.I. 186 at 16-20.

Amgen appealed the denial of the preliminary injunction.  Cipla argued to the Third Circuit that it was entitled to launch under the Cipla Agreement without consequence "irrespective of whether Teva has 'ceased or agreed to cease selling' the Teva products."  Br. of Pls.-Appellees ("Cipla 3d Cir. Br.") at 32, *Cipla Ltd. v. Amgen, Inc.*, No. 19-2017 (3d Cir. June 20, 2019).  The Third Circuit agreed and affirmed, holding that "Amgen was not authorized to seek relief against Cipla for its launch" because Teva "made an at risk launch of its generic cinacalcet."  2019 WL 3202824, at *5.  Cipla's product has been on the market for six months.

---

[4] This court can take judicial notice of the contents of court records.  *See, e.g., Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991).

**ARGUMENT**

This Court should dismiss the claims against Teva under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, Rule 12(b)(6) for failure to state a plausible claim upon which relief can be granted and Rule 9(b) for failure to plead fraud with particularity. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). And when a plaintiff alleges fraud, it must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Cipla's allegations fall far short of its burden.

**I.      CIPLA'S SHERMAN ACT CLAIM AGAINST TEVA MUST BE DISMISSED.**

      **A.      Cipla Lacks Constitutional And Antitrust Standing.**

As a threshold matter, Cipla's Sherman Act claim fails because Cipla lacks constitutional and antitrust standing. Even where there has been a violation of the antitrust laws (which is not the case here), an antitrust plaintiff must satisfy the constitutional standing requirements, as well as the special "antitrust standing" requirements: "antitrust injury," *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264-65 (3d Cir. 1998), and a showing that the plaintiff is "the most effective plaintiff from among those who have suffered loss." *Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987). Cipla has not established constitutional or antitrust injury, nor would it be a proper plaintiff even if it had.

1.      **Cipla Has Failed To Allege Constitutional Or Antitrust Injury.**

An indispensable component of constitutional and antitrust standing is that the plaintiff suffered injury in fact traceable to the defendant's action; antitrust standing further requires that the injury be "the type the antitrust laws were intended to prevent that flows from that which makes defendants' acts unlawful"—*i.e.*, antitrust injury. *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232-33 (3d Cir. 2013). In other words, antitrust injury "means injury from higher prices or lower output." *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986).

Cipla is estopped from arguing that it has suffered *any* injury, much less an antitrust injury, flowing from *any* aspect of or statements about the Teva Agreement. Cipla argued—successfully—to both this Court and the Third Circuit that under Section 5.6 of its agreement with Amgen, (a) its right to launch its generic cinacalcet product arose the moment Teva did because a district court had previously found that Teva's product did not infringe on Amgen's patent, and (b) this right was in no way affected by Teva's subsequent settlement with Amgen because its right to launch was not dependent on Teva staying in the market. D.I. 168-1 at 12-14; Cipla 3d Cir. Br at 24-27, 32. Thus, according to Cipla itself, Teva's conduct was pro-competitive and, in any event, entirely *beneficial* to Cipla: It triggered Cipla's right to enter the market, and Teva's subsequent settlement with Amgen had no impact whatsoever on that right. Cipla's prior decision to stay out of the market was just that—Cipla's decision—and Cipla is estopped from arguing otherwise. *See, e.g., In re Dex Media*, 595 B.R. 19, 36-41 (D. Del. 2018).

Even if Cipla could plausibly claim that the Teva Agreement negatively affected its right to launch, that would not be an injury flowing from the Teva Agreement because that situation would be entirely the result of the bargain that Cipla itself negotiated with Amgen. Cipla and Amgen expressly contemplated that another company might engage in an at-risk launch, and

their agreement provided different rights to Cipla depending on the circumstances surrounding that launch: Under the Cipla Agreement, if Amgen either sought a preliminary injunction or *entered into an agreement requiring the at-risk launcher to stop selling its generic product*, Cipla *agreed* that it would not launch. AC Ex. 1 ¶ 5.5(a)(ii). Meanwhile, as this Court and the Third Circuit have found, Section 5.6 of the Cipla Agreement *allowed* Cipla to launch under certain other circumstances—*e.g.,* Teva's at-risk launch. Once again, therefore, Teva's conduct was directly to Cipla's benefit, but even were it not, Cipla's position would be the direct result of Cipla's own agreement with Amgen. Accordingly, Cipla cannot now claim that it was injured by Teva's conduct (including the Teva Agreement).

In any event, Cipla's asserted injury is not an *antitrust* injury. Cipla alleges that the Teva Agreement "restrict[s] supplies of, and . . . maintain[s] artificially high prices for, Cinacalcet Products sold in United States commerce." AC ¶ 53. But Cipla does not allege that *it* was injured by any restriction in the supply of cinacalcet products; and it does not allege that *it* was injured by high prices for those products. Nor could it. As the Supreme Court has explained, plaintiffs cannot recover damages for acts by their competitors "to charge higher than competitive prices" or that "limit[] output" because "[s]uch restrictions, though harmful to competition, actually *benefit* competitors." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1974); *accord Ball Mem. Hosp.*, 784 F.2d at 1334.

Apparently recognizing this fundamental problem, Cipla tries to plead around it, alleging that it was deprived of the opportunity to *take advantage of* the higher prices in the market because it was not sure whether it had the right to launch its own product under its agreement with Amgen and, thus, did not immediately launch in the wake of Teva's at-risk launch. AC ¶¶ 24, 67. But neither common sense, nor longstanding antitrust jurisprudence, supports this

-10-

allegation: Teva cannot credibly be faulted for Cipla's uncertainty about its own contractual rights, and that uncertainty is simply not "the type of injury that the antitrust statute was intended to forestall." *SigmaPharm, Inc. v. Mutual Pharm. Co.*, 454 F. App'x 64, 70 (3d Cir. 2011) (loss of a "contractually agreed upon" benefit is not an antitrust injury). Ultimately, Cipla is complaining about its own failure, based on its own uncertainty as to its contractual rights, to profit from the *lack* of competition in the marketplace.[5] That alleged injury revolves around a disputed "interpretation of the [agreement]" between Cipla and Amgen, which "should be resolved pursuant to common-law contract principles," and not antitrust law. *Schuylkill Energy Resources, Inc. v. Penn. Power & Light Co.*, 113 F.3d 405, 418 (3d Cir. 1997); *see also Balaklaw v. Lovell*, 14 F.3d 793, 797-98 (2d Cir. 1994).

Indeed, because Cipla's alleged injury stems from Cipla's agreement with Amgen, it is an injury that is unique to *Cipla*, and not shared by the overall market. But the antitrust laws "were enacted for the protection of competition not competitors," *Brunswick Corp.*, 429 U.S. at 488 (internal quotation marks omitted); accordingly the "hallmark for evaluating the plausibility of an allegation of antitrust injury hinges upon whether the allegedly anticompetitive conduct bears consequences for the overall market, rather than only for the individual competitor," *Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*, 187 F. Supp. 3d 483, 486 (D.N.J. 2016) (internal quotation marks and brackets omitted). The only consequence Cipla alleges is that *Cipla* was did not enter the market for a period of several weeks. AC ¶ 67. Cipla does not allege that anyone else suffered this purported harm, much less that Cipla seeks similar vindication for those

---

[5] Cipla has acknowledged in its filings in this litigation that it wants to take advantage of the fact that there were no other generics in the market and to sell its product at correspondingly elevated prices. D.I. 143 at 12-13; D.I. 148 at 2.

manufacturers. *See, e.g.*, *QSGI, Inc. v. IBM Global Fin.*, 2012 WL 1150402, at *2 (S.D. Fla. Mar. 14, 2012) (dismissing complaint for failure to allege antitrust standing where plaintiff "has not identified a single competitor (other than itself) that supposedly has been harmed by [defendant's act]").").  Cipla's claim fails for this reason as well.

2.     **The Other Relevant Factors Weigh Against Finding Antitrust Standing.**

Cipla is also not a "proper plaintiff" to bring the antitrust claims.  To determine whether a plaintiff is a "proper plaintiff," courts consider factors such as "the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, . . . the directness of the injury . . . [,] the existence of more direct victims of the alleged antitrust violations[,] and . . . the potential for duplicative recovery or complex apportionment of damages."  *Barton & Pittinos, Inc. v. SmithKlineBeecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997) (Alito, J.).  All of these factors weigh against permitting Cipla to sue.

*No Causal Connection.*  As set forth above, there is no causal connection between Teva's conduct and Cipla's alleged "injury."  At most, any causal connection is indirect and attenuated: Teva did not directly force Cipla to refrain from entering the generic cinacalcet market.  Instead, Cipla alleges that Teva's entrance into the Teva Agreement caused Cipla to question whether its own contractual right to launch a generic cinacalcet product under its separate agreement with Amgen (and not Teva) might otherwise have been triggered by Teva's earlier at-risk launch.  Such a convoluted and remote connection is insufficient to satisfy the requisite causal connection to establish antitrust standing.  *See, e.g., Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926-27 (3d Cir. 1999).

*More Direct Victims.*  In contrast to the tenuous connection between Teva's actions and Cipla's asserted harm, there exist more direct victims of the alleged antitrust violations—such as

purchasers of cinacalcet products, who have in fact brought antitrust actions against Amgen and Cipla. And those consumers' interests are aligned with the "proper functions of antitrust." *Ball Mem. Hosp.*, 784 F.2d at 1334. By contrast, as noted above (*supra* at 10-11), Cipla's interest is "gain from high prices," which is "just the opposite of the consumers' interest." *Id.*

*Risk of Duplicative Recovery.* Additionally, the existence of actions by purchasers creates the risk of duplicative recovery should Cipla be permitted to sue here: The purchaser plaintiffs are seeking, at a minimum, the difference between the price charged by Amgen and the price that would have been charged in a market with generic products; Cipla meanwhile seeks lost profits, including the amount it believes it could have charged in a market without other generic products.[6] Accordingly, Cipla is not a proper plaintiff to bring these claims. *See, e.g.*, *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 968-69 (3d Cir. 1983) (finding that plaintiffs lacked antitrust standing because of "[t]he possibility of duplicative recovery if the direct purchaser brings suit and the potential for complex apportionment of damages").

### B. Cipla Failed To Plausibly Allege a Violation Of 15 U.S.C. § 1.

Cipla's claim fails for a second and independent reason: Cipla has failed to plausibly allege a violation of Section 1 of the Sherman Act. Reading its complaint liberally, Cipla alleges three possible sources of its asserted antitrust injury: (1) the Teva Agreement; (2) Amgen's and Teva's public statements about the Teva Agreement; and (3) Amgen's January 4, 2019 letter to Cipla. But Cipla has failed to plausibly allege that any of these actions violated Section 1 of the Sherman Act—which requires "(1) concerted action by the defendants; [2] that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted

---

[6] Cipla's actual damages, if any, would depend on complicated determinations of whether other generic manufacturers also would have entered the market, at what time, and at what price.

actions were illegal; and (4) that it was injured as a proximate result of the concerted action."

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).

1. **Cipla Failed To Plausibly Allege That The Teva Agreement Violated Section 1 Of The Sherman Act.**

The heart of Cipla's Sherman Act claim is that Amgen and Teva allegedly entered into an unlawful agreement that restrained and eliminated competition, restricting the supply of, and maintaining artificially high prices for, cinacalcet products sold in United States commerce.  AC ¶¶ 55-61.  Cipla misunderstands the law and misreads the Teva Agreement.

***The Agreement Is Not Unlawful.***  Cipla's claim that the Teva Agreement is illegal is foreclosed by the Supreme Court's decision in *Actavis*, which blessed agreements like the Teva Agreement, and excused them from antitrust scrutiny.   In *Actavis*, the Supreme Court approvingly stated that parties to patent litigation "may, as in other industries, settle," including "by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration."  570 U.S. at 158.  The patentee may not pair that license with a reverse payment—a payment from the patentee to the patent challenger to stay out prior to the license date.  *Id.*  But the Supreme Court recognized the "commonplace" scenario where "Company A sues Company B for patent infringement," and "B (the defendant) . . . pay[s] A (the plaintiff) some amount less than the full demand as part of the settlement."  *Id.* at 151.  The Supreme Court "agree[d]" that such "common place forms have not been thought for that reason alone subject to antitrust liability" and "d[id] not intend to alter that understanding."   *Id.* at 152; *accord In re Lipitor Antitrust Litig.*, 868 F.3d 231, 250-52 (3d Cir. 2017).

This is precisely the type of agreement entered into by Amgen and Teva.  There was no "reverse payment" from Amgen to Teva.  In fact, Amgen did not agree to pay Teva anything, nor did it agree to provide any other "unexplained large transfer of value from the patent holder to

the alleged infringer."[7]  *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403-06 (3d Cir. 2015).  Instead, as expressly permitted by *Actavis*, Amgen merely agreed to "allow[] the generic manufacturer [Teva] to enter the patentee's [Amgen's] market prior to the patent's expiration."  570 U.S. at 158; *see* AC Ex. 3, §§ 5.1-5.2.  And Teva agreed to pay Amgen "some amount less than [Amgen's] full demand"—at most $40 million.  570 U.S. at 151; *see* AC Ex. 3, § 3.1.

Cipla attempts to obfuscate the commonplace and accepted form of the Teva settlement by mischaracterizing the Teva Agreement as one in which Amgen and Teva agreed to "share in monopoly profits."  AC ¶ 53.  Cipla appears to premise this allegation on the fact that under the Teva Agreement, Teva is not required to pay Amgen *all* of the profits Teva earned from its at-risk launch, but rather an amount not exceeding $40 million—*i.e.*, a portion of the damages Amgen is alleged to have incurred.  AC at 1.  But Teva's profits are not monopoly profits: Teva's profits came about from *Teva*'s at-risk sales, which were undeniably *pro*-competitive and *undermined* any monopoly or market power that Amgen may have otherwise enjoyed.

In any event, Teva's payment of money to Amgen under the Agreement is, once again, precisely the type of payment condoned by the Supreme Court in *Actavis*.  Had Amgen continued to pursue its patent infringement claim against Teva on appeal, its damages would have included the amount Teva made during its at-risk launch.  Accordingly, Teva's payment to Amgen of a portion of that amount is simply a "traditional" settlement that is not "subject to antitrust liability."  *Actavis*, 570 U.S. at 152.

---

[7] Nor did the Teva Agreement provide for any cross-licensing and patent pooling that could only be for the purpose of destroying competitors (*see United States v. Singer Mfg. Co.*, 374 U.S. 174, 189-194-95 (1963)), or fix the minimum price at which products embodying Amgen's patent could be sold (*see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 368-69, 400 (1948)).

That the amount Teva must pay Amgen could decrease depending on whether and when other generic cinacalcet products entered the market does not alter this conclusion. This feature of the Teva Settlement makes perfect sense: If other generics enter the market, the amount of Amgen's alleged damages that are attributable to *Teva* would decrease. The proportional amount of those damages that Teva would be willing to pay would, logically, be reduced as well.

That Teva prevailed in the district court and settled only after its launch and during the pendency of the appeal does not change the analysis either. Cipla would apparently require parties to incur the costs, risks, and delays associated with litigating an appeal. The law does not force parties—or the courts—to undertake such burdens. To the contrary, the "law favors settlement." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995); *see also Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*, 61 F. Supp. 2d 102, 108 (D. Del. 1996). And as numerous courts have held, a trial court's non-infringement ruling does not preclude victorious parties from nevertheless settling while the case is on appeal.[8] *See, e.g.*, *Hospira, Inc. v. Sandoz Inc.*, 2014 WL 794589, at *5 (D.N.J. Feb. 27, 2014); *Goldman v. Gen. Accident Ins. Co. of Am.*, 2007 WL 2781935, at *1 (D.N.J. May 24, 2007); *Kim v. United States*, 903 F. Supp. 1546 (S.D.N.Y. 1995).

***There Was No Concerted Action.*** Cipla also failed to plausibly allege concerted action—that is, that "the alleged conspirators . . . had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 208 (3d Cir. 2005). To do this, it is not enough for Cipla to simply allege that Teva entered into

---

[8] Indeed, this Court recognized that "with all due respect to any District Judge who sits through a trial and makes a finding, it's not the last word. The Federal Circuit could disagree on claim construction and we could have a different outcome. It can't be that [litigants] can't bargain over that risk and uncertainty and reach a settlement." D.I. 181 at 54-55.

the Teva Agreement for anticompetitive purposes, nor is it enough for Cipla to allege facts that are "merely consistent with" an agreement to engage in anticompetitive conduct, *Twombly*, 550 U.S. at 556, where the facts alleged are "equally consistent with independently motivated behavior." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.42 (3d Cir. 2010); *see also Burch v. Milberg Factors, Inc.*, 2009 WL 840589, at *14 (D. Del. March 30, 2009) ("[A]llegations that point equally both to lawful and unlawful behavior are inadequate to state a violation of Section 1 of the Sherman Act."). Instead, Cipla must allege "further factual enhancement" to take the claim from "possibility" to "plausibility." 550 U.S. at 570.

There are no such allegations here. In fact, Cipla alleges nothing that is inconsistent with Teva independently deciding to enter into the settlement agreement. There is no allegation that Teva acted against its economic interests. *See Paragon Trade Brands, Inc.*, 61 F. Supp. 2d at 109. Indeed, this Court recognized that it is "plausible that Amgen and Teva may have reasonably assessed the risks each faced on appeal (and otherwise) and reached a rational compromise of their patent disputes." D.I. 186 at 35; *Paragon Trade Brands, Inc.*, 61 F. Supp. 2d at 105.

At a minimum, to survive beyond the pleading stage, Cipla must allege that Teva knew its settlement with Amgen would somehow affect Cipla's contractual right to launch. Cipla did not. As a result, it is simply not plausible, based on Cipla's own allegations, that Teva engaged in a scheme with Amgen designed to preclude Cipla from entering the market.

2.     **Teva's Public Statement About The Settlement Agreement Is Not An Antitrust Violation.**

Cipla attempts to get around the unquestionably lawful nature of the Teva Agreement by collaterally attacking Amgen's and Teva's press releases describing the settlement agreement. Cipla claims that Amgen and Teva falsely represented that Teva had agreed to stop selling its

product as of the agreement's signing date, and that the statements were an attempt to deter other cinacalcet manufacturers from entering the market.  AC ¶¶ 19, 21.  But Cipla failed to plausibly allege that the press releases were false or the result of concerted action.

**The Press Releases Are Not Unlawful.**  First, Cipla fails to plausibly allege that Teva's (or Amgen's) press releases were unlawful.  Cipla claims that Teva's statement that Teva agreed to stop selling cinacalcet products was false, and that the Teva Agreement instead licenses Teva to sell and distribute cinacalcet products.  AC. ¶ 22.  But Cipla identifies no provision of the agreement that supports this allegation, and for good reason:  The allegation is flatly contradicted by the agreement itself.  As this Court recognized, the Teva Agreement obligates Teva not to "[sell] or otherwise transfer[]" its generic product "between the signing date and the Effective Date."  D.I. 186 at 21-22.  Teva further agreed not to sell cinacalcet products between the "Effective Date" (defined as the date ███████████████████████████████████████ ███) and the "Entry Date" (defined as ███████, or earlier under certain conditions not relevant here).  AC Ex. 3, §§ 5.1-5.2, 7.1.  Teva's public statement that it agreed to stop selling its generic cinacalcet product upon signing the Teva Agreement was thus entirely accurate, and this Court should reject Cipla's groundless allegations and theory to the contrary.  *See, e.g., Nat'l Distillers & Chem. Corp. v. Dep't of Energy*, 1980 WL 1057, at *1 (D. Del. Oct. 23, 1980) (Court is not obligated to accept "unwarranted factual inferences contradicted by written documents incorporated and referred to in the complaint").

**The Press Releases Are Not The Product of Concerted Action.**  Second, Teva's press release cannot serve as the basis for antitrust liability because Cipla has once again failed to plead concerted action.  Cipla alleges only that Amgen and Teva each issued press releases.  Cipla alleges no facts supporting the inference that these press releases were the result of a

common scheme by Amgen and Teva—much less a scheme designed to deceive and deter Cipla, and/or other manufacturers, from entering the market.  Again, Cipla did not even plead that Teva knew the terms of Cipla's agreement with Amgen.  At most, Cipla has alleged parallel conduct by Amgen and Teva, in that they both issued press releases, announcing the settlement, around the same time.  But parallel conduct of this sort (two companies issuing press releases announcing the settlement of litigation between them) is commonplace, and as the Supreme Court has explained, in any event, an allegation of parallel conduct "stops short of the line between possibility and plausibility."  *Twombly*, 550 U.S. at 557.

### 3. **Amgen's January 4, 2019 Letter.**

Finally, Cipla's attempt to cast Amgen's January 4, 2019 letter as a Sherman Act violation is similarly deficient.  Cipla pleads no facts to suggest that Teva had any involvement in Amgen drafting or sending that letter.  "Unilateral activity by a defendant . . . cannot give rise to a section 1 violation."  *Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).  Furthermore, for the reasons stated in Amgen's motion to dismiss, the letter is not illegal.

For any or all of the above reasons, this Court should dismiss Cipla's Sherman Act claim.

### C. **This Court Should Remand Or Dismiss Cipla's State Law Claims.**

Because Cipla's sole federal law claim fails, this Court should decline to exercise supplemental jurisdiction over its state law claims.  *See United States v. Gibbs*, 383 U.S. 715, 726 (1966).  In any event, Cipla also failed to adequately plead the state law claims.

### 1. **Cipla Failed To Plausibly Plead A Violation Of The Cartwright Act Or UCL.**

Cipla's Cartwright Act and UCL claims are based on the same barebones allegations as its Sherman Act claim.  Accordingly, "the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not

unlawful under the Cartwright Act or the 'unlawful' prong of the UCL," *Lenhoff Enters., Inc. v. United Talent Agency, Inc.,* 729 F. App'x 528, 531 (9th Cir. 2018), or an "'unfair' business act or practice" under the UCL. *City of San Jose v. Office of the Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015); *Lenhoff Enters.*, 729 F. App'x at 531.

### 2.    Cipla Fails To State A Fraud Claim.

Cipla fails to state its fraud claim with particularity, as required by Rule 9(b).  A plaintiff fails to satisfy Rule 9(b) where he simply reasserts the rest of its complaint in his fraud claim, without "explain[ing] how [the] conduct alleged in other paragraphs constitutes . . . fraud." *NNN 400 Capital Ctr. 16, LLC v. FGG, Inc.*, 2018 WL 3614794, at *3 (D. Del. July 27, 2018); *see also Kappe Assocs. v. Chesapeake Evntl. Equip., LLC*, 2016 WL 1257665, at *12 (E.D. Pa. Mar. 31, 2016).  That is precisely what Cipla did here:  The entirety of Cipla's fraud claim is an incorporation by reference of the previous 79 paragraphs, and a sentence stating "The conduct of Amgen and Cipla constitutes fraud."  AC ¶¶ 81.

In any event, nothing in the complaint supports a claim of fraud.  The only statement Cipla identifies as having been made by Teva is the statement that "[o]n or about January 2, 2019," Teva "agreed to stop selling its generic product until its license date in mid-year 2021, or earlier under certain circumstances."  AC ¶ 19.  As explained above, nothing about that statement is false or misleading.  *See Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).[9]

### CONCLUSION

The Court should dismiss the claims against Teva with prejudice.

---

[9] Cipla does not specify what state's law applies to its fraud claim.  As Teva's statement pertains to the interpretation of the Teva Agreement, and the Agreement specifies that Delaware law governs its interpretation, Delaware law should govern Cipla's fraud claim.  AC Ex. 3 at 12.

Date: October 15, 2019

By:  /s/ Karen E. Keller

Karen E. Keller (No. 4489)
Shaw Keller LLP
I.M. Pei Building
1105 North Market Street, 12th floor
Wilmington, DE 19801
Telephone: (302) 298-0702
kkeller@shawkeller.com

Henninger S. Bullock (*pro hac vice*)
Richard A. Spehr (*pro hac vice*)
Karen W. Lin (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
hbullock@mayerbrown.com

*Counsel for Defendant Teva
Pharmaceuticals USA, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LIGATION | ) ) ) ) ) MDL No. 19-2895-LPS |
| CIPLA LTD. and CIPLA USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMGEN INC. and TEVA PHARMACEUTICALS USA, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) C.A. No. 19-044-LPS ) ) ) ) |

**[PROPOSED] ORDER GRANTING UNOPPOSED MOTION TO REDACT OPENING BRIEF (NO. 19-44 D.I. 239, MDL NO. 2895 D.I. 26) UNDER SEAL**

At Wilmington this _____ day of _____, 2019, having considered Defendants'

Unopposed Motion to Redact its Opening Brief in support of its Motion to Dismiss, it is hereby

ORDERED that the Defendants' motion is GRANTED.

The Clerk of the Court shall docket the redacted version as Exhibit B to the motion. The

original, unredacted version of D.I. 239 shall be kept permanently under seal.

_____
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on February 25, 2019, this document was served on

the persons listed below in the manner indicated:

**BY EMAIL**

James W. Dabney
Patrice P. Jean
Dina Hoffer
Deanne K. Cevasco
David E. Lansky
Lynn M. Russo
Richard M. Koehl
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
james.dabney@hugheshubbard.com
patrice.jean@hugheshubbard.com
dina.hoffer@hugheshubbard.com
deanne.cevasco@hugheshubbard.com
david.lansky@hugheshubbard.com
lynn.russo@hugheshubbard.com
rivchard.koehl@hugheshubbard.com

Sue L. Robinson
Brian E. Farnan
Michael J. Farnan
FARNAN LLP
919 North Market Street,12th Floor
Wilmington, DE 19801
srobinson@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Jack B. Blumenfeld
Brian P. Egan
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302-351-9454
began@mnat.com

Eric J. Stock
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-013
(212) 351-4000
estock@gibsondunn.com

Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
ajohnson@gibsondunn.com