IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: SENSIPAR (CINACALCET HYDROCHLORIDE TABLETS) ANTITRUST LITIGATION | ) ) ) | MDL No. 19-2895 (LPS) |
| CIPLA LTD. and CIPLA USA, INC., | ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 19-44 (LPS) |
| AMGEN INC. and TEVA PHARMACEUTICALS USA, INC., | ) ) ) ) | PUBLIC VERSION OF D.I. 241 |
| Defendants. | ) ) | |

## AMGEN INC.'S BRIEF IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS CIPLA LTD. AND CIPLA USA INC.'S FIRST AMENDED COMPLAINT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant Amgen Inc.*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 571-2900

Eric J. Stock
Kate Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

October 15, 2019

# TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF PROCEEDINGS ................................................................... 1

II.   SUMMARY OF ARGUMENT .......................................................................................... 1

III.  STATEMENT OF FACTS ................................................................................................. 3

IV.   ARGUMENT ..................................................................................................................... 5

  A.   Cipla Has Not Alleged Standing for Claims 2-5. ...........................................................5

    1.   Cipla Fails to Establish Article III Standing for Claims 2-5. ..................................... 5

    2.   Cipla Fails To Establish Antitrust Standing. ............................................................. 6

  B.   Cipla Has Not Adequately Pled a Claim Under Section 1 of the Sherman
       Act....................................................................................................................................9

    1.   The Amgen-Teva Agreement Does Not Violate the Antitrust Laws. ....................... 10

    2.   A Unilateral Pre-Suit Letter Is Not Actionable Under Section 1. ............................ 14

    3.   Cipla's Patent Misuse Theory Improperly Distorts the Doctrine............................. 14

    4.   Cipla Has Not Adequately Pled a Relevant Market. ................................................ 17

  C.   Cipla's California Claims Fail for the Same Reasons as the Federal
       Claims. ...........................................................................................................................18

  D.   Cipla's Fraud Claim Fails As A Matter Of Law............................................................19

V.    CONCLUSION................................................................................................................ 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
　369 F.3d 732 (3d Cir. 2004)........................................................................9

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*,
　263 F.3d 239 (3d Cir. 2001)..................................................................13, 14

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De Numours & Co.*,
　826 F.2d 1235 (3d Cir. 1987)......................................................................9

*Am. Sales Co. v. AstraZeneca AB*,
　2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011)...........................................17

*Amgen Inc. v. Amneal Pharm. LLC*,
　328 F. Supp. 3d 373 (D. Del. 2018)...........................................................4

*Aryeh v. Canon Bus. Sols., Inc.*,
　55 Cal. 4th 1185 (2013) ...........................................................................18

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)....................................................................................5

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
　459 U.S. 519 (1983)....................................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.*,
　495 U.S. 328 (1990)................................................................................7, 8

*B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*,
　909 F. Supp. 162 (S.D.N.Y. 1995)...........................................................17

*Baraka v. McGreevey*,
　481 F.3d 187 (3d Cir. 2007).......................................................................5

*Baseload Energy, Inc. v. Roberts*,
　619 F.3d 1357 (Fed. Cir. 2010)............................................................14, 15

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
　313 F. Supp. 2d 569 (S.D.N.Y. 2011).......................................................17

*Brown Shoe Co. v. U.S.*,
　370 U.S. 294 (1962)..................................................................................17

iii

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................................................ 7, 8

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) .................................................................................................. 14

*Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (Cal. 1999) ............................................................................................ 18, 19

*In re Cipro Cases I & II*,
61 Cal. 4th 116 (2015) ......................................................................................................... 18

*City of Pittsburgh v W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998) .................................................................................................. 7

*Constitution Party of Penn. v. Aichele*,
757 F.3d 347 (3d Cir. 2014) ................................................................................................ 5, 6

*Dang v. S.F. Forty Niners*,
964 F. Supp. 2d 1097 (N.D. Cal. 2013) ................................................................................. 19

*Fed. Ins. Co. v. Dencity, Inc.*,
2008 WL 11342969 (C.D. Cal. June 5, 2008) ........................................................................ 20

*Flex-Foot, Inc. v. CRP, Inc.*,
238 F.3d 1362 (Fed. Cir. 2001) ............................................................................................. 15

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007) .................................................................................................. 5

*FTC v. AbbVie Inc.*,
107 F. Supp. 3d 428 (E.D. Pa. 2015) ..................................................................................... 12

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ............................................................................... 2, 10, 11, 12, 17

*Gatt Commc'ns, Inc. v. PMS Assocs. LLC*,
711 F.3d 68 (2d Cir. 2013) .................................................................................................... 8

*Goldman v. Gen. Accident Ins. Co. of Am.*,
2007 WL 2781935 (D.N.J. May 24, 2007) ............................................................................. 13

*Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*,
836 F.3d 261 (3d Cir. 2016) ................................................................................................ 5, 6

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Hinesley v. Oakshade Town Ctr.*,
    135 Cal. App. 4th 289 (Cal. App. 2005) ................................................................19

*Hospira, Inc. v. Sandoz Inc.*,
    2014 WL 794589 (D.N.J. Feb. 27, 2014) ......................................................13, 16

*Janssen Prods., L.P. v. Lupin Ltd.*,
    2016 WL 1029269 (D.N.J. Mar. 15, 2016) ...........................................................13

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
    791 F.3d 388 (3d Cir. 2015) ..................................................................................11

*In re Lipitor Antitrust Litig.*,
    868 F.3d 231 (3d Cir. 2017) ............................................................................11, 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................5, 6

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004) ..................................................................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..............................................................................................8, 9

*Morse v. Lower Merion Sch. Dist.*,
    132 F.3d 902 (3d Cir. 1997) ..................................................................................11

*Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,
    795 F.3d 1124 (9th Cir. 2015) ...............................................................................18

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
    730 F.3d 263 (3d Cir. 2013) ....................................................................................6

*Phila. Taxi Ass'n., Inc. v. Uber Tech., Inc.*,
    886 F.3d 332 (3d Cir. 2018) ....................................................................................7

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) .............................................................................15

*Smith v. Allstate Ins. Co.*,
    160 F. Supp. 2d 1150 (S.D. Cal. 2001) .................................................................19

*In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*,
    758 F. Supp. 2d 1077 (S.D. Cal. 2010) .................................................................20

## TABLE OF AUTHORITIES *(continued)*

<u>Page(s)</u>

*Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*,
  2013 WL 1389760 (E.D. Pa. Apr. 4, 2013) .......................................................................14

*U.S. v. CIBA Geigy Corp.*,
  508 F. Supp. 1118 (D.N.J. 1976) ........................................................................................18

*In re Wellbutrin XL Antitrust Litig.*,
  133 F. Supp. 3d 734 (E.D. Pa. 2015) ..................................................................................12

*Zeneca Ltd. v. Pharmachemie B.V.*,
  37 F. Supp. 2d 85 (D. Mass. 1999) ...............................................................................13, 16

**Statutes**

15 U.S.C. § 1 .............................................................................1, 4, 5, 8, 9, 10, 14, 15, 18, 19

Cal. Bus. Prof. Code §§ 16720, 17200 .....................................................................................18

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................5, 10, 19

Fed. R. Civ. P. 12(b) ...............................................................................................................1, 5, 6

Fed. R. Civ. P. 62.1 .......................................................................................................................4

## I.      NATURE AND STAGE OF PROCEEDINGS

Amgen Inc. ("Amgen") hereby moves to dismiss the First Amended Complaint's ("FAC") second, third, fourth, and fifth causes of action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim.

## II.      SUMMARY OF ARGUMENT

On or about March 6, 2019, Plaintiffs Cipla Ltd. and Cipla USA, Inc. (collectively, "Cipla") launched the generic drug which Cipla claims Amgen had caused to be excluded from the market. *See* D.I. 111. Cipla has, by its own admission, made sales in at least the "eight-figure" range. D.I. 173 at 36:11. Yet the FAC still impossibly claims that Cipla "has and is continuing to suffer antitrust injury" because it has been prevented from entering the market. FAC ¶¶ 66-70. Cipla cannot plausibly contend that it has suffered any "injury" at all, "antitrust" or otherwise. It was the first generic to launch its cinacalcet product after Teva ceased sales. Despite lacking any entitlement to exclusivity, Cipla effectively achieved it, and thereby obtained the profits that it alleges Amgen's actions denied it. Because Cipla has not plausibly pled injury in fact, Cipla's Sherman Act claim must be dismissed for lack of Article III standing.

Even if Cipla had pled injury in fact, its antitrust claims would still be appropriately dismissed because the FAC fails to allege that it suffered "antitrust injury." The antitrust laws do not provide a remedy for all injuries flowing from unlawful conduct. Instead, standing under the antitrust laws is only granted to those plaintiffs that suffered injury that flows from the competition-reducing aspect of the conduct—i.e., injury of the type that the antitrust laws were designed to prevent. Cipla's claimed injury does not fit that description. Cipla claims to have suffered injury from its failure to enter the market, and it claims that the Amgen-Teva Agreement led to that result. But Cipla's injuries, if it suffered any, did not flow from any *reduction in competition* between Teva and Amgen. Rather, a competitor like Cipla would ordinarily *benefit* from a reduction in

competition among its competitors.  Cipla's claimed injury, instead, resulted from its own hesitance to launch at risk in the face of its own prior agreement not to launch absent certain preconditions. Whether or not Teva's at-risk launch and subsequent exit from the market caused those conditions to be met, it was the operation of Cipla's own agreement and Cipla's own decisions in light thereof— not any competition-reducing effect of the Amgen-Teva Agreement—that caused Cipla's "injury." This is not the type of "harm" antitrust law is intended to police.

Cipla's vague, scattershot antitrust claims fail, in any event, to state a claim under either federal or state law.  Indeed, it is difficult to decipher exactly what conduct Cipla contends violates the antitrust laws.  Cipla appears to attack several actions Amgen took with respect to its settlement with Teva, but none are actionable.  Without any allegation that the Teva settlement included a "large and unjustifiable" reverse payment from the patentee to the alleged infringer, Cipla's attack on the Amgen-Teva Agreement fails as a matter of law under *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).  Insofar as Cipla is also alleging that Amgen and Teva's filing of a joint motion seeking vacatur of the District Court ruling or Amgen's sending of a pre-suit litigation letter to Cipla somehow violates the antitrust laws, Cipla is mistaken.  Both actions are nonactionable and protected by the *Noerr-Pennington* doctrine.  Moreover, Cipla's failure to adequately plead a "relevant market" independently dooms its antitrust claims to dismissal.

The FAC's one-sentence claim for common law fraud fares no better.  Amgen's statements regarding the effect of its agreement with Teva were true, but in any event were nonactionable, objectively reasonable statements of Amgen's opinion about what Teva had agreed to do.  Cipla has failed to plead anything but the most conclusory allegations that Amgen made knowingly false statements, or that Amgen intended to deceive Cipla, or that Cipla ever reasonably relied on such alleged misrepresentations.  Indeed, the FAC itself admits that regardless of what Amgen said about

the Teva agreement, Cipla was prepared to launch anyway—which it ultimately did.

Accordingly, Cipla's second through fifth causes of action should be dismissed.

## III.    STATEMENT OF FACTS

Amgen is the assignee of United States Patent No. 9,375,405 (the "'405 patent"), which claims pharmaceutical compositions that include the active ingredient cinacalcet hydrochloride. Cinacalcet hydrochloride is the active ingredient in Sensipar®, a medication marketed and sold by Amgen that is indicated for the treatment of secondary hyperparathyroidism and hypercalcemia in certain patients. Beginning in 2016, Cipla and other generic drug manufacturers (including Teva's subsidiary, Watson) filed Abbreviated New Drug Applications ("ANDAs") seeking approval to manufacture and sell generic cinacalcet hydrochloride products. Amgen sued each of those manufacturers for infringement of the '405 patent.

On February 26, 2018, Amgen and Cipla entered into a settlement agreement resolving Amgen's claims against Cipla. *See* FAC Ex. 1 ("Amgen-Cipla Agreement"). As is common in patent infringement litigation between branded and generic pharmaceutical manufacturers, the parties settled on a compromise entry date permitting Cipla to enter the market prior to expiration of the patent at issue. Specifically, Amgen agreed to grant Cipla a license allowing Cipla to enter the market 97 days before expiration of the '405 patent. *See* Amgen-Cipla Agreement § 5.2(a).

The Amgen-Cipla Agreement accelerates this entry date if one of two events occurs: (1) the issuance of a final court decision (i.e., upheld on appeal) holding the '405 patent invalid or unenforceable; or (2) the launch of a generic cinacalcet hydrochloride product by another generic manufacturer, under certain circumstances. *Id.* §§ 5.2(b)–(c). With respect to the latter acceleration event, the Amgen-Cipla Agreement provides that a launch by another generic manufacturer will not permit an accelerated entry by Cipla (even at-risk) if the launch falls under one of the exceptions listed in paragraph 5.5 of the agreement. *Id.* § 5.2(b). One of those exceptions is for an "at-risk"

launch—a third-party launch done without authorization from Amgen and without a final court decision (upheld on appeal) of non-infringement, unenforceability, and/or invalidity of the '405 patent.  Although an at-risk launch thus does not grant Cipla a license, it may allow Cipla to sell its generic product at-risk without threat of preliminary injunction if Amgen does not enter into an agreement within ten days of learning of the third party at-risk launch that requires the third party to cease its sales within 30 days of the agreement.  *Id.* § 5.5(a).

On July 27, 2018, the District Court held that the '405 patent was infringed by one defendant, but not by three others—Amneal Pharmaceuticals LLC, Piramal Healthcare UK Ltd., and Watson Laboratories, Inc. (a division of Teva, hereinafter referred to as "Teva").  *Amgen Inc. v. Amneal Pharm. LLC*, 328 F. Supp. 3d 373, 399 (D. Del. 2018).  Amgen appealed that judgment.  During that appeal, any marketing of a generic product by Amneal, Piramal, or Teva would be an "at risk" launch, because if Amgen wins the appeal, the sales made by the generic manufacturer during the pendency of the appeal would be infringing and entitle Amgen to damages.

On December 28, 2018, Teva launched at-risk, selling generic cinacalcet hydrochloride without Amgen's authorization.  FAC ¶ 12.  Five days later, on January 2, 2019, Amgen and Teva entered into a settlement agreement resolving Amgen's still-pending infringement claims against Teva.  *Id.* ¶ 15; FAC Ex. 3 ("Amgen-Teva Agreement").  Under that agreement, Teva ceased sales of its generic product and moved jointly with Amgen for an "indicative ruling" from the district court that it would vacate its order of non-infringement, per Federal Rule of Civil Procedure 62.1.

Cipla filed its original complaint on January 8, 2019, and the FAC on February 25, 2019.  Count 1 of the FAC seeks a declaratory judgment that Cipla is now licensed under the Amgen-Cipla Agreement due to Teva's December 28 launch.  Count 2 claims that Amgen and Teva violated Section 1 of the Sherman Act.  Counts 3 and 4 allege that the same conduct violated California's

Cartwright Act and Unfair Competition Law.  Count 5 alleges common law fraud.

In spite of its allegation that it is precluded from selling generic cinacalcet, Cipla launched its drug on or about March 6, 2019, before any other generic (other than Teva, which had ceased sales). *See* D.I. 111.  Cipla has made sales at least in the "eight-figure" range.  D.I. 173 at 36:11.

## IV.     ARGUMENT

To have Article III standing to sue, a plaintiff "must have suffered an injury in fact."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A "motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Constitution Party of Penn. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).  Where, as here, the "facts of the case . . . do not support the asserted jurisdiction," the "District Court may look beyond the pleadings to ascertain the facts" and "may weigh and consider evidence outside the pleadings."  *Id.* at 358.  Because antitrust standing is treated "not as an Article III jurisdictional issue, but rather as a merits issue," a challenge to antitrust standing is evaluated under Rule 12(b)(6).  *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 269 (3d Cir. 2016).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court need not "accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  Under the "stringent pleading restrictions" of Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud" with "particularity."  *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

### A.     Cipla Has Not Alleged Standing for Claims 2-5.

#### 1.     Cipla Fails to Establish Article III Standing for Claims 2-5.

Count 2 of the FAC, alleging a violation of Section 1 of the Sherman Act, fails for the

fundamental reason that Cipla has neither alleged, nor suffered, an injury in fact sufficient to confer Article III standing. To meet the "irreducible constitutional minimum" of Article III standing, a plaintiff invoking federal jurisdiction bears the burden of pleading and establishing, *inter alia*, "injury in fact." *Lujan,* 504 U.S. at 560.

Here, the only injury claimed by Cipla under Count 2 is its alleged exclusion from an alleged market for cinacalcet products. *See* FAC ¶¶ 66-70. But since filing the FAC, Cipla has in fact launched and made sales in at least the "eight-figure" range. *See* D.I. 173 at 36:11. This undisputed fact can be considered on both a facial and factual challenge to Cipla's Article III standing. *Constitution Party of Penn.,* 757 F.3d at 358 (court may consider evidence outside of the pleadings on Rule 12(b)(1) "factual" challenge to jurisdiction); *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013) (on motion to dismiss, court may consider "items appearing in the record of the case"). Cipla does not allege that it would have profited *more* if it had entered the market earlier, much less allege any facts plausibly supporting such an allegation. Now that Cipla's theory of injury has been supplanted by subsequent developments, including Cipla's tens of millions of dollars in sales, Cipla cannot plausibly contend that it has suffered any "injury" at all.[1] Without a plausible allegation of injury, Cipla lacks Article III standing and this Court lacks jurisdiction.

## 2.    Cipla Fails To Establish Antitrust Standing.

Even if Cipla had pled an injury sufficient to establish *constitutional* standing, it has failed to plausibly plead *antitrust* standing, which "remains [] a prerequisite to suit, focusing on the nature of the plaintiff's alleged injury and asking whether it is of the type that the antitrust statute was intended to forestall." *Hartig Drug Co. Inc.*, 836 F.3d at 269. Antitrust standing is a prudential

---

[1] Although Cipla previously suggested it has been limiting the amounts it would sell, as this Court recognized, that "self-imposed limit" is independent of Amgen's actions. D.I. 173 at 36:10-12.

doctrine that "is distinct from Article III standing" and is a "threshold requirement" for an antitrust plaintiff.  *Phila. Taxi Ass'n., Inc. v. Uber Tech., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018).

To satisfy this "threshold" antitrust standing requirement, a private plaintiff asserting antitrust claims must plead "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also, e.g.*, *City of Pittsburgh v W. Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998) (affirming dismissal for failure to plead antitrust injury).  "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344 (1990).  Other types of injuries—even those that result directly from the alleged antitrust violation—do not constitute "antitrust injury."

Here, Cipla's alleged "injury" is its "exclu[sion] . . . from entering the market for Cinacalcet Products."  FAC ¶ 67.  But Cipla has pled no theory that this alleged injury "flow[ed]" from any illegal or anticompetitive conduct, much less that it "flow[ed] from that which makes the defined acts unlawful." *Pittsburgh*, 147 F.3d at 265; *Brunswick*, 429 U.S. at 489.  With a vague, buckshot approach, Cipla cursorily takes aim at Amgen's entering into the Amgen-Teva Agreement (FAC ¶¶ 54, 66); seeking an indicative ruling (FAC ¶ 54); making allegedly "false public statements" about Teva's agreement to cease selling its product (FAC ¶¶ 24, 54); and sending a pre-suit letter (FAC ¶ 68).  But by Cipla's own allegations, all that kept it from launching its generic product was its own concern that doing so might breach its settlement agreement with Amgen—*not* the "competition-reducing" effect (if any) of Amgen's alleged actions. *Atl. Richfield*, 495 U.S. at 344.

Cipla explicitly states that it would have begun selling its product "but for the January 4, 2019, letter from Amgen with its threat of further litigation."  FAC ¶¶ 68.  Cipla thus admits that it

was not affected by any anticompetitive harm to the marketplace or its consumers.  Cipla would have

entered—and did enter—the market *notwithstanding* the Amgen-Teva Agreement and Amgen's

alleged "false public statements."  FAC ¶ 54.  Its alleged "exclu[sion]" from the market, FAC ¶ 67,

was its own decision, a calculated business judgment in light of Amgen's pre-suit letter and Cipla's

own legal evaluation of the effect of its settlement agreement with Amgen.

These are simply not the type of facts that can support an antitrust suit.  Cipla's evaluation of

its own contractual rights and obligations had nothing to do with the Amgen-Teva Agreement's

alleged maintenance of "artificially high prices," "restrict[ions] [on the] supply" of available drugs,

FAC ¶ 62, or any alleged "competition-reducing" aspect of Amgen's actions.  *Atl. Richfield*, 495

U.S. at 344.  Indeed, competition has *increased* since Cipla filed its FAC, with Cipla's launch of its

generic product resulting in "eight-figure" sales, and other generics also having entered the market.

If any conduct by Amgen harmed consumers by reducing competition, that reduction of competition

simply did not lead to Cipla's claimed fears that it would breach its contract.  *Brunswick*, 429 U.S. at

487–88; *see also, e.g.*, *Gatt Commc'ns, Inc. v. PMS Assocs. LLC*, 711 F.3d 68, 77 (2d Cir. 2013)

(plaintiff lacked antitrust injury because its injuries did not flow from anticompetitive consequences

of the antitrust violation, i.e., higher consumer prices).  Were it otherwise, mere disputes over

contract interpretation would be turned into antitrust actions.

The fact pattern here—a plaintiff challenging an agreement that supposedly reduced

competition between two of that plaintiff's own competitors—is well-trod and invariably results in

dismissal for lack of standing.  As the Supreme Court reasoned in *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, plaintiffs cannot "recover damages for any conspiracy by [its competitors] to

charge higher than competitive prices"—even if such conduct would "violate the Sherman Act"—

because, "as [defendants'] competitors, [plaintiffs] stand to gain from any conspiracy to raise the

market price." 475 U.S. 574, 582–83 (1986). "[F]or the same reason, [plaintiffs] cannot recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive." *Id.* at 583.

Cipla makes the same logical mistake here. Its purported "injury" does not arise from the supposed lessening of competition between Amgen and Teva. It alleges that the "purpose of the January 2 Agreement" is to restrain competition between Amgen and Teva so that Amgen can charge "artificially high prices for Cinacalcet Products." FAC ¶ 57. But as the Supreme Court has noted, higher prices benefit, rather than harm, competitors, who thus have no standing to challenge such conduct. *Matsushita*, 475 U.S. at 582–83. And since Cipla entered the market while other generic manufacturers respected their contractual agreements, Cipla benefitted from those higher prices and certainly has no standing to assert antitrust claims relating to them.

Finally, Cipla also lacks standing for the distinct reason that its injury is, at most, indirect. "[S]tanding analysis is employed to search for the most effective plaintiff from among those who have suffered loss." *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Numours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987). A plaintiff, like Cipla, that alleges only indirect injury—if any—is not the most effective plaintiff to bring a claim. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540–41 (1983) ("*AGC*"). To the extent the Amgen-Teva Agreement, as Cipla alleges but Amgen disputes, created "artificially high prices" and a reduction in drug supply, FAC ¶ 62, consumers—not competitors like Cipla—are the "direct victims of the conspiracy," *AGC*, 459 U.S. at 542 n.47, and "suffered a more direct and more appropriate antitrust injury," *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 742 (3d Cir. 2004).

## B.       Cipla Has Not Adequately Pled a Claim Under Section 1 of the Sherman Act.

Assuming *arguendo* that Cipla has standing to assert its Sherman Act claim, the FAC

nevertheless falls far short of stating a plausible claim.  Nothing in Cipla's allegations comes close to describing any recognizable antitrust violation.  Entering into a settlement like the Amgen-Teva Agreement is not actionable antitrust misconduct.  Nor is filing a motion for an indicative ruling or sending a notice letter warning that the patentholder will enforce its rights.  And even if Cipla had pled actionable misconduct, Cipla fails to adequately plead a "relevant market," as required under Section 1.  The Sherman Act claims should thus be dismissed.[2]

### 1.      The Amgen-Teva Agreement Does Not Violate the Antitrust Laws.

Cipla alleges that it suffered antitrust harm "by reason of" the Amgen-Teva Agreement.  FAC ¶ 66.  Cipla's theory appears to be that because Amgen settled its infringement suit against Teva, a claimed infringer and unlawful competitor, under terms that temporarily kept Teva—and, under its own settlement agreement, Cipla—out of the market, the Amgen-Teva Agreement "restrain[ed] trade" in violation of the Sherman Act.  FAC ¶¶ 61, 62.  Cipla's claim must be dismissed because settlements like the Amgen-Teva Agreement do not violate the antitrust laws.

Lawful settlements of pharmaceutical patent litigation very frequently "allow[] the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point."  *Actavis*, 570 U.S. at 158.  Under *Actavis*, such a patent settlement only becomes potentially unlawful where the brand manufacturer has provided a "large and unjustified" payment to the generic manufacturer, raising an inference that the generic manufacturer has agreed to delay its entry not out of respect for the patents, but because of the payment.  *Id*. at 158.  Because such a settlement "requires the patentee to pay the alleged infringer, rather than the other way around," this kind of settlement is often called a "reverse payment"

---

[2] Insofar as Cipla's theory is that Amgen's alleged misrepresentations about the Amgen-Teva Agreement support antitrust liability, that assertion fails for the same reasons as Cipla's fraud claim. *See infra* Section D; *Lum v. Bank of Am.*, 361 F.3d 217, 229 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) (dismissing antitrust claim premised on fraud where fraud allegations did not comply with Rule 9(b)).

settlement.  *Id*. at 140–41.  While acknowledging the potential harms of a reverse payment settlement, the Supreme Court required caution in invalidating infringement settlements because of the "general legal policy favoring the settlement of disputes."  *Id.* at 153.

Accordingly, post-*Actavis*, "to survive a motion to dismiss . . . plaintiffs [challenging a patent settlement] *must allege* facts sufficient to support the legal conclusion that the settlement at issue involves a *large and unjustified reverse payment* under *Actavis*."  *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 251–52 (3d Cir. 2017) (emphasis added).  Thus, although this Court previously stated that "it seems plausible that Amgen and Teva may have colluded to divide up the market for cinacalcet," D.I. 186 at 35, Supreme Court and Third Circuit law is clear that an agreement like the Amgen-Teva settlement is ***not actionable*** under antitrust law in the absence of a "large and unjustified reverse payment."  *Lipitor*, 868 F.3d at 251–52.

Cipla does not, and cannot, allege any reverse payment from Amgen to Teva, much less a "large" and "unjustified" payment.  Its conclusory allegations of the "purpose" and "effect" of the Amgen-Teva Agreement, FAC ¶¶ 55-60, have no bearing on the key inquiry: whether the settlement entailed "an unusual, unexplained transfer of value from the patent holder to the alleged infringer that cannot be adequately justified."  *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 409 (3d Cir. 2015).  To the extent Cipla intends its vague references to "Amgen ceding to Teva up to hundreds of millions of dollars in profits on sales of Cinacalcet Products" and "shar[ing] in monopoly profits" (FAC ¶¶ 32, 53) to allege an improper reverse payment, that theory also fails.  First, Cipla alleges no facts that would support such *ipse dixit* allegations, and "a court need not credit a complaint's bare assertions."  *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  Second, under the Amgen-Teva Agreement, Teva made payments to Amgen, which are not a reverse payment.  *See* [D.I. 28, MDL No. 19-2895 (LPS), at 7-14].

If Cipla's theory sufficed to state a claim under *Actavis*, *every* patent settlement—which by definition entails some agreement not to compete—would be subject to an antitrust claim.  But that is not the law, as the Supreme Court recognized in "exempt[ing] 'commonplace forms' of settlement from [antitrust] scrutiny."  *Lipitor*, 868 F.3d at 250 (quoting *Actavis*, 570 U.S. at 152)); *see also Actavis*, 570 U.S. at 158  ("[T]he fact that a large, unjustified reverse payment risks antitrust liability does not prevent litigating parties from settling their lawsuit . . . in other ways.").

Indeed, the Teva settlement is exactly the type of settlement that the Supreme Court endorsed.  *Actavis* specifically approved of settlements that "allow[] the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point."  *Actavis*, 570 U.S. at 158.  Here, the Amgen-Teva Agreement—without any payment from Amgen to Teva—grants Teva a license on the earlier of three occurrences, but in no event later than ████████████  Teva Agreement § 5.2.  This is ████ ████ before the '405 patent is set to expire.  Courts addressing similar settlement agreements have held that, pursuant to *Actavis*, such agreements "do[] not run afoul of the antitrust laws" and in fact "promote[] competition."  *FTC v. AbbVie Inc.*, 107 F. Supp. 3d 428, 436 (E.D. Pa. 2015) (settlement that allowed Teva to enter a particular market six years prior to the expiration of the patent at issue, unaccompanied by any payment to the claimed infringer, was legal under *Actavis* and concededly so by the FTC); *see also, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 752 (E.D. Pa. 2015) ("Such settlements . . . are not subject to antitrust scrutiny.")

Contrary to Cipla's allegations, the fact that the District Court previously issued a ruling in favor of Teva—now on appeal—does not somehow preclude settlement.  *See* FAC ¶¶ 33, 54, 63.  Parties to a case on appeal are entitled to settle their litigation while on appeal, just as they are entitled to settle prior to the appeal, regardless of which party won in the trial court.  *See, e.g.*,

*Hospira, Inc. v. Sandoz Inc.*, 2014 WL 794589, at *5 (D.N.J. Feb. 27, 2014) (settlement of patent litigation where alleged infringer won in district court found to be unobjectionable); *Janssen Prods., L.P. v. Lupin Ltd.*, 2016 WL 1029269, at *3 (D.N.J. Mar. 15, 2016) (modifying an order enjoining a defendant from manufacturing and selling a generic product to accommodate a settlement agreement entered into while on appeal); *Goldman v. Gen. Accident Ins. Co. of Am.*, 2007 WL 2781935, at *1 (D.N.J. May 24, 2007) (consent order vacating prior judgment in favor of defendant pursuant to settlement reached after plaintiff had filed notice of appeal); *Zeneca Ltd. v. Pharmachemie B.V.*, 37 F. Supp. 2d 85, 90 (D. Mass. 1999) (Federal Circuit vacated district court judgment in favor of alleged infringer after the parties reached settlement while on appeal).

Moreover, Teva's settlement has no anticompetitive effect because the other two parties to the District Court ruling are continuing with the appeal—and if they succeed, it will trigger the other basis for accelerating Cipla's entry date. *See* Amgen-Cipla Agreement ¶¶ 5.1, 5.2(c).

Finally, Cipla's suggestion that Amgen's and Teva's motion for an indicative ruling is somehow "collusive" or unlawful is baseless. FAC ¶ 54; *see also id.* ¶ 23. Numerous courts have entered similar orders vacating a prior judgment in accordance with settlement terms that were contrary to those judgments. *See Hospira*, 2014 WL 794589, at *1, 4; *Goldman*, 2007 WL 2781935, at *1; *Zeneca*, 37 F. Supp. 2d at 90. Moreover, filing a motion with a court is quintessential petitioning conduct, and the *Noerr-Pennington* doctrine "immunize[s]" "private parties . . . against liability stemming from antitrust injuries flowing from valid petitioning," including to "the judiciary." *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 250–51 (3d Cir. 2001). Nor has Cipla alleged how such motion could have injured Cipla. If the Court had *granted* the motion, Cipla's complaint would have been with the Court, not Amgen; because it did not grant the motion, the filing of the motion had no effect on Cipla whatsoever.

### 2.   A Unilateral Pre-Suit Letter Is Not Actionable Under Section 1.

Although Cipla's "antitrust" allegations appear geared toward the Amgen-Teva Agreement, Cipla also alleges, as discussed above, that what *actually* kept it out of the market was its own hesitance in the face of Amgen's January 4, 2019 letter. *See* FAC ¶ 68; *supra* 7-8.  Insofar as Cipla is claiming that sending the letter is itself an antitrust violation, it is mistaken.  A Section 1 claim requires allegations of a "contract, combination, or conspiracy"; "[u]nilateral action," like sending a letter stating the writer's rights, "is not a violation of Section 1."  *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011).  Moreover, because the pre-suit letter is immune from antitrust liability under the *Noerr-Pennington* doctrine, any claim based on the letter fails as a matter of law. *See A.D. Bedell*, 263 F.3d at 252 (*Noerr-Pennington* extends to "action[s] incidental to litigation such as prelitigation threat letters"); *Sweet St. Desserts, Inc. v. Chudleigh's Ltd.*, 2013 WL 1389760, at *6 (E.D. Pa. Apr. 4, 2013) ("[P]resuit demand letters are immunized under *Noerr-Pennington*."). Cipla pleads no facts suggesting that Amgen's positions as expressed in the letter were objectively meritless, much less a sham.  A reasonable difference of opinion on the interpretation of a contract cannot constitute an antitrust violation.

### 3.   Cipla's Patent Misuse Theory Improperly Distorts the Doctrine.

Cipla's attempt to render the '405 patent unenforceable altogether by invoking patent misuse is also unavailing.  FAC ¶¶ 64, 65.  As an initial matter, Cipla, in the very settlement agreement it now purportedly attempts to enforce, explicitly agreed "not to [] challenge the . . . enforceability" of the '405 patent.  Cipla Agreement § 4.2(A).  Under the doctrine of contractual estoppel, "invalidity and unenforceability claims may be released . . . if the language of the [settlement] agreement . . . is clear and unambiguous."  *Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1362 (Fed. Cir. 2010). Here, the plain terms of the Cipla agreement could not be more "clear and unambiguous."  Cipla agreed not to challenge the enforceability of the '405 patent, and is thus contractually estopped from

14

raising any patent misuse argument.

Amgen respectfully disagrees with this Court's prior reliance on *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1370 (Fed. Cir. 2001), in ruling that Cipla may invoke patent misuse because it is "a defense which is based on facts and circumstances arising after execution of the Amgen-Cipla Agreement and on which, therefore, Cipla had no opportunity to conduct discovery." D.I. 186 at 33 n.23. Although *Flex-Foot* looked to whether the estopped party first had "an opportunity to conduct discovery," 238 F.3d at 1370, the Federal Circuit subsequently held that "a prior dispute and litigation" is not necessary. *Baseload*, 619 F.3d at 1363. Instead, "[i]n the context of settlement agreements . . . clear and unambiguous language barring the right to challenge patent invalidity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated." *Id*. The same reasoning applies to the release of challenges to patent enforceability. *See id*.

Moreover, even if Cipla could invoke patent misuse, its skeletal allegations do not articulate a viable theory of misuse, much less plead misuse constituting a Section 1 conspiracy. Patent misuse is a "narrow" doctrine and "has not [been] applied . . . expansively." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1321 (Fed. Cir. 2010). The "key inquiry" is whether the patentholder, by "using the patent to obtain market benefit beyond that which inheres in the statutory patent right," has "impermissibly broadened the physical or temporal scope of the patent grant." *Id*. at 1328. Patent misuse often involves tying, in which the "patentee leverage[s] its patent . . . by insisting that its licensees purchase unpatented goods," or licenses that require the payment of fees even "after the expiration of the licensed patent." *Id*. at 1333, 1327.

Cipla's allegations bear no resemblance to any recognizable form of patent misuse. Cipla's primary contention seems to be that merely entering into the settlement agreement with Teva

constitutes patent misuse because, in Cipla's view, the agreement "exclude[s] the sale of Cinacalcet Products falling outside the scope of the ['405] patent."  FAC ¶ 63; *see also id.* ¶ 13.  But whether Teva's products fall "outside the scope of the ['405] patent" is precisely the question that Teva and Amgen were litigating when the settlement agreement was entered.  As discussed above, numerous courts have approved patent settlements during pendency of an appeal—with no hint that doing so was somehow sanctioning patent misuse, even when the settlement required vacating the district court's judgment, and regardless of whether the infringing defendant would have prevailed on appeal.  *See supra* 13.

In *Zeneca*, for example, the court rejected a patent misuse defense based on a prior settlement that had required the Federal Circuit to vacate—which it did—a district court judgment in favor of the generic drug manufacturer that the patent at issue was invalid and unenforceable.  37 F. Supp. 2d at 92.  The court held that "the concept . . . of patent misuse quite simply does not fit the facts of this case."  *Id.*  If merely entering into the settlement was "collusive" and improperly "broadened" the scope of the patent, then that would be true for "every case that was settled while on appeal" where "the district court judgment of invalidity or unenforceability [was] vacated."  *Id.* at 93.  "As a matter of law," the court concluded, this "does not fall within the rubric of patent misuse."  *Id.*; *see also Hospira*, 2014 WL 794589, at *1–4 (where generic manufacturer had obtained a district court judgment that the patent at issue was invalid, district court saw "no reason to squelch a settlement agreement" reached while case was on appeal; a district court conclusion is neither final nor dispositive where an appeal "remain[s] pending before the Federal Circuit").

The Teva settlement here likewise "does not fall within the rubric of patent misuse."  *Zeneca*, 37 F. Supp. 2d at 93.  Amgen and Teva had a good faith disagreement about the scope of Amgen's patent.  They settled that dispute with an agreement that "allow[ed] the generic manufacturer to enter

16

the patentee's market prior to the patent's expiration"—the type of agreement endorsed by *Actavis*. 570 U.S. at 158.

### 4.      Cipla Has Not Adequately Pled a Relevant Market.

Cipla's antitrust claim must also be dismissed because the FAC does not adequately plead a "relevant market" for antitrust purposes.  The definition of a product market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).  Here, Cipla alleges that "pharmaceutical products comprising cinacalcet hydrochloride" constitute the relevant market, FAC at 1, ¶ 50,  but does not explain why the substitute drug that it identifies—Parsabiv®, FAC ¶ 45—or "other drugs for treating hyperparathyroidism," FAC ¶ 43, are not "reasonably interchangeab[le]" with cinacalcet products.  This is insufficient to withstand a motion to dismiss. *Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786, at *3 (S.D.N.Y. Apr. 14, 2011) (assertion that no products were interchangeable with drug was "a legal conclusion unsupported by allegations describing [the drug] or the competitive landscape of heartburn-treatment products"); *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995).

Nor do Cipla's general allegations about Sensipar®'s pricing suffice to plausibly plead that Sensipar® is its own market.  FAC ¶¶ 47-51.  Absent well-pled facts about how much Sensipar®'s price increased, how that compares to increases in inflation, costs, and other drug prices over the same time period, and how sales of Sensipar®, Parsabiv®, or other HPT drugs responded, Cipla's oversimplified conception of cross-elasticity analysis says nothing about market definition or Amgen's alleged market power.  *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 313 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (to plausibly plead a relevant product market, plaintiff "must allege sufficient facts about other treatments to make its proposed product market plausible," "must offer a theoretically rational explanation for why the boundaries of the market are defined as they are[,] and

17

must define the market according to the rules of interchangeability and cross-elasticity").  Because Cipla fails to provide a "plausible explanation" for why the relevant market should be limited to a single class of drug, its claim must be dismissed.  *U.S. v. CIBA Geigy Corp.*, 508 F. Supp. 1118, 1155–56 (D. N.J. 1976).

### C.      Cipla's California Claims Fail for the Same Reasons as the Federal Claims.

Cipla's third and fourth claims for relief arise under California's Cartwright Act (§ 16720) and Unfair Competition Law (§ 17200) ("UCL").  FAC ¶¶ 72-79.  These claims are based on the same factual allegations as the Sherman Act claim, and simply relabel the cause of action as a California state law violation.  Neither states a claim for relief.

Because "the analysis under the Cartwright Act . . . is identical to that under the Sherman Act," Cipla's Cartwright Act antitrust claim fails for the same reasons as its Sherman Act claims. *Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015).[3]  The California Supreme Court's decision in *In re Cipro Cases I & II* specifically construed the Cartwright Act in connection with antitrust challenges to patent settlements.  61 Cal. 4th 116 (2015).  *Cipro* followed the Supreme Court's decision in *Actavis* and recognized that for a patent settlement delaying generic entry to be unlawful, a reverse payment is required.  *Id.* at 151– 52.  As discussed above, Cipla has pled no such "reverse payment."  *See supra* 10-13.

Cipla's claim under California's UCL fares no better.  California's UCL provides equitable relief for business acts or practices that are "unlawful, unfair or fraudulent."  Cal. Bus. Prof. Code § 17200; *id.* § 17203; *Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (Cal. 1999).  Cipla's UCL claim is based on exactly the same allegations that form the basis of its

---

[3]  The Cartwright Act is not always coextensive with the Sherman Act—for example, with respect to when a claim accrues for purposes of the statute of limitations, *see Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1195 (2013)—but with respect to the substance of a plaintiff's antitrust allegations, the same analysis applies.  *See, e.g.*, *Name.Space*, 795 F.3d at 1131 n.5.

Sherman Act and Cartwright Act claims.  FAC ¶ 78.  Thus, Cipla's claim of "unlawful" practices under the UCL fails for the same reasons as its other claims—the acts alleged are not unlawful. Likewise, the California Supreme Court has explained that for purposes of the UCL, "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law."  *Cel-Tech Comm'ns*,  20 Cal. 4th at 187.  Because Cipla's allegations do not make out any such violation, they also fail to state a claim for "unfair" business practices under the UCL.  *Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097, 1103 (N.D. Cal. 2013) (where UCL claim is "based on the same allegedly unlawful anticompetitive activity" as Sherman Act and Cartwright Act claims, "the Court will apply the standard antitrust violation analysis" to all claims).

### D.        Cipla's Fraud Claim Fails As A Matter Of Law

Strewn throughout the FAC are conclusory allegations that Amgen "deceive[d] or misle[d]" Cipla and the public with a "false" statement about Teva's agreement to cease its sales.  *E.g.*, FAC ¶¶ 21, 52, 67.[4]  These cursory allegations fall far short of stating a claim for fraud, particularly since Fed. R. Civ. P. 9(b) requires Cipla to "state with particularity the circumstances constituting fraud." *See Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 294 (Cal. App. 2005) (elements of fraud are "(a) a misrepresentation . . . ; (b) scienter or knowledge of its falsity; (c) intent to induce reliance;  (d)  justifiable  reliance;  and  (e)  resulting  damage").    Here,  Cipla  pleads  no "misrepresentation."   The FAC does not plead any facts (other than a facial misreading of the Amgen-Teva Agreement, *see* D.I. 122, 170, 194) "explaining why the statement was false when made."  *Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1152 (S.D. Cal. 2001).

Even if Amgen (and Teva) misunderstood their own agreement, Amgen's representation was

---

[4]  Cipla does not indicate which state's law should apply to its fraud claim; in light of Cipla's other California state law claims, Amgen will also apply California law to Cipla's fraud claim.

at most a nonactionable opinion about what Amgen genuinely believed was the effect of its contract with Teva. *Fed. Ins. Co. v. Dencity, Inc.*, 2008 WL 11342969, at *4 (C.D. Cal. June 5, 2008) ("A statement of opinion is not actionable as fraud."). The FAC lacks any non-conclusory allegation that Amgen believed that the representation was false when made. Indeed, it is utterly implausible that if, as Cipla claims, Amgen sought through the Amgen-Teva Agreement to *exclude* competition for Sensipar®, Amgen would have entered an agreement that it understood to settle Teva's liability for past sales, yet allow Teva to continue sales and other manufacturers to launch.

Cipla also does not allege that it relied on any statement from Amgen. To the contrary, Cipla alleges that *notwithstanding Amgen's public statement*, it was "prepared to begin selling its own generic version of Sensipar® in the United States immediately after January 16, 2019 and *would have done so but for the January 4, 2019, letter from Amgen with its threat of further litigation*." FAC ¶ 68 (emphasis added). Thus, it was not some belief that Teva had ceased its sales that prevented Cipla from launching—by its own admission, it was going to launch *anyway*—but rather the fear of litigation, and uncertainty over the operation of *its own* contract with Amgen, that kept it from doing so. Cipla's fraud claim thus fails to state a claim.[5]

## V.  CONCLUSION

The Court should dismiss the FAC's second through fifth causes of action. Because Cipla previously had the opportunity to amend its complaint and chose not to do so (*see* D.I. 231), the dismissal should be with prejudice.

---

[5]  Insofar as Cipla is alleging fraud as a basis for its California UCL claim, it must be dismissed for failure to plead actual reliance on the alleged misrepresentations. *See In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1092 (S.D. Cal. 2010) ("[C]laims under the UCL's fraudulent practices prong" require a plaintiff to plead that it "actually relied on the alleged misrepresentation.").

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

OF COUNSEL:

M. Sean Royall
Ashley E. Johnson
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
(214) 571-2900

Eric J. Stock
Kate Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

October 15, 2019

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Defendant Amgen Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 15, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire                                              *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire                                          *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
Richard M. Koehl, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004
*Attorneys for Plaintiffs*

*/s/ Brian P. Egan*
_____
Brian P. Egan (#6227)