## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIPLA LTD. and CIPLA USA, INC.,

    Plaintiffs,

    v.

AMGEN INC. and TEVA
PHARMACEUTICALS USA, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 19-cv-44-LPS

REDACTED - PUBLC VERSION
Filed: May 12, 2020

AMGEN INC.,

    Counterclaim-Plaintiff,

    v.

CIPLA LTD. and CIPLA USA, INC.,

    Counterclaim-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

## DECLARATION OF CHRISTOS GEORGHIOU IN SUPPORT OF
## AMGEN INC.'S MOTION FOR A PRELIMINARY INJUNCTION

I, Christos Georghiou, declare as follows:

## I.     **INTRODUCTION**

1.     While I recently moved to a new position within Amgen (Executive Director of Global and U.S. Enbrel Marketing), I was the Executive Director of U.S. Nephrology Marketing at Amgen from September of 2013 through July of 2018.  Prior to assuming my Nephrology role, I held various positions within Amgen beginning in October of 2004.  I first had direct involvement with the marketing for SENSIPAR® cinacalcet hydrochloride tablets ("SENSIPAR®") in January of 2008.

2.     I obtained both a Bachelor of Science in Management and a Master of Business Administration with a focus in Marketing/Healthcare from the University of Tennessee.

3.     As part of my former role, I was responsible for all aspects of marketing for Amgen's Nephrology portfolio in the United States and based on my experience I am personally familiar with Amgen's sales and marketing of SENSIPAR®.

4.     I make this declaration in support of Amgen's Motion for a Preliminary Injunction.  Absent injunctive relief in this matter, I expect Amgen to suffer immediate irreparable harm upon the continued launch of a generic version of SENSIPAR® by Plaintiffs Cipla Ltd. and Cipla USA, Inc. (together, "Cipla").  Unless Cipla's generic launch is quickly halted, that harm will likely include a loss of up to about 40–70% market share, or more, in the first month, immediate and long-lived (if not permanent) price erosion, loss of formulary status, and lost profits in the hundreds of millions of dollars in the first two months alone.

5.     I have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

## II.    **AMGEN AND SENSIPAR®**

6.     Amgen is one of the world's leading independent biotechnology companies and

has long been committed to unlocking the potential of biology for patients suffering from serious illnesses by discovering, developing, manufacturing and delivering innovative human therapeutics. Amgen focuses on areas of high unmet medical need. The development of SENSIPAR® embodies this focus. SENSIPAR® is approved for two "orphan indications": (1) the treatment of hypercalcemia in patients with parathyroid carcinoma; and (2) hypercalcemia in adult patients with primary hyperparathyroidism for whom parathyroidectomy would be indicated on the basis of serum calcium levels, but who are unable to undergo parathyroidectomy. These are rare diseases that affect fewer than 200,000 people in the United States. SENSIPAR® is also approved for the treatment of secondary hyperparathyroidism in patients with Chronic Kidney Disease on dialysis.

7.     Before launching SENSIPAR®, Amgen engaged in years of research, development, and testing related to potential calcimimetic compounds and effective formulations. Even after development, Amgen remained committed to not only seeing the drug to market but providing ongoing and substantial support to the nephrology community. In addition to both manufacturing and marketing SENSIPAR®, Amgen also maintains active and ongoing relationships with the health care providers administering SENSIPAR®, and Amgen devotes substantial efforts to related education. As a result of Amgen's extensive commitment, SENSIPAR® has treated over 1 million patients in the United States and more than 3 million patients worldwide, and it has grown to be one of Amgen's key drug products.

8.     At present, SENSIPAR® is primarily administered to patients covered by Medicare, and Medicare (including Medicare Advantage) provides reimbursement for nearly ████ ████ of all SENSIPAR® sales by volume. The remaining patients are typically covered by third party payors (private insurers, public health programs, and healthcare maintenance

organizations).

### III.    **GENERIC PRODUCTS**

9.    At least 20 different generic drug manufacturers have filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking to market generic versions of SENSIPAR®, and several of these proposed generic versions have been either tentatively or finally approved by the FDA.

10.    Generic drug manufacturers prepare thoroughly for the launch of their generic products, ramping up production and taking pre-orders from drug wholesalers well in advance of the launch date. As a result, they are typically prepared to enter the market within days of final FDA approval.

11.    Indeed, final approval has now been granted by the FDA for seven (7) of the filed ANDAs, including the ANDA of Cipla and of Watson Laboratories, Inc., a division of Teva Pharmaceuticals ("Teva").

12.    On December 28, 2018, Teva launched its generic versions of SENSIPAR® without authorization or license from Amgen (an "at-risk launch"). I understand that almost immediately thereafter, on January 2, 2019, Amgen and Teva entered into a settlement agreement under which Teva agreed to immediately cease selling its generic products. I understand that Cipla informed Amgen on March 2, 2019 that it had begun its own at risk launch of its generic cinacalcet product, although my understanding is that Cipla has not yet engaged in a full-scale launch. I understand that Piramal Pharma may have commenced selling its generic cinacalcet product at risk as well, although I do not know the extent of Piramal's potential entry.

### IV.    **LOSS OF SALES AND MARKET SHARE**

#### a.    **Immediate Effect**

13.    Amgen currently projects that the price of generic cinacalcet could be 25% to

50% of the current branded SENSIPAR® Wholesaler Acquisition Cost, depending on the number of generic versions available.  Although Cipla and, potentially, Piramal, are the only entities currently selling generic alternatives in the market, other generic manufacturers may attempt their own at-risk launches if Cipla is not promptly enjoined.  Additionally, it is also common for the generic price to decrease further over time.  As a result of head-to-head competition from one or more of the generics, Amgen would have little choice but to compete on price if it wants to attempt to reduce its loss of market share.  In the case of the generic launch by Teva, Amgen has not yet been forced to lower its price because a settlement agreement ceasing generic sales was entered into almost immediately after Teva's at-risk launch.  In addition, Cipla has not yet begun a full-scale launch (and nor, to my understanding, has Piramal).  However, as is explained further below, Amgen does expect that Teva's and Cipla's at-risk launches will ultimately force Amgen to lower the price of SENSIPAR® or lose substantial market share in the future, due to the nature of the current and future Medicare reimbursement systems, particularly if Cipla's launch is not immediately halted.

14.  Amgen will unquestionably lose significant market share in the event of a sustained generic launch, whether or not it attempts to compete on price.  If Amgen wants to mitigate these market share losses and retain any significant market share, it will need to respond to sustained generic competition by dropping the price of SENSIPAR® dramatically.  Market research has shown that generic oral drugs typically capture approximately 40-70% or more of the market within the first month following launch, and the numbers are even greater at three months (80-90%) and six months (90-95%).  Based on this research and for the reasons described below, if a generic version of SENSIPAR® were to enter the market through a full-scale launch in the near future, and remain on the market for a significant period of time, Amgen

5

risks losing up to about 70% of market share within the first month, and 95% of market share within the first six months, if it does not reduce SENSIPAR® prices substantially, especially in the event that there are multiple generic launches.

15.      As prices decline and market share is lost, Amgen's costs per unit to maintain its current manufacturing, distribution and sales infrastructure for SENSIPAR® would increase. Both Amgen's revenue and profitability would be significantly harmed by sustained generic entry, and it would be difficult to predict precisely how deeply and how long that injury would be suffered under any particular set of circumstances.

16.      Of note here, the Medicare reimbursement policy that presently governs the administration of SENSIPAR® (the "Transitional Drug Add-on Payment Adjustment" policy or "TDAPA") could even further exacerbate and accelerate Amgen's loss of market share.  Under TDAPA, until at least January of 2020, the amount that dialysis centers and other healthcare providers are reimbursed by Medicare for the administration of SENSIPAR® is based on a four-quarter running average selling price for SENSIPAR® and any generic drugs sharing the same Healthcare Common Procedure Coding System ("HCPCS") code as SENSIPAR®.  At the time TDAPA ends, the Medicare reimbursement for SENSIPAR® will transition to a permanent, capitated system.

17.      As a result of TDAPA, dialysis centers and other healthcare providers will be both strongly incentivized to switch to the generic after a full-scale launch by Cipla and strongly disincentivized from administering SENSIPAR® because the reimbursement they receive for their acquisition cost of these products will be based on the combined retrospective running average selling price for these products.  For example, at least at the outset, a dialysis center that immediately switches to the generic product after launch will see substantially increased profits,

as the reimbursement rate will continue to reflect the past average price of branded SENSIPAR®, while it will incur only the substantially reduced cost to purchase the generic product. For the same reason, unless Amgen drops its price dramatically to compete with the generics, a dialysis center would at best break even if it continued administering branded SENSIPAR®, and would quickly incur increasing losses as the Medicare reimbursement trended downward over time as the growing volume of lower priced sales are averaged into the calculation of the reimbursement rate.

18. In addition to pricing differentials, there are also several other reasons that Amgen faces the risk that generic versions of SENSIPAR® might capture such a large portion of the market so quickly after a sustained generic launch. First, a number of states have "automatic substitution" laws that mandate the substitution of generic drugs for branded drugs, regardless of whether the physician specifically prescribes the branded drug. In those states, immediately upon launch of a generic version of SENSIPAR®, the generic product will be automatically substituted for SENSIPAR® by pharmacists when presented with a prescription for SENSIPAR®, to the extent that the generic product is available to the pharmacist.

19. Further, other states permit (but do not require) pharmacists to substitute generic drugs for branded drugs without consulting the physician, either because it is in the pharmacist's financial interest to do so, or because the patient requests it. Because pharmacists negotiate discounted prices for generic drugs, they are typically incentivized to substitute the generic drug for the brand name drug even if it is not mandated by state law.

20. Third party payors also actively drive demand for the generic drug. These third-party payors, often acting through a pharmacy benefit manager (PBM), create "formularies," or lists of covered medicines that may be prescribed by physicians, typically ranked by tier. By

assigning generic drugs more favorable placement on formularies (and often, removing brand name products from the formularies entirely once a generic drug is available), PBMs encourage the substitution of generic drugs for branded drugs.  At present, SENSIPAR® is ranked as "Tier 1" by most third-party payors, and therefore enjoys preferred coverage.  While Teva's entry caused a few commercial plans to move SENSIPAR® to Tier 3, it still remains on Tier 1 for most plans.  After a sustained generic launch, Amgen expects that SENSIPAR® would fall to at least Tier 3 status on most formularies, which would result in larger patient copays and increasing step therapy requirements that would direct patients and prescribing physicians to try less expensive treatment options prior to branded SENSIPAR®, further reducing Amgen's market share and profitability.

            **b.**     **<u>Ongoing Detriment</u>**

21.     In the event of a sustained generic launch, the market changes to insurance coverage, reimbursement and formulary status as well as the price erosion caused by generic entry are deeply engrained and can be almost impossible to undo even if the generic products themselves are removed from the market.  Indeed, even after a launched generic product is removed from the market, I expect that a number of factors will result in Amgen's continuing to experience losses.  Those losses will be significant, but they are especially difficult to quantify here.

22.     As one example, a sustained generic at-risk launch of a drug administered under the TDAPA reimbursement policy, to my knowledge, has never occurred before.  Even after a generic exit, the TDAPA reimbursement policy would leave Amgen in an unprecedented and unpredictable position—wherein the Medicare reimbursement rate for SENSIPAR® would remain well below the pre-generic launch level as a result of the four-quarter average selling price, which will continue to reflect prior cut-rate generic sales.  With the reimbursement level

depressed, dialysis centers will be unwilling, and likely unable, to pay for SENSIPAR® at the pre-launch cost, as doing so would require them to take a loss each time the drug is administered. Furthermore, Amgen is not aware of any mechanism within the TDAPA framework that would allow an adjustment in the reimbursement rate to address such an issue. Patients and doctors could face difficulties accessing the product, and Amgen would unquestionably lose substantial goodwill within the nephrology community under any resolution that did not involve steeply discounting SENSIPAR®. In effect, Amgen could not attempt to rehabilitate price without injuring its relationship with its customers.

23. Amgen even expects the limited generic at-risk launches by Teva and Cipla (thus far) to cause the Medicare reimbursement rate for the administration of SENSIPAR® to fall within the next year due to the structure of TDAPA and the fact that Teva and Cipla almost certainly have sold their generic products at a price below Amgen's selling price for SENSIPAR®. Due to uncertainties about the price and volume of generic products sold by Teva and Cipla, the precise magnitude of this effect will not be known to Amgen until the Medicare reimbursement rate actually changes in the future. However, regardless of the magnitude of the change, Amgen will likely be forced to reduce the price of SENSIPAR® to match any reduction in the reimbursement rate if it wishes to attempt to mitigate the substantial market share losses likely to occur with generic entry. Furthermore, Amgen also expects that Teva's and Cipla's generic at-risk launches could affect the price of SENSIPAR® even after the end of TDAPA; in the post-TDAPA environment, the capitated reimbursement rate may ultimately reflect the reduced, post-generic launch average selling price, rather than Amgen's own selling price for SENSIPAR®.

24. Additionally, after a sustained generic launch, even if those generic products were

later recalled from the market, SENSIPAR® is unlikely to regain its preferred Tier 1 status on most formularies, unless Amgen were to provide substantial discounts to PBMs.  If SENSIPAR® were to remain at Tier 2 or 3, it would continue to suffer from the related market-share-suppressing effects discussed previously, and patients' ability to continue with or resume SENSIPAR® may be impeded.  For example, patients who were already taking SENSIPAR® might be required to disrupt their treatment and try alternative (less expensive) treatments without the proven efficacy of SENSIPAR®.

25.     Lastly, even during a relatively short period of generic availability, Amgen expects that generic manufacturers would continue to be motivated to flood the market with enough lower priced generic products to supply the markets for months or even years (and presumably such products will have a five-year expiration date, like SENSIPAR®).

26.     Between the expected price erosion, market share loss, and effect from changes to product reimbursement and coverage by public and private insurers as a result of a sustained generic entry, the potential damage to Amgen if generics like those offered by Cipla are not prohibited from launching at risk is difficult to quantify, but Amgen would undoubtedly be at risk of suffering a substantial and continuing injury to its business.

27.     The fact that Piramal also may have recently commenced an at-risk launch does not eliminate the great risk to Amgen's business posed by the threatened sustained market entry by Cipla.  To begin with, if Amgen obtains an injunction against Piramal, Piramal's product would remain on the market only for a very short time.  In that scenario, the threat of a sustained launch by Cipla would not be materially affected by a fleeting launch by Piramal.  Moreover, even if Piramal does enter the market to some degree for some period of time, a sustained launch by Cipla will still likely have the effect of significantly—probably dramatically—enhancing the

irreparable harm suffered by Amgen as a result of the market entry of these generics.

## V.        EFFECT ON AMGEN OPERATIONS

28.     Amgen's loss of market share and revenue related to a sustained generic launch would, in turn, also have a significant negative impact on Amgen's Research and Development ("R&D") efforts and internal operations.  Amgen reinvests approximately 16-22% of its revenue into R&D, and the projected loss of the SENSIPAR® component of this revenue would cause a significant reduction in Amgen's ability to self-fund R&D.

29.     Additionally, Amgen anticipates that the significant reduction in sales associated with a generic launch would force Amgen to make reductions across its SENSIPAR® related operations, including to its manufacturing, regulatory, and clinical, as well as sales and marketing efforts.

30.     For example, with particular regard to Amgen's nephrology sales and marketing team, Amgen projects that it would have to reduce a substantial portion of its over 150-person team following a sustained generic launch.

31.     These staff reductions would also have an unpredictable and unquantifiable effect on the reputation and goodwill that Amgen has established in the nephrology community. Physician loyalty is also central to the success of SENSIPAR®, and Amgen devotes substantial efforts to educating physicians about the unique benefits of SENSIPAR®, and toward developing, promoting, and retaining their loyalty.  Amgen would expect to significantly curtail, if not entirely eliminate, these efforts relating to SENSIPAR® after a sustained generic entry.  As discussed above, Amgen is a trusted resource in the nephrology community.  An at-risk generic launch, resulting in staff reductions and a decrease in physician support and education relating to SENSIPAR®, would cause unquantifiable damage to Amgen's reputation in this field.

32.     Staff layoffs and loss of income would also negatively impact Amgen's ability to

11

retain and recruit top talent in the future, especially to support its SENSIPAR® business, even if generics were later withdrawn from the market.  That would result in damage to Amgen that cannot be calculated.  After a sustained generic launch, Amgen would likely lose a significant number of sales staff for SENSIPAR®, who would also be nearly impossible to regain, even if the generic products were later withdrawn.  Amgen would, importantly, lose the extensive experience held by these current staff members and the relationships that they hold within the nephrology community, suffering further unquantifiable harm.

33.     Finally, Amgen's loss of market share and reduced profitability could damage Amgen's reputation and significantly impact Amgen's stock price.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 11, 2019.

Christos Georghiou

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 11, 2019, upon the following in the manner indicated:

Sue L. Robinson, Esquire                                          *VIA ELECTRONIC MAIL*
Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiffs*

James W. Dabney, Esquire                                          *VIA ELECTRONIC MAIL*
Patrice P. Jean, Esquire
Dina Hoffer, Esquire
Deanne K. Cevasco, Esquire
David E. Lansky, Esquire
Lynn M. Russo, Esquire
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004
*Attorneys for Plaintiffs*


                                        */s/ Brian P. Egan*
                                        _____
                                        Brian P. Egan (#6227)